IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

MATTHEW SOLON,                    )
                                  )
          Plaintiff,              )
                                  )  CAFN:1:19-CV-02467-JPB
     vs.                          )
                                  )
JOSHUA A. HALE, MICHAEL           )
O'BRIEN & MICHAEL HORTON,         )
individually,                     )
                                  )
          Defendants.             )

_____

DEPOSITION OF JOSHUA ALAN HALE

_____

January 27, 2020

10:20 a.m.

At the offices of

Gray, Rust, St. Amand, Moffett & Brieske

1700 Salesforce Tower

950 East Paces Ferry Road, N.E.

Atlanta, Georgia  30326


Debra J. Puckett, CCR B1188

Deb Puckett & Associates

636 Old Ivy Road

Atlanta, Georgia  30342

678-428-3562

debpuckett@bellsouth.net

[2]

                        DISCLOSURE
STATE OF GEORGIA        Deposition of
                        JOSHUA ALAN HALE
COUNTY OF FULTON


     Pursuant to Article 8.B of the Rules and
Regulations of the Board of Court Reporting of the
Judicial Council of Georgia, I make the following
disclosure.


     I am a Georgia Certified Court Reporter.  I am
here as an independent contractor for Deb Puckett &
Associates.


     Deb Puckett & Associates was contacted by the
offices of Gray, Rust, St. Amand, Moffett & Brieske,
LLP to provide court reporting services for this
deposition.  Deb Puckett & Associates will not be
taking this deposition under any contract that is
prohibited by O.C.G.A. 15-14-37(a) and (b).
     Deb Puckett & Associates has no
contract/agreement to provide reporting services
with any party to the case, any counsel in the case,
or any reporter or reporting agency from whom a
referral might have been made to cover this
deposition.  Deb Puckett & Associates will charge
its usual and customary rates to all parties in the
case, and a financial discount will not be given to
any party to this litigation.


Debra J. Puckett, CCR# B1188  January 27, 2020

[3]

APPEARANCES OF COUNSEL:


On behalf of the Plaintiff:

    WILLIAM J. ATKINS
    Edmond, Lindsay & Atkins, LLP
    344 Woodward Avenue, SE
    Atlanta, Georgia 30312
    batkins@edmondfirm.com


    ZACK GREENAMYRE
    Mitchell & Shapiro, LLP
    3490 Piedmont Road, Suite 650
    Atlanta, Georgia 30305
    zack@mitchellshapiro.com

On behalf of the Defendants:

    HARVEY S. GRAY
    Gray, Rust, St. Amand, Moffett & Brieske
    1700 Salesforce Tower
    950 East Paces Ferry Road, N.E.
    6tlanta, Georgia 30326
    hgray@grsmb.com


Also present:  Matthew Solon

[4]

I   N   D   E   X

|                                   | Page |
|-----------------------------------|------|
| Examination by Mr. Atkins.................. | 6    |

| Plaintiff's Exhibit |                                    | Page |
|---------------------|------------------------------------|------|
| 1                   | Documents from personnel file      | 7    |
| 2                   | Officer Certifications             | 17   |
| 3                   | SOP, Department Vehicles           | 19   |
| 4                   | SOP, Audio/Video Recording Equipment | 23 |
| 5                   | Officer Daily Report               | 30   |
| 6                   | Incident Report                    | 37   |
| 7                   | Dispatch report                    | 38   |
| 8                   | Investigative report               | 65   |
| 9                   | Criminal Warrant                   | 123  |
| 10                  | General Bill of Indictment         | 127  |
| 11                  | Dismissal                          | 131  |
| 12                  | Amended Dismissal                  | 133  |
| 13                  | I.A. report                        | 135  |

[5]

-- -- --

1

2      MR. ATKINS:  All right.  This will be the

3    deposition of Joshua Hale taken in the matter

4    of Matthew Solon versus Joshua Hale, et al.

5    pending in the Northern District of Georgia

6    before the Honorable Judge Boulee.

7        It's taken pursuant to Notice and by

8    agreement for all purposes allowed under the

9    Federal Rules.  We will reserve objections

10    except for form of question and any issue that

11    comes up as to privilege let me know and we'll

12    see what we can figure out.

13      MR. GRAY:  Joshua, you have the right when

14    the deposition is transcribed to read it over

15    and see if there's any mistakes in taking down

16    your testimony.  You can't change your

17    testimony but you can say something is spelled

18    wrong or you didn't say it that way.  Some

19    witnesses waive it, some don't.  It's purely up

20    to you.

21        What will happen is if you want to reserve

22    it, Deb will send me the transcript.  We'll

23    send it to you.  You'll have one page which you

24    can say on page seven, line six this is what it

25    says, it should say this.

[6]

1          Do you have a preference right now?

2          THE WITNESS:  I don't have a preference.

3          MR. GRAY:  Well, just remind us before we

4      leave.

5                   JOSHUA ALAN HALE,

6  having been duly sworn, was examined and deposed as

7  follows:

8                   CROSS-EXAMINATION

9  BY MR. ATKINS:

10     Q    Would you please state your full name for

11  the record, sir.

12     A    Joshua Alan Hale.

13     Q    Mr. Hale, where are you currently

14  employed?

15     A    The City of Kennesaw Police Department.

16     Q    I'm sorry.  I said mister.  Are you a

17  patrol officer?

18     A    Officer, yes.

19     Q    Do you mind if I call you mister?

20     A    That's fine.  You can call me whatever.

21     Q    All right.  As I understand it you worked

22  for Kennesaw minus a brief stint that we'll talk

23  about in a minute since what, 2010?  Is that right?

24     A    I was actually hired July 6, 2009.

25     Q    2009.  Okay.

[7]

1          Before we get to that, tell me what you

2    did to prepare for your deposition?  I don't want to

3    know anything you talked about with your attorney,

4    all right?  I just want to know what you reviewed,

5    what you did.

6        A    Nothing other than coming here and

7    speaking with my attorney.

8        Q    Did you look at any videos?

9        A    This morning with my attorney.

10       Q    Did you listen to 911 calls?

11       A    No.

12       Q    All right.  I assume you've seen your

13   incident report and took a look at that?

14       A    Yes, sir.

15            MR. ATKINS:  All right.  Let's go ahead

16       and mark this real quick and go through some of

17       this stuff real quick.

18                      (Documents were marked for

19                      identification as Plaintiff's

20                      Exhibit No. 1.)

21   BY MR. ATKINS:

22       Q    Officer Hale, these are just some

23   documents that were removed from your personnel

24   file.  I want to ask you a few quick questions about

25   them.

[8]

1          First of all it appears that you were POST

2     certified in December of 2009, right?

3          A     Yes.

4          Q     And you've remained -- you've kept your

5     certification until today?

6          A     Yes.

7          Q     You haven't ever had it suspended or

8     revoked?

9          A     No, sir.

10         Q     Prior to coming to work at Kennesaw it

11    appears that you  didn't have any prior law

12    enforcement experience, correct?

13         A     I did not.

14         Q     There are no dates for your graduation.

15    When did you graduate from high school?

16         A     2005.

17         Q     And when did you get your diesel

18    certificate?

19         A     I did a dual enrollment program to 2005.

20         Q     Okay.  What was the plan with the diesel

21    enrollment?  Was your plan to go into auto mechanic

22    work or?

23         A     Actually it was just I needed an elective

24    and I've always enjoyed working on things so I

25    decided to take that and to get the certificate.

[9]

1      Q    Fair enough.

2      A    And eventually use it.

3      Q    No military experience?

4      A    No, sir.

5      Q    I notice that you're a life long member of

6   the National Rifle Association, correct?

7      A    I was.  I believe it has expired.  I know

8   I was doing the payment plan and it has expired now.

9      Q    Okay.  Believe it or not, I tried a case

10   in Fairfax, Virginia last January and the first

11   juror in our panel was the administrative director

12   of the National Rifle Association.

13      A    Wow.

14      Q    When you were working at the, I think it

15   was the last job you had before you joined law

16   enforcement, was it the firearms?

17      A    Gun range, yes, sir.

18      Q    It lists a salesperson but I thought

19   somewhere I saw that you were also trained on, you

20   know, pistol --

21      A    I'm a -- that was a pistol -- I was an NRA

22   First Steps Pistol Instructor.

23      Q    What does that mean?

24      A    It means I went through a class with the

25   NRA to be able to instruct the proper safe handling

[10]

1   of pistols to people who had never handled firearms

2   before.

3        Q    Okay.  How to load it, how to unload it,

4   how to clean it?  Those kinds of things?

5        A    Yeah, and basically and then we would have

6   them shoot, you know, as many rounds as they wanted.

7   Usually five of ten just to feel comfortable with it

8   was all they shot at the time.

9        Q    And just because they live in the Atlanta

10  area and might some day show up on the jury, I want

11  to ask you about some of these references.

12       A    Okay.

13       Q    Billy Sullivan, at the time I guess you

14  had only know him for a year.  Is that a relative or

15  close friend?

16       A    He actually worked with me at the gun

17  range and is the reason that I started instructing

18  the NRA.  He got me into that.  We taught together.

19       Q    Got it.  And then there's two folks on

20  here, Joseph Parker and Kevin Floyd from the

21  Georgia Hospital Association.

22       A    Right.

23       Q    Let's start with Mr. Parker.  What is your

24  relationship with him?

25       A    So he was the CEO of the Georgia Hospital

[11]

1    Association and he was my mom's boss and I've

2    known -- my mom has worked there for 30 years.

3         Q    Okay.

4         A    I've known him.

5         Q    And that explains how you know Mr. Floyd

6    as well, right?

7         A    Yeah.

8         Q    Chris Noggle.

9         A    So he was a youth pastor at the church I

10   attended.  He wasn't my youth pastor but he was just

11   a youth pastor there.

12        Q    Okay.  Which, if you don't mind me asking.

13   Do you attend church now?

14        A    I don't currently, no.

15        Q    Did you go up in the Kennesaw area?

16        A    Yeah, I grew up in Marietta but I went to

17   Kennesaw Mountain High School.

18        Q    And finally I guess Sharon Markham.

19        A    That would be -- she, let's see.  My first

20   babysitter that ever had when I was kid.  That's her

21   daughter.

22        Q    Okay.

23        A    And she had a son that was like a year

24   older than me, so we're family friends.

25        Q    Okay.  Fair enough.  I thought I'd seen

[12]

1    it, Certified Pistol Instructor somewhere.

2          All right.  If you look at the Bates stamp

3    at the bottom right-hand corner, Page 50.

4          A    Yeah.

5          Q    And I apologize, it's just what lawyers

6    do, you know, cherry picking.  You had a lot of very

7    nice things, accommodations that you had in your

8    file so I'm not picking on you.  I wanted to ask you

9    just a quick question about this.  This appears to

10   be a written counseling form you got on February 3rd

11   2016.

12         A    Okay.

13         Q    And it deals with -- I'm not so much

14   concerned with the counseling but what it deals

15   with.  It says you failed to activate your body

16   camera in accordance with policy 2-15-01.

17         Sort of explain that to me.  What is the

18   policy as you understood it?

19         A    So during this time, I believe this is

20   when we were first getting body cameras and we were

21   still getting use to them.  I don't remember this

22   incident to be honest with you.  But reading it I

23   would assume that taking a search warrant takes a

24   lot of time.

25         Q    Sure.

[13]

1     A     And I know we were having problems with

2  the batteries in our body cameras.  I -- I don't

3  know for sure to be honest with you but I believe

4  what it was while waiting on a search warrant to

5  come back I had cut off my body camera.  And then

6  didn't reactivate because I was worried about the

7  battery being, the battery life, but....

8     Q     I've actually always been curious about

9  that.  What -- terms of the body cameras that folks

10 were using during this incident in June of 2017, I

11 guess.  What is the body -- what is the battery life

12 on those things?

13    A     So we had a lot of problems with them

14 where they would not hold a charge or take a charge

15 because we only had eight for the department.

16    Q     Okay.

17    A     Between all of the officers and we

18 routinely had three or four of them down, at a

19 minimum three or four would be down.  And they would

20 not last the whole shift because we were rotating

21 them through.

22    Q     Okay.  Let's talk about the department

23 itself really quickly.  The shift that you were on

24 during this incident, do you all run two shifts?  A

25 day shift and a night shift?

[14]

1     A     Yes, we do.  We have 12-hour shifts.

2     Q     Okay.  So you would have been on the night

3  shift; is that right?

4     A     Yes, sir.

5     Q     I should have said that.  You've never

6  been deposed before, right?

7     A     No.

8     Q     Okay.  Sorry.  One of the things we've got

9  to do is make sure we get a written record.

10     A     Okay.

11     Q     So if nod your head --

12     A     -- it doesn't get --

13     Q     -- yes or no, and I'm going to ask you and

14  I'm not being rude, just to make sure we get it on

15  the record.

16     A     Okay.

17     Q     All right.  The other thing I should have

18  told you at the beginning is if you need to take a

19  break at any time, just, you know, let us know --

20     A     -- okay --

21     Q     -- and we'll do that.

22     A     Okay.

23     Q     I'll try to take one once an hour, anyway.

24     A     Okay.

25     Q     All right.  So you were on the evening

[15]

1   shift, and does Kennesaw have -- do y'all have two

2   groups, I guess, of officers?

3        A    We do.  So there's technically four

4   shifts, two day shifts and two night shifts and they

5   rotate.

6        Q    Okay.  But I guess I was asking a

7   different question.

8        A    Okay.

9        Q    On a given shift how many officers are on

10  duty assuming that you're at full capacity?

11       A    Now there would be seven officers.  At the

12  time I believe we only had five if we were at full

13  capacity.

14       Q    Okay.  And are there zones in Kennesaw?

15       A    We have two zones, yes.

16       Q    Two zones.

17       A    A and B zones.

18            MR. GRAY:  Make sure you let him finish.

19            THE WITNESS:  Okay.  I'm sorry.

20            MR. GRAY:  Because she's got to take it

21       all down.

22  BY MR. ATKINS:

23       Q    And that group of officers, are you split

24  between one that patrols Zone A and one that patrols

25  Zone B?

[16]

1      A      Yes, sir.

2      Q      And you told me and I've already

3  forgotten.  At the time of this incident how many

4  officers, assuming you were at full capacity, would

5  have been on duty?

6      A      I believe it would have been five.

7      Q      Okay.  All right.  And I had mentioned

8  that small blip.  You left Kennesaw briefly in

9  20- -- what is it, August 2016; is that right?

10     A      August, yes.

11     Q      What was the other position that you were

12 exploring?

13     A      I went to work for Colonial Pipeline as a

14 pipeline controller.

15     Q      Okay.  And why did you decide to leave

16 that?

17     A      It was sitting in a room about as big as

18 this conference room for 12 hours a day and I could

19 not do that.

20     Q      I don't blame you.

21            So it looks like you came to the

22 department in, was it December; is that right?

23     A      December, yes, sir.  It was about a

24 three-month break.

25     Q      And you've remained employed there ever

[17]

1   since, right?

2        A    Yes, sir.

3                      (Documents were marked for

4                      identification as Plaintiff's

5                      Exhibit No. 2.)

6   BY MR. ATKINS:

7        Q    All right.  I just got this so give me

8   just a minute.  Well, let me ask the question this

9   way.  Just as part of your standard training in

10  Kennesaw in 2016 and 2017, did you all do active

11  shooter training?

12       A    I know we've been through it.  I don't

13  know if we did it in that time frame.

14       Q    Let me ask you this.  Tell me what

15  training you all typically did in the department as

16  it related to use of deadly force.

17       A    We do use of force every year at the

18  range.  It's required to have -- the POST

19  requirement is one hour of deadly force and we do

20  four hours minimum every year.  Usually more than

21  that.  Every time we go to the range for any weapon

22  system, we cover use of force.

23       Q    And just to be clear.  One of the things

24  you have to do at POST is just qualify with your

25  weapon, right?

[18]

1      A     You have to qualify and cover use of

2    deadly force.

3      Q     Right.  And so as to the qualification

4    part, that's just accuracy and --

5      A     Yes, sir.

6      Q     -- and whatnot.  And then the second

7    component of that use of force training --

8      A     Yes, sir.

9      Q     -- POST requires one hour, you all do

10   four.

11     A     Yes, sir.

12     Q     Does that include simulator training?

13     A     We do -- we have implemented that.  We did

14   not at the time.  Nobody -- to my knowledge we

15   didn't have access to a simulator at the time.

16     Q     Okay.  There's a class that I see in 2019,

17   obviously long since that which is Judgmental

18   Simulator Training.  That's not something you all

19   had at the time?

20     A     No, sir, that -- we used Acworth's and I

21   don't believe they had bought the system at the

22   time.

23     Q     Okay.  In terms of training you received

24   that was specific to investigating crimes on the

25   scene when you arrive, other than your general POST

[19]

1   training, could you tell me what are the classes

2   that you took?

3       A    I believe criminal procedure would be one

4   of them that I had taken.  And I believe I've had

5   interviewing and interrogations.

6       Q    Okay.

7       A    That would be as far as pertaining to any

8   direct, outside of regular training, I believe that

9   would be the only thing.

10      Q    All right.  I have a few policies I want

11  to run through with you real quick.

12                      (Documents were marked for

13                      identification as Plaintiff's

14                      Exhibit No. 3.)

15  BY MR. ATKINS:

16      Q    These are some policies that were produced

17  during the course of discovery.  This is Exhibit No.

18  3 which is the policy that relates to department

19  vehicles.  I just have a couple of quick questions

20  for you.

21              If you will go to down at the bottom, 465?

22      A    Yes, sir.

23      Q    There's a list of things that the patrol

24  vehicles are required to have for purpose of

25  handling emergency and public safety and what not.

[20]

1   Seat belts on down to tire jacks, right?

2        A    Yes, sir.

3        Q    Are those things that each vehicle is

4   supposed to have?

5        A    Yes, they are supposed to have those

6   things.

7        Q    Let's talk about the video equipment that

8   was available in your vehicle at the time of this

9   incident.  Tell me how it worked.

10       A    As far as?

11       Q    So obviously I've seen the video.

12       A    Yes.

13       Q    So sometimes the car audios, like the car

14   systems have a mic?

15       A    Yes, sir.

16       Q    So when you get out of the vehicle you can

17   still hear?

18       A    Yes, sir.

19       Q    Did you all have that?

20       A    We did have that, yes, sir.

21       Q    Okay.  And does it only work within a

22   certain range of the car or how does that work?

23       A    I'm not familiar with the capability of

24   how far it goes from the car.

25       Q    When does it, when does it activate?

[21]

1      A     So it activates either when you manually
2  start it or if you -- depending on the set up of the
3  car, either the lights or the siren are activated.
4      Q     Can you turn it off?
5      A     The video?
6      Q     Yes.
7      A     You have to manually press the stop
8  button, yeah.
9      Q     Can you turn off the audio?
10     A     Like the mic pack?
11     Q     Yes.
12     A     Yes, sir.
13     Q     So the reason I'm asking these questions
14 is we've got the video from your car.
15     A     Yes, sir.
16     Q     And I'm sure you've seen it at one time or
17 another but we can hear you and we can hear what
18 happens after you turn the lights on and you're
19 dispatched and heading to the scene.
20     A     Uh-huh.
21     Q     And when you first pull up.  But my
22 recollection is when you get out of the car at that
23 point we can't hear you anymore.
24     A     Okay.
25     Q     Is that -- I'm just trying to understand

[22]

1   was the mic pack not working or --

2         A     It might -- I'm not sure if it was working

3   or not.  Sometimes they would not link.  You had to

4   set it.  They were finicky about linking.  Sometimes

5   with the mic pack you had to set it in.  There is an

6   internal microphone inside the car.

7         Q     Right.

8         A     That would pick up, you know, the audio in

9   the car.  But I don't -- I don't know exactly what

10  happened that night as to whether or not it wasn't

11  linked or anything like that.

12        Q     Do you remember checking to see if it was

13  working?

14        A     At the beginning of my shift?

15        Q     Yes.

16        A     I don't remember if I did that that day.

17  I do it every day when I come to work but I can't

18  say for sure that I remember that day.

19        Q     If you check it and it's not working is

20  that something that you have to, you know, you have

21  to note?

22        A     You notify your supervisor and they will

23  send a help ticket to our I.T. department.

24        Q     Do you have any recollection at all as to

25  whether there were any issues with your mic pack

[23]

1    that day or that night?

2        A    I don't, I don't know for sure.

3        Q    When you watched the video after the fact,

4    were you surprised that there was no audio from your

5    --

6        A    I was.

7        Q    Did anyone check into it and do a

8    maintenance request on your mic pack?

9        A    I'm not sure.  After that I believe that

10   car was given to somebody else.  By the time I had

11   seen the video and there was no audio.

12       Q    All right.  So certainly it's your

13   testimony then that you didn't turn off your mic

14   pack that day?

15       A    Yes, sir.

16            MR. GRAY:  That's a double negative

17       question.  Yes, you did not turn off your mic;

18       is that what you're saying?

19            THE WITNESS:  Yes, I did not turn off my

20       mic that day.

21            MR. GRAY:  You did not turn off your mic.

22            THE WITNESS:  I did not turn off my mic.

23            MR. ATKINS:  Got it.

24                       (Documents were marked for

25                        identification as Plaintiff's

[24]

1            Exhibit No. 4.)

2   BY MR. ATKINS:

3        Q    Officer Hale, I'm showing you what's been

4   marked as Plaintiff's Exhibit No. 4 which is the

5   audio video recording equipment policy for Kennesaw.

6   The policy generally is that officers shall activate

7   the audio video devices when such use is appropriate

8   in the proper performance of his or her official

9   duties when the recordings are consistent with this

10  policy and law.  I don't know who wrote that.

11       A    I don't know either.

12       Q    So let's put that in English.  Basically

13  the idea is that if you have the equipment available

14  to you and it's functioning correctly, you should

15  have it on throughout your encounters at a scene; is

16  that correct?

17       A    Yes, sir.

18       Q    And we looked at that one counseling

19  earlier where yours wasn't on for whatever reason

20  and they gave you a written counseling, right?

21       A    Yes, sir.

22       Q    I know you didn't have a body CAM that day

23  but I want to ask you a few questions just about how

24  those body CAMs worked.

25       A    Okay.

[25]

1      Q     -- at the time.  Unlike the systems within

2  the car?

3      A     Yes, sir.

4      Q     Those have to be activated -- the body

5  CAMs have to be activated manually, right?

6      A     Yes, sir.

7      Q     And there's a button on them and that

8  allows you -- and they turn on and sometime they

9  have a delay, actually in a case I have with Harvey,

10  before they actually start to record --

11      A     -- yes, sir --

12      Q     -- what's being said.  And I guess you

13  have the option to turn it off during, on a scene if

14  you need to, right?

15      A     Yeah, I mean you have that option, yes,

16  sir.

17      Q     Okay.  If an officer either doesn't

18  activate the video equipment, doesn't record the

19  entire contact or interrupts the recording, the

20  officer is supposed provide a written documentation

21  as to why that happened, right?

22      A     I believe that's our policy, yes, sir.

23      Q     Look at that second page.  I'm sorry.  I'm

24  not trying to trick you.

25      A     Yes.

[26]

1       Q     Right at the top.

2       A     Yes, sir.

3       Q     And if there's an issue with the equipment

4    itself, and I'm looking now under installation,

5    maintenance and repairs, one, two, three the third

6    paragraph down.

7       A     Okay.

8       Q     And I think you hinted to this.  If there

9    any problems that are encountered, you're supposed

10   to report that to your supervisor and he or she will

11   prepare an IT help ticket that gets forwarded to the

12   IT department, right?

13      A     Yes, sir.

14      Q     And if there's any loss, damage or theft

15   of the things, a written report is supposed to be

16   filed related to the incident, right?

17      A     Yes, sir.

18      Q     And then I was curious about this

19   authority and use of all your recording devices.

20      A     Where are you at now?

21      Q     Sorry.  Midway down on the page.

22      A     Okay.

23      Q     There's, if you look kind of the second --

24   the third sentence begins with a therefore.  Do you

25   see that there?

[27]

1      A     Yes, sir.

2      Q     It says therefore it's necessary to

3   consider every method available to document contacts

4   with citizens, when no other way exists to video

5   record the traffic stop, interviews, et cetera,

6   recording devices (micro-cassette recorder, digital

7   mini-recorders, et cetera) may be utilized to

8   document all traffic stops, interviews, et cetera.

9      A     Okay.

10     Q     What kind of a phone did you have with you

11  on the night of this incident?

12     A     That was a couple of phones ago.  Probably

13  a Samsung.

14     Q     Okay.  Is that department issued or is it

15  your personal?

16     A     It's my personal.

17     Q     Were you, was the Samsung able to do audio

18  recordings?

19     A     I'm sure, yes, sir.

20     Q     Was it capable of doing video recordings?

21     A     Yeah, I have a camera.

22     Q     All right.  Have you ever watched, Officer

23  Hale's body CAM from this case?

24     A     I'm Officer Hale.

25     Q     I apologize.

[28]

1      A     Okay.

2      Q     Thank you.  Officer O'Brien's body CAM?

3      A     I believe I've seen pieces of it but I've

4  never watched the entire thing, no.

5      Q     Do you have -- have you ever spoken to him

6  about the recording from that night?

7      A     The only thing I've ever spoken to him

8  about was with, when the attorney came down to visit

9  with us.

10     Q     Okay.  Has Officer O'Brien ever indicated

11 to you that he was having any problems with the

12 proper functioning of his body CAM that night?

13     A     I know that he has said that he had

14 battery, he was trying to conserve battery life on

15 his body camera.  He did that during most shifts.

16     Q     That was his -- okay.  Did he say that

17 specifically to you about this shift?

18     A     Not about this shift.  I know that he,

19 that was his reasoning on all shifts he's made that

20 statement.

21     Q     Okay.  And so one of the examples you gave

22 us was in the, you know, with the written counseling

23 you're at the scene but you've got to wait for a

24 search warrant.  Somebody's gone off to the

25 Magistrate to get a search warrant.  And in that

[29]

1    setting because nothing's going while you're waiting

2    you had turned yours off?

3         A    Yes, sir.

4         Q    But once you executed the search warrant,

5    you were supposed to turn it back on?

6         A    Yes, sir.

7         Q    So if we sort of take that in this context

8    in preserving a battery, certainly if Officer

9    O'Brien is simply hanging out at the scene and not

10   talking to any witness, doing any interviews, maybe

11   you turn off the body CAM, right?

12        A    Possibly.

13        Q    But if you're conducting an interview with

14   a witness, the body CAM is supposed to be on,

15   right?

16        A    Yes, sir.

17        Q    And you knew that you didn't have a body

18   CAM, right?

19        A    Yes, sir.

20        Q    The sergeant who was on the scene was

21   Sergeant Horton?

22        A    Yes, sir.

23        Q    Sergeant Horton didn't have a body CAM,

24   did he?

25        A    I'm not sure.

[30]

1      Q    Okay.  When -- and we're going to go into

2  this in a lot of detail if you notice, but do you

3  recall when you actually spoke to Matt Solon and

4  sort of interviewed him about the incident?

5      A    Yes, sir.

6      Q    Do you remember that?

7      A    Yes, sir.

8      Q    Other than you, were there any other

9  officers around when you conducted that interview?

10     A    I know that he was in Officer O'Brien's

11 car and got him out.  I don't remember if Officer

12 O'Brien stayed there while I interviewed him or not.

13     Q    Okay.  All right.

14                    (Documents were marked for

15                    identification as Plaintiff's

16                    Exhibit No. 5.)

17 BY MR. ATKINS:

18     Q    Officer Hale, I'm showing you what's been

19 marked as Plaintiff's No. 5 which is a series of

20 Officer Daily Log Reports.

21     A    Yes, sir.

22     Q    These are reports that you prepare on each

23 shift, correct?

24     A    Yes, sir.

25     Q    And they summarize, for lack of a better

[31]

1   word, your activity for that night, correct?

2        A    Yes, sir.

3        Q    They also include the second page.  The

4   first two pages are yours for the night of --

5        A    Okay.

6        Q    -- June 26 of 2017.

7        A    Okay.

8        Q    The second page, I guess, is the vehicle

9   maintenance and inventory on the right-hand side.

10  This is something you go through at the beginning of

11  each shift, right?

12       A    No, actually we -- we do go through it but

13  it's -- yeah, I guess at the beginning of each shift

14  you would go through it and check it.  And then you

15  check it at the end like for the damage would be.

16       Q    Okay.  Let me ask a better question.

17       A    Yes.

18       Q    What is it?

19       A    Okay.  So this is our maintenance and

20  inventory to where we like, we check our lights and

21  our tires and -- we don't, the hubcaps, which are

22  just center pieces.  And then the brakes and

23  transmission.

24            The equipment we have, I don't remember if

25  we had them at the time but the equipment, there's

[32]

1    an actual vehicle inspection sheet that the, the

2    supervisor does.  And they typically do that so we

3    don't answer the equipment portion of this.

4         Q    Okay.  So the supervisor at the beginning

5    of each shift does the equipment?

6         A    It's every -- it's supposed to be every

7    week.

8         Q    Okay.

9         A    Is when they do it.

10        Q    Once a week?

11        A    Yes, sir.

12        Q    All right.  What is DB camera?

13        A    I don't know why that's still on there.

14   They used to have a Polaroid camera that they would

15   give, and we do not issue those anymore.  This is --

16   the report, the template was actually created in

17   probably 2006 and it has never changed since.

18        Q    And things have changed since 2006.

19        A    Yes.  Just like we don't get maps anymore.

20        Q    If you have to take a picture on the

21   scene, collect evidence, what do you use?

22        A    We usually use the sergeant's phone

23   because the sergeant is issued a phone.  We were

24   always warned against using any of our personal

25   stuff because then it becomes the subject of a case.

[33]

1    So we always -- so that night we would use Sergeant

2    Horton's phone.

3        Q    Right.  So the sergeant on each shift has

4    a department-issued telephone that he is to take

5    pictures with?

6        A    Right.

7        Q    If you look at Officer O'Brien's, like you

8    said about the equipment, because yours is the only

9    of these that didn't have any, anything about our

10   showing the equipment.  What you're telling me is

11   that's not something you did.

12       A    It's not something I did, no.

13       Q    So it may just be for that week your car

14   hadn't been, they hadn't done the weekly inspection

15   for your car?

16       A    Could have been, yes, sir.

17       Q    But in any event the DV camera, it sounds

18   like that would have been irrelevant by 2017 anyway?

19       A    Yes sir.  That's odd that they've got it.

20       Q    They have it checked as yes, right?

21   That's an odd thing?

22       A    Yeah.

23       Q    It may just be a product of auto select.

24            All right.  Let's go back to yours real

25   quick.

[34]

1      A      Okay.

2      Q      What is a signal 69?

3      A      It is a person armed.

4      Q      And the received column is when you

5  received the dispatch call?

6      A      Yes, sir.  That's when dispatch actually

7  assigned it to me.

8      Q      107 is when you arrived on the scene?

9      A      Yes, sir.

10      Q      And then 108 is when you were back in

11  service?

12      A      After I completed all my paperwork and

13  everything.

14      Q      All right.  The case number that was see

15  over on the far right, that's assigned by dispatch;

16  is that right?

17      A      Yes.

18      Q      When you're in your car on patrol driving

19  around, you -- if you get dispatched to a call, the

20  911 operator contacts you and let's you know where

21  you're supposed to go, right?

22      A      Uh-huh.

23      Q      Is that yes?

24      A      Yes, sir.  I'm sorry.

25      Q      That's all right.  And they give you some

[35]

1  basic information about the scene like, for example,

2  it's a Signal 69.

3       A    Yes, sir.

4       Q    Can you actually hear the 911 call itself?

5       A    No.

6       Q    Is there any way they communicate other

7  than by what they tell you over the radio what's

8  going on in the call?

9       A    They, they type call notes, and I could

10 open the call and look at those call notes but I'm

11 trying to drive to the scene.  So typically they're

12 just, it's whatever they say over the radio and they

13 summarize it based on what they feel like is a

14 priority for me to hear, know.

15      Q    So you just told me something I didn't

16 know.  So can you actually, if you want to, can

17 you see the CAD report as it's being created?

18      A    I can see what dispatch is typing in

19 their notes as it's being created if I wanted

20 to take my eyes off the road.  Or if I had the

21 time.  If it's a call that's not a priority I

22 could, yeah.

23      Q    Sure.  Or when you stop and get to the

24 scene and things are calm you can check it if you

25 want to?

[36]

1      A    I could, yes.

2      Q    All right.  Do you communicate with --

3    Kennesaw has its own 911 center?

4      A    Yes, sir.

5      Q    So you have your own dispatchers, right?

6      A    Yes, sir.

7      Q    Can you hear Cobb radio traffic?

8      A    If I, if I select the scan I can.

9      Q    But you have your own, you have your

10   channel which is where you stay, I presume.

11     A    Yes, sir.

12     Q    Okay.  You probably know now, may not have

13   known it at the time, that when Matt Solon first

14   placed back -- let me back up.  Strike that.

15          Were you aware that Matt Solon was the

16   person who had placed the 911 call?  As you arrived

17   on the scene were you aware of that?

18     A    I think they told me somebody named Matt

19   but that's all.

20     Q    Okay.  Were you aware that when he placed

21   the call or when the person named Matt had placed

22   the call, it was first linked to Cobb County

23   dispatch?

24     A    No, but that doesn't surprise me.

25     Q    It's sort of sitting right there on the,

[37]

1    on the border line?

2        A    That would be right -- yeah, they're right

3    on the edge so sometimes on a cell phone call, which

4    I presume ot was a cell phone, it would go through

5    Cobb County.

6                          (Documents were marked for

7                          identification as Plaintiff's

8                          Exhibit No. 6.)

9    BY MR. ATKINS:

10       Q    So Officer Hale, I'm showing you what's

11   been marked as Plaintiff's Exhibit No. 6, and I'll

12   represent to you that this is a, it's a detailed

13   report.  I'm going to refer to it as CAD report.

14       A    Okay.

15       Q    That's how I think of them.  It's probably

16   old-fashioned.  Anyway.  From Cobb County?

17       A    Okay.

18       Q    First of all, have you ever seen this

19   before?

20       A    I have not.

21       Q    All I want to know is whether you're aware

22   of any of the information that was contained on

23   here.  And you told me that you would not have been

24   the, you would not have been receiving information

25   from Cobb, right?

[38]

1        A     Correct.

2        Q     So we're going to look at -- we're going

3     to look at -- go ahead, sorry.

4        A     Let me clarify it.  So the information --

5     I wouldn't be receiving it directly from Cobb.  They

6     would be relaying it to my dispatcher who would be

7     telling me.

8        Q     Right.  And we're going to look at that

9     that in just a minute.

10       A     Okay.

11       Q     If you look at 423 down on the right-hand

12    corner.

13       A     Yes, sir.

14       Q     There's a Mazzy Plott complainant and

15    advised male pulled a gun on him, complainant

16    kicked male and now male is bleeding.  Complainant

17    took male's gun.

18             Do you remember as you get dispatched and

19    are driving to the scene, being made aware of this

20    information?

21       A     I don't remember being made aware of it,

22    no.

23       Q     Okay.  The call was transferred over to

24    Kennesaw and y'all were dispatched.

25                        (Documents were marked for

[39]

1                    identification as Plaintiff's
2                    Exhibit No. 7.)
3     BY MR. ATKINS:
4         Q    So the first page of the Kennesaw report,
5     the entries that we see for radio log.  This is kind
6     of a summary, right?
7         A    That would be the radio log as when they
8     did something like dispatched me and when I was on
9     scene.  And then these would be the driver's
10    licenses that were run.  These are, it's basically,
11    yes, a summary of the events that I'm telling the
12    dispatch.  Like things that dispatch did for me like
13    running licenses.
14        Q    One of these I was a little surprised by
15    and it may just be kind of how different departments
16    work different ways.  But do you all have a system
17    where when you're on the scene they do a welfare
18    check every ten minutes or so?
19        A    Yeah, they're supposed to check on us
20    every four minutes.  I believe that's what their
21    policy is.  They have their own set of policy and
22    guidelines.  I know they check on us.
23        Q    And when they do, do you respond?  Is
24    there a code you give them back?
25        A    We tell them Code 4.

[40]

1      Q    Unit 1144, is that you?

2      A    That would my radio number, yes.

3      Q    Okay.  Thank you.  So are those radio

4  numbers?

5      A    That would be my radio number, yes, sir.

6      Q    So regardless what car you were driving on

7  that day, your radio number would remain the same?

8      A    Yes.  Yeah.

9      Q    Okay.  When -- how do you get assigned --

10  well, how did you get assigned in this case as the

11  primary officer?

12      A    It was my turn in the rotation so whoever

13  is in that zone, they just rotate calls, and it was

14  my turn in the rotation.

15      Q    Okay.  And when you were the, sort of the

16  person who was assigned to the call, what does that

17  mean practically in terms of how, how the call is

18  handled?

19      A    That means that I'm going to be the one

20  that is going to end up, you know, writing the

21  report and doing the investigation.  And being the

22  primary officer, if an action needs to be taken, it

23  will be my, my case to handle.

24      Q    Okay.  As we know in this case you arrived

25  on the scene.  Officer O'Brien arrived on the scene

[41]

1   roughly at the same time.  Eventually, I think

2   there's two Cobb County officers who get there

3   relatively soon after you all arrived.  And then

4   ultimately Sergeant Horton comes.

5           How, how is it that multiple vehicles get

6   dispatched?

7       A   So everybody's listening to the radio and

8   you, if a call goes out in your zone and your B

9   partner is assigned to it, you are their back-up.

10  And then the Cobb County officers since it goes

11  through Cobb County first, they would notify them

12  seeing as how it's a person armed and they would

13  just come to assist if need be.

14      Q   A person armed, is that a code that sort

15  of triggers a higher level of attention than, you

16  know, maybe a, you know, something that perhaps less

17  serious?

18      A   Yes, sir.

19      Q   And that's very inartfully phrased by me.

20  What does that mean when you get a, something like a

21  Signal 69, how does that change the way you all

22  react?

23      A   That would be, for us when it's dispatched

24  as a person armed, we are going into it thinking

25  that somebody is armed and there's possibly violence

[42]

1   with that weapon being conducted at the scene.

2        Q    Is that a, does that sort of raise your

3   concern not only for the other people on the scene

4   but also for your yourselves as you arrive?

5        A    Yes, sir.

6        Q    Does it mean that when you arrive you

7   would typically have your weapon un-holstered?

8        A    Not every time.  It would depend on the

9   scene and once you survey it as you get there.

10       Q    Okay.  It looks like you arrived on scene,

11  you got the call around 2:04?

12       A    Uh-huh.

13       Q    And then you arrived on scene at 2:06?

14       A    Yes, sir.

15       Q    What does Call 51 mean?

16       A    That means that was the 51st call for that

17  day.

18       Q    Oh, okay.

19       A    So it restarts every, I believe it's every

20  morning.  I don't know.  It restarts every day but

21  that's the 51st call that they put in for that day.

22  And actually, that's not 51.  I'm sorry.  So it

23  would be fifth call for the day.  If you look down

24  here at the bottom it's 5E.  That's an L a -- so

25  that's call 5L.

[43]

1      Q     5L?

2      A     Yes.

3      Q     Got it.  But it still refers to the call

4    that --

5      A     It's just the call of the day.

6      Q     Okay.  What does the letter refer to?

7      A     Whether it is, I believe the E is for

8    emergency medical.  I believe the Es are medical

9    calls and the Ls are law enforcement calls.

10     Q     All right.  And then again, it looks like

11   just is kind of just a summary of the activity.  So

12   if we, at roughly the same time that you arrive on

13   the scene, it looks like dispatch has dispatched an

14   ambulance to the scene.  Metro One, right?

15     A     That's what it looks like, yes, sir.

16     Q     One of the first things you did on the

17   scene at 2:07 was run a driver's license, right?

18     A     Yes, sir.

19     Q     And then the between 2:12 and 2:16 it

20   looks like you ran four, four more licenses, right?

21     A     Yes, sir.

22     Q     We'll look at the individual ones in a

23   minute, but you recall that you were basically

24   checking driver's licenses for the various people

25   that you encountered on the scene, correct?

[44]

1    A    Yes, sir.

2    Q    At 3:02 if we go across we have unit and

3  it says available B.  What does that mean?  Or

4  available, excuse me.

5    A    Available, I don't know why they put is as

6  available.  If you look to the description it says

7  35.

8    Q    Yeah.

9    A    That means I was at headquarters, and I

10 wouldn't have been available because I would have

11 been doing my paperwork.

12   Q    So at the end of the call, obviously we

13 know that Mr. Cooper goes to the hospital.

14 Mr. Solon goes to jail.  You went back to

15 headquarters and is that when you would have

16 prepared your written report?

17   A    My warrant and my report, yes, sir.

18   Q    There are a number of other entries under

19 hear.  One actually has your name on it, the JL at

20 438.  It says 6 MBC.  What is MBC?

21   A    That is my mobile computer.

22   Q    Okay.

23   A    I don't know, I don't know what that is

24 for.  There's buttons I must have hit 'cause it says

25 input.  I don't know why it would say input and MBC

[45]

1    other than fact that, maybe I -- I must have

2    manually entered something into the call comments.

3    I don't know, but I don't know why it would -- input

4    it is not something that we normally do on our MBC.

5    We can run driver's licenses and things like but I

6    don't know what we would be inputting.

7        Q    Okay.  Under that next heading also input

8    B, it says call being entered and it says CLR colon

9    five.  Does that stand for clear?

10       A    I believe so.  Clear stat five which would

11   be our incident report.  It looks like the call was

12   inadvertently closed out and then reopened before or

13   no, I'm sorry.  'Cause that's at 4:38.  So it looks

14   like that's just them clearing out the call after I

15   went in service.

16       Q    Okay.  Let's go to the next page.

17       A    Okay.

18       Q    And I'm just trying to visualize how this

19   is, this is going down --

20       A    -- yes --

21       Q    -- in real time and I think we have a

22   little of audio your inside your car.

23       A    Okay.

24       Q    So we can confirm it with that.  But it

25   looks like 2:04 you're dispatched to the scene.

[46]

1   S. Logan is the 911 operator, dispatcher?

2        A     Yeah, that would have been our 911

3   dispatcher.

4        Q     And it says S 29.  Subject pulled a gun

5   then someone is busted in the face?

6        A     Uh-huh (affirmative).

7        Q     Is that a yes?

8        A     Yes, sir.  Sorry.

9        Q     What is S 29?

10       A     Signal 29 is a fight.

11       Q     Oh, right.  And then above that it's like

12  Signal 19 with Signal 69.  Which basically means

13  it's a fight and there's a gun?

14       A     Yes, sir.

15       Q     Do you remember as you were driving to the

16  scene learning that there had been a subject who had

17  pulled a gun, then someone is busted in the face?

18       A     That's what they would have given me that

19  information over the radio, yes.

20       Q     And then it says Matt has the gun?

21       A     Yes.

22       Q     Also information they would have provided

23  to you over the radio?

24       A     Yes.

25       Q     But you didn't know who Matt was?

[47]

1        A     Exactly.

2        Q     And they didn't tell you who Matt was.

3        A     Yes.

4        Q     And then I think just a few minutes before

5   you arrive in the scene -- well, maybe not.  At 2634

6   it appears to be about 30 seconds after you arrived

7   on the scene, there's this Matt subject has taken

8   the ammo out of the gun.

9        A     Yes, sir.

10       Q     Is that something that -- if the 911

11  operator is putting that in the CAD report, is that

12  because she's still on the call?

13       A     So if I'm already on scene and she's

14  typing that in there, it's probably something she's

15  still getting from Cobb County that has been relayed

16  or it's something along that line.  I'm not sure

17  where.  But it's definitely the dispatcher inputting

18  it.  She could still be on the call.  I'm not sure.

19       Q     All right.  So at 2:07 it looks like the

20  first thing that happens is you're running a

21  driver's license history for Antoine Bernard Lyra?

22       A     Yes, sir.

23       Q     That was one of the two, I think they were

24  both African-American, the two African-Americans who

25  were on the scene that you first spoke to; is that

[48]

1    right?  If you remember?

2        A    I don't remember what his name was.

3        Q    Do you remember that there were two

4    African-American men on the scene that you talked

5    to?

6        A    Yes, sir.

7        Q    Then at 2:11 it appears that you ran one

8    on Sean Michael Loudermilk.

9             Do you remember who he was?

10       A    I remember he was with Mr. Solon and his

11   group, yes.

12       Q    And then at 2:13 you ran one on Melissa

13   Victoria Veitengruber?

14            Do you know, remember who she was as you

15   sit here?

16       A    She was in the group as well.

17       Q    Mr. Solon's group?

18       A    Yes.

19       Q    Now, at 2:16 you ran a driver's license

20   history on Dwight David Cooper, correct?

21       A    Yes, sir.

22       Q    That was the person whose head was

23   bleeding.

24       A    Yes, sir.

25       Q    Did you run -- do you have the ability not

[49]

1  just to run a driver's license but to do a, run a

2  criminal background check, too, right?

3       A    I got dispatch do it and give it to me.

4  They have it printed out and give it to me,

5  typically.

6       Q    Okay.  Can they give it to you over the

7  phone if a person has any outstanding warrants?

8       A    They will tell me -- so that's a different

9  return for the warrants would be just attached to

10 his driver's license.  I would get a warrant return.

11 A criminal history is a completely separate entity

12 that I have to have, I had to request dispatch to

13 do.

14      Q    But when you requested a driver's license,

15 if there's an outstanding warrant it picks that up

16 as well?

17      A    Yes, it is suppose to.

18      Q    All right.  And then if you want to do a

19 criminal history, that's completely different

20 request?

21      A    Yes, sir.

22      Q    Is does not appear at the time, anyway,

23 you asked them to run a criminal history on

24 Mr. Cooper.

25      A    No, I typically don't do them on the

[50]

1   scene.  I do them afterwards.

2       Q    And then finally at 2:16 it looks like

3   there's one done on Sydney Kirsten Fields.

4       A    Okay.

5       Q    She was also in the group, Mr. Solon's

6   group?

7       A    Okay.

8       Q    Do you remember that?

9       A    I do remember, yes.  There's two females

10  in Mr. Solon's group.

11      Q    And then finally at 2:19 it looked like,

12  looks like you ran one on Osorio Lopez.

13           Do you remember who that was?

14      A    I do not.

15      Q    Then less than a hour layer, about 15

16  minutes plus or minus, it looks like you ran Matt

17  Solon's driver's license history, right?

18      A    Yes.

19      Q    At 3:11?

20      A    Yes.

21      Q    As the lead officer on the scene, were you

22  the person who was responsible for running all these

23  driver's license histories?

24      A    Not always.  Just any officer they'll put

25  it in my call comment.

[51]

1      Q     Okay.

2      A     If anybody runs it.

3      Q     I was surprised when I saw this, that you

4  were the only officer on here.  You were obviously

5  not the only officer on the scene.

6      A     Uh-huh.

7      Q     If Officer O'Brien, for example, had

8  called in to do a license check, would that appear

9  on the same CAD report?

10     A     It depends on the dispatcher and how they

11 input it.  Some of them might use my radio number

12 'cause they have to have a radio number to run it.

13 Some of them seeing that it's my call might only use

14 my radio number.  Some might put it under each

15 person's radio number as they do it.  It depends on

16 the dispatcher.

17     Q     Okay.  So the dispatcher essentially has

18 discretion if Officer O'Brien calls in to just put

19 it in under your radio number instead of his?

20     A     They could use mine because it's my call.

21     Q     Got it.  Well, then let me ask it, let me

22 ask you this.

23           Do you have a specific recollection as

24 being the officer who ran these various license

25 requests?

[52]

1     A     I don't remember specifically running all

2  of them, no.

3     Q     All right.  Let's talk about the incident

4  itself.  Officer, in your own words, if you can just

5  tell me what you remember as you sit here today

6  about what you saw, observed and did once you

7  arrived on the scene.

8     A     Once I arrived on the scene I observed a

9  handgun laying on the ground in front of my patrol

10  car.  I observed a male with an object in his hand

11  which later was determined to be his cell phone.  At

12  that time I drew my weapon and I told him to put his

13  hands on the car because I wasn't sure who he was at

14  the time.

15          Once I determined it to be his cell phone

16  and that the gun was away from everybody at that

17  time, Officer O'Brien stayed with Mr. Solon, and I

18  went and looked at Mr. Cooper who was being tended

19  to by his girlfriend and some other people.

20          And then began my investigation,

21  interviewing people.  I got some witness statements,

22  and then went and interviewed Mr. Solon about the

23  incident.  Watched the video and then made my

24  determination.

25     Q     Okay.  And so let's sort of start at the

[53]

1   end.

2        A     Yes, sir.

3        Q     If I understand what you just told me, you

4   watched the video after you had interviewed Matt?

5        A     Yes, I believe so.

6        Q     Was that the last thing you did as part of

7   your investigation?

8        A     I believe so, yes.

9        Q     Before you watched the video, if you can

10  recall, what was your understanding of what had

11  transpired?

12       A     Mr. Cooper had approached the group, four

13  people, and asked for a cigarette.  They told him

14  no, and he got upset with that.  They were telling

15  him to leave, get away from them and at that point

16  he had backed up and had brandished a firearm.  And

17  then Mr. Solon kind of tackled him.  They fought and

18  then the gun came loose at some point in time during

19  that and was on the ground.

20           Mr. Cooper was then on the ground, what

21  appeared in the video to be a couple of people

22  around him.  And then Mr. Solon goes and picks up an

23  object, comes back and then strikes him in the head

24  is what appears in the video.  And then Mr. Cooper

25  then gets up and kind of runs away and falls down a

[54]

1    short time later.  And then that was it.

2        Q    Let me, let me pick on you a little bit

3    and this is difficult, all right?  It's very

4    difficult to bifurcate these things so I'm not

5    trying to be a jerk, but as best you can what I want

6    to know is what did you know before you watched that

7    video?  What was your understanding of what had

8    transpired before you watched the video?

9        A    Mr. Cooper had pulled a gun on that group

10   and then he was tackled.  And then at that point in

11   time -- so before I watched the video does that

12   count me interviewing Mr. Solon?

13       Q    Sure.

14       A    Okay.

15       Q    Yes.

16       A    So I watched the -- so, let me back up and

17   start over now that I know that.  So he pulled a gun

18   on group.  He was tackled.  There was a fight that

19   ensued.  The subject dropped the gun during the

20   fight.  He was on the ground and then the two

21   friends were next to him or around him to make sure

22   he wouldn't leave.  And then Mr. Solon said he went

23   and picked up the gun and then came back and struck

24   him in the head to make sure he stayed down.

25       Q    Okay.  So you have a clear distinct

[55]

1  recollection that Matt Solon essentially told you

2  that after the person, after Mr. Cooper had been

3  disarmed, was subdued on the ground, that he went

4  back over and struck him on the head with the

5  weapon?

6      A    Yes, sir.

7      Q    Do you remember Mr. Solon ever saying to

8  you that what he did was go over and put his foot on

9  him and say you're not going anywhere, I'm calling

10 the police?

11     A    I don't remember him saying that to me,

12 no, sir.

13     Q    And in terms of this statement that you

14 attribute to Mr. Solon, when you took that statement

15 from him he had been -- he had been up to that point

16 in the back of Officer O'Brien's patrol car,

17 correct?

18     A    Yes, sir.

19     Q    And he had been handcuffed and detained

20 there?

21     A    Yes, sir.

22     Q    You took him out of the car and took his

23 handcuffs off, right?

24     A    Yes, sir, and gave him all his property

25 back.

[56]

1     Q     And you asked, and you thanked him for

2  being patient.  Is that a yes?  If you remember.

3     A     I don't remember to be honest with you,

4  no.

5     Q     And he wasn't very happy at that point,

6  was he?

7     A     No, sir.

8     Q     And he expressed a number of things to

9  you, not the least of which was, you know, what have

10  y'all done that sort of add to this, right?

11     A     Yes, sir.

12     Q     And it was after he made those statements

13  to -- well, strike that.

14           Do you remember that Officer O'Brien was

15  present when he was making those statements when he

16  was criticizing y'all for how you handled things?

17     A     I don't remember where Officer O'Brien

18  was standing, no, sir.

19     Q     Okay.  Do you remember Officer O'Brien

20  handing him a business card?

21     A     I don't.

22     Q     In any event, it was after he had made

23  those statements that you conducted your interview

24  with him, correct?

25     A     Yes, sir.

[57]

1        Q    Did you make any effort to record the

2    interview with Mr. Solon on your personal cell

3    phone?

4        A    No, sir.

5        Q    Did you ask Officer O'Brien to stay nearby

6    so that the interview would be picked up on his body

7    CAM?

8        A    I don't believe so.

9        Q    Did you open the door to Officer O'Brien's

10   vehicle so that the interview would be picked up on

11   the microphones from inside the car?

12       A    No, sir.

13       Q    Did anyone else to your knowledge --  let

14   me strike that.

15            Do you recall any of the other officers on

16   the scene standing near, right around you when

17   Mr. Solon allegedly made the statement?

18       A    I don't remember.

19       Q    So even before you watched the video it

20   seems to me, Officer Hale, if Matt Solon made that

21   statement to you that, that would be an

22   incriminatory statement, right?  Against him

23   essentially, his admission of sorts.

24       A    Yeah, of sorts, yes, sir.

25       Q    We're going to talk a little bit about

[58]

1   your sort of understanding of the, you know, sort of

2   the applicable laws that surrounded this incident as

3   you were trying to form your probable cause

4   determination.  But you were aware at the time,

5   obviously, that kind of one of the big questions

6   was, was Matt Solon acting in self-defense or, you

7   know, had he at one point, at some point become the

8   aggressor, correct?

9        A    Yes, sir.

10       Q    And as I understand your probable cause

11   determination, you determined eventually that after

12   Mr. Cooper had been disarmed and subdued and no

13   longer presented a threat, that Mr. Solon went over

14   and struck him on the head with the butt of a gun a

15   couple of times.

16       A    I don't know what part of the gun but with

17   the gun, yes sir.

18       Q    With the gun.  Fair enough.  And let's --

19   let me ask you this.  Again, we're going to separate

20   out the video, you haven't seen it yet?

21       A    Okay.

22       Q    Okay.  That's where we are in time.  And

23   you told me what Matt said to you.

24       A    Uh-huh.

25       Q    Up to that point in time had any other

[59]

1  witness on the scene told you that after Mr. Cooper

2  was on the ground an subdued and disarmed, Matt went

3  over, picked up the gun, walked back and struck him

4  in the head a couple of times?

5      A    Not to my knowledge.

6      Q    Do you recall going over to Brad

7  Loudermilk and asking him do you remember Matt Solon

8  picking up the gun, walking back over and striking

9  him in the head?

10     A    Is Brad --

11     Q    Did I say Brad?

12     A    Yeah.

13     Q    Because I know a Brad Loudermilk.

14     A    Okay.

15     Q    It's probably not his name.

16     A    Okay.

17     Q    Mr. Loudermilk.  He was one of the people

18 that was there with him.

19     A    Okay.

20     Q    Do you remember going over and speaking to

21 him specifically about that?

22     A    I don't recall, no.

23     Q    What about Melissa Veitengruber?

24     A    I don't remember.  I don't recall.

25     Q    And what about Sydney Fields?

[60]

1        A     Ms. Fields, which we spoke earlier.  Ms.

2     Fields was Mr. Cooper's girlfriend, I believe.

3        Q     You know, I led you right into that.

4     That's my mistake, not yours, and I apologize.  That

5     was his girlfriend, right?

6        A     That was Mr. Cooper's girlfriend, I

7     believe.  And she was hysterical, not able to be

8     interviewed.

9        Q     So you didn't gather any useful

10    information from her one way or the other?

11       A     No, sir.

12       Q     And what about Mr. Cooper?

13       A     Due to his urgent need for medical care

14    from the bleeding of his head and what appeared to,

15    looked like he was intoxicated, I wasn't able to get

16    anything out of him.

17       Q     All right.  Was he, did he appear to you

18    to be visibly intoxicated?

19       A     I don't know -- I would say that he did

20    have the appearance of being intoxicated but he also

21    had been struck in the head -- or had a head injury.

22       Q     Sure.

23       A     And had been struck in the head so I don't

24    know if that was the cause of it or not.

25       Q     Were you able to determine from looking at

[61]

1   Mr. Cooper where he was actually injured on his

2   head?

3        A    The main bleeding from what I remember I

4   believe was coming from the back of his head.  Or

5   like maybe on the top.

6        Q    Did you actually inspect the wound?

7        A    I looked at it and then there were other

8   people caring for him and they had, were applying

9   pressure so I felt it more necessary to keep

10  pressure on it.

11       Q    And again I'm not picking on you.

12       A    Yeah.

13       Q    I just want to make sure it's clear on the

14  record.  When you said you looked at it, you just

15  visually inspected it.  You didn't put your gloves

16  on and --

17       A    No, obviously not.

18       Q    Okay.  One of the first things we see you

19  do the way you described it is exactly right.  I

20  mean you got out of your car.  You had your gun

21  drawn.  You identified who Matt was, had him put his

22  hands on dash.  And then Officer O'Brien went over

23  to him.

24            One of the first things we see you do is

25  talk to two individuals who are sort of, the three

[62]

1    of you are kinding of standing, you're facing

2    Mr. Cooper and facing --

3         A    Uh-huh.

4         Q    -- you're kind of facing Mazzy's.  You're

5    kind of standing to left of the car where Matt had

6    his hands on it.

7         A    Okay.

8         Q    What do you remember about your

9    conversation with two those individuals?

10        A    I don't even recall having a conversation

11   with them on that night.

12        Q    Okay.  In your incident report you

13   indicate that the males were determined to not be

14   involved and stated they did not see anything.  They

15   were released once this was confirmed.

16        A    Yes.

17        Q    All right.  I want to make sure I

18   understand that.  When you say they were released

19   once this is confirmed, you mean once it was

20   confirmed that they hadn't seen anything?

21        A    From the best of my knowledge, I was

22   told -- I don't remember if I spoke to them or

23   another officer had spoken to them.  But it was

24   determined they hadn't seen anything and they

25   weren't relevant to the investigation or the crime

[63]

1  scene so I dismissed them.

2      Q    Then I may have put words in your mouth so

3  let me back up.

4          Do you remember standing and talking to

5  two individuals when you first got to the scene?

6      A    I don't remember specifically talking to

7  two individuals when I first got to the scene, no.

8      Q    Okay.  Do you remember whether you were

9  the person who conducted the interviews with the

10  other three people that Matt Solon was with?

11      A    I did conduct -- yeah, I do 'cause I their

12  written statements.

13      Q    And I wanted to make sure I understood

14  kind of how that went down.  Did you take a, you

15  know, talk to them and ask them questions orally and

16  then ask them to give you a written statement?

17      A    Yes, sir.

18      Q    So both those things occurred.

19      A    Yes, sir.

20      Q    Did you ask -- all right.  So Officer

21  O'Brien didn't conduct any of those interviews for

22  you, you did them yourself?

23      A    I believe so, yes, sir.

24      Q    When you conducted those interviews did

25  you -- we know you didn't have a body cam.

[64]

1          Was Officer O'Brien anywhere nearby?

2      A    I'm not aware.

3      Q    Did you make any effort to record any of

4  those interviews?

5      A    Not to my knowledge.

6      Q    There were some photographs that Sergeant

7  Horton took at the scene.  In making your probable

8  cause determination, did those photographs enter

9  into the equation one way or the other?

10     A    I'm not even sure what those

11  photographs -- I don't remember what he took

12  photographs of.  I'm sure it was the injury, but.

13     Q    I saw them for the first time last night.

14  There appear to be some blood on the pavement, and I

15  was just wondering whether that, that you even

16  looked at those or considered those when you were

17  trying to decide what happened?

18     A    No, I would have just looked at the blood

19  on the scene.  I wouldn't have looked at his

20  pictures of it.

21     Q    From looking at the blood on the scene,

22  was there anything about that that played a role in

23  your probable cause determination?

24     A    No.

25     Q    In your report you talk about your

[65]

1  interview with Mr. Loudermilk.  I haven't given this

2  to you yet.

3            THE WITNESS:  Would it be possible for me

4       to take a break?

5            MR. ATKINS:  Absolutely.

6                 (A short recess was taken.)

7                          (Documents were marked for

8                          identification as Plaintiff's

9                          Exhibit No. 8.)

10 BY MR. ATKINS:

11      Q    All right.  I want to start at the very

12 first paragraph here.

13      A    Okay.

14      Q    Because you're sort of summarizing what

15 dispatch had told you.

16      A    Uh-huh.

17      Q    One subject armed with a gun.  Dispatch is

18 only able to inform responding officers a Matt

19 subject had the gun.  No further description of the

20 armed subject was provided.

21      A    Yes, sir.

22      Q    In the next paragraph the person you're

23 describing the male subject you later learned was

24 Matt Solon, right?

25      A    Yes, sir.

[66]

1    Q    And you say he was yelling something about

2  disarming someone and yelling something about hollow

3  point bullets.

4    A    Yes, sir.

5    Q    All right.  Paragraph four deals with the

6  decision to detain Matt Solon, and my question and

7  what I want to talk to you about, Officer Hale is,

8  what did you observe that you felt had justified the

9  decision to detain him?

10    A    I didn't observe anything.  Officer

11  O'Brien made that decision independently.  I was, I

12  believe at that time I was on the other side of the

13  car looking at Cooper.

14    Q    Right.  So the information that's

15  contained in this paragraph, is that information you

16  would gave gotten from Officer O'Brien?

17    A    That would have been it, yes, sir.

18    Q    Okay.  So you didn't, you didn't see or

19  hear him continually disobeying orders to keep his

20  hands out of his pockets.

21    A    Not to my recollection.

22    Q    Did sergeant, or do you remember as you

23  sit here today Sergeant Horton telling you anything

24  about why Matt Solon was detained?

25    A    I don't remember Sergeant Horton telling

[67]

1   me anything about it, no.

2        Q    Can we agree that Matt Solon was the only

3   person on the scene who was detained, that is,

4   handcuffed --

5        A    In handcuffs, yeah.  He was the only one

6   detained in handcuffs, yes, sir.

7        Q    And you asked the other people to remain

8   on the scene, correct?

9        A    Yes, sir.

10       Q    And I supposed if they tried to leave, you

11  would have stopped them?

12       A    Yes, sir.

13       Q    All right.  And then so let's see, one,

14  two, three, four, five.  The sixth paragraph is

15  your, looks like your interview with Loudermilk.

16       A    Yes.

17       Q    And he describes Cooper coming up and

18  asking for the cigarette.  Loudermilk telling him

19  they don't smoke.  Then he said that Cooper became

20  derogatory towards the females in the group.

21       A    Yes, sir.

22       Q    Do you remember anything specific that he

23  told you?

24       A    No, sir.

25       Q    Do you remember him describing any

[68]

1    insulting or, you know, sexually demeaning

2    statements that he made?

3         A    No, sir, I don't remember.

4         Q    Did he tell you that he appeared, that

5    Loudermilk thought that Cooper appeared to be

6    visibly intoxicated?

7         A    I don't remember him saying that.

8         Q    All right.  They asked him to move and one

9    of the things, and at that point or shortly

10   thereafter Cooper pulled up his shirt and exposed

11   the fact that he had a handgun on him, right?

12        A    Yes, sir, from this statement.

13        Q    And then Loudermilk told you that Cooper

14   actually removed the gun from his waistband and

15   started to wave it around in the air and at some

16   point pointed it at the group.

17        A    Yes, sir.

18        Q    And that Matt Solon confronted Cooper and

19   took the gun away.

20        A    Yes.

21        Q    Did Loudermilk say anything to you at the

22   time that gave you reason to suspect that Mr. Solon

23   had done anything other than act in self-defense?

24        A    At that time, no, sir.

25        Q    So there was nothing about Loudermilk's

[69]

1    statements to you that gave you any reason to

2    investigate Matt Solon's criminal misconduct at that

3    point?

4          A    Yes, sir.  Or, no, sir.

5          Q    Sorry.  That was another double negative.

6          A    Yes.

7          Q    Okay.

8          A    Nothing that Loudermilk said led me to

9    investigate it at that time.

10         Q    Thank you.  That was a poorly phrased

11   question.

12              Then you spoke to Ms. Veitengruber and she

13   gave you a very, a very similar story essentially,

14   right?

15         A    Yes, sir.

16         Q    She indicated to you that he wouldn't take

17   no for an answer.

18         A    Yes, sir.

19         Q    Did you get the impression that Mr. Cooper

20   had been fairly belligerent with these people if you

21   know what I mean by that?

22         A    Yes, sir.

23         Q    I guess maybe a better word for it were

24   you starting to form the impression that Cooper had

25   been --

[70]

1      A     If I may, I would say that he was
2   confrontational with them.
3      Q     That's the right word.  Perfect.  Yeah, he
4   was being confrontational.  And she also saw him
5   reveal a gun.
6      A     Yes.
7      Q     And he pulled it from his waistband and
8   started waiving it in the air but the gun was never
9   really pointed at them, right?
10     A     Yes.
11     Q     And she told you that Solon ran at Cooper,
12  wrestled the gun away.
13     A     Yes.
14     Q     And that the subject started bleeding from
15  the head and the police were called.
16     A     Yes.
17     Q     Did Ms. Veitengruber say anything to you
18  during your interview with her that caused to
19  suspect that Matt Solon had done anything other than
20  act in self-defense?
21     A     No, sir.
22     Q     With your interview with Ms. Thompson,
23  your summary of it is somewhat more abbreviated.
24  Essentially she saw Cooper pull a gun and wave it in
25  the air.  And then she saw Solon wrestle with him.

[71]

1        A      Yes, she was less descriptive on it.

2        Q      Did any of those three individuals

3   Loudermilk, Ms. Veitengruber, Ms. Thompson appear to

4   be visibly intoxicated to you?

5        A      I don't recall.

6        Q      Was there anything about their appearance

7   or demeanor that caused you to doubt whether they

8   were telling you the truth?

9        A      I don't recall.

10        Q      You talk about attempting to speak to

11   Mr. Cooper and that he was intoxicated and speaking

12   incoherently, correct?

13        A      Yes, sir.

14        Q      Do you remember telling him at one point

15   the best thing you can do is just to stop talking?

16        A      I don't remember telling him that, no,

17   sir.

18        Q      By the time you completed your interviews

19   with Loudermilk, Ms. Veitengruber and Ms. Thompson,

20   you were aware that first of all, Mr. Cooper had

21   approached the group, they hadn't approached him,

22   correct?

23        A      Yes, sir.

24        Q      And that he had been confrontational with

25   them?

[72]

1     A    Yes, sir.

2     Q    That he was intoxicated?

3     A    Yes, sir.

4     Q    That he had said some derogatory things

5   directed at the women in the group?

6     A    Yes, sir.

7     Q    That they had denied, told him we don't

8   have a cigarette and they had asked him to leave

9   them alone?

10     A    Yes, sir.  I'm sorry.

11     Q    That's okay.  And that as they asked him

12   to leave them alone at some point he had pulled his

13   shirt up and revealed that he was armed with a

14   weapon?

15     A    Yes, sir.

16     Q    And then, you know, moments, seconds

17   later, he actually reached for the gun and pulled it

18   out of his waistband?

19     A    Yes, sir.

20     Q    You knew that the gun was at least out.

21     A    Yes, sir.

22     Q    I guess there was some question as to

23   whether it had been pointed at the group, correct?

24     A    Yes, sir.

25     Q    Can we agree that those facts even before

[73]

1    you watched the video, those facts from those three

2    independent witnesses, gave rise to probable cause

3    to arrest Mr. Cooper for a crime?

4         A    Yes, sir.

5         Q    I know you ultimately charged him with

6    simple assault, correct?

7         A    Yes, sir.

8         Q    I had asked a while ago about your

9    training in law enforcement and specifically as it

10   related to use of deadly force.

11        A    Yes, sir.

12        Q    I want to ask you a few questions about

13   that.  And first of all, Officer, would you agree

14   with me that as a police officer your right to use

15   deadly force is no greater or lesser ultimately than

16   that of an ordinary citizen who is confronted with a

17   potential deadly threat.  If you know.

18             MR. GRAY:  Let me object to the form.

19        Requires a legal conclusion.

20   BY MR. ATKINS:

21        Q    Do you understand the question?  You can

22   respond to a question if there's an objection to

23   form.

24             MR. GRAY:  The judge will rule on that

25        later.

[74]

1          THE WITNESS:   Okay.

2    BY MR. ATKINS:

3          Q     You can give me your best answer.

4          A     My best answer, okay.  My best answer is

5    no, we have two separate laws in the State of

6    Georgia.  There's one that covers the general public

7    and then there's use of force for police officers

8    covered under 17420 subsection B.

9          Q     Okay.  If you, if you approach the scene

10   on a Signal 69, for example, and you encounter a

11   subject you believe to be armed, one of the first

12   things you're going to do is make sure that you're

13   prepared to use force if you have to, correct?

14         A     Yes, sir.

15         Q     And you're going to ask the person to drop

16   their weapon, correct?

17         A     Yes, sir.

18         Q     If that person displays their weapon, you

19   know, lifts the shirt up the way this person,

20   Mr. Cooper did, and now you know they're armed, you

21   will put out your service revolver, correct?  Or

22   your gun.  Excuse me.

23         A     Yes.

24         Q     Your service weapon.

25         A     Yes, sir.

[75]

1      Q     And among other things you're going to

2   tell him do not touch that gun, right?

3      A     Yes, sir.

4      Q     And if he reaches for that gun, you're not

5   going to wait to see if pulls it out and shoots you,

6   you would be authorized the take action to protect

7   yourself, correct?

8           MR. GRAY:  Objection as to form.  You can

9       answer.

10          THE WITNESS:  Yes, yes, you could utilize

11      every force in that scenario.

12   BY MR. ATKINS:

13     Q     Right.  You don't have to wait for the

14   person to point the gun at you and shoot you, you

15   can take steps to protect yourself, correct?

16     A     Correct.

17     Q     And you're trained in law enforcement to

18   shoot to stop, correct?

19     A     You shoot to -- until the threat ceases,

20   yes.

21     Q     And you're taught to shoot center mass,

22   right?

23     A     Yes, sir.

24     Q     And the threat ceases when the person is

25   on the ground.

[76]

1      A    The threat ceases when there's no longer a

2  threat.   Just because they're on the ground they can

3  still fire a weapon.

4      Q    Fair enough.  Fair enough.  All right.

5          So now let's talk about just an ordinary

6  citizen, someone like Mr. Solon.  You would agree

7  that assuming the facts that Mr. Loudermilk, Ms.

8  Veitengruber and Ms. Thompson had told you were

9  true, in the moment where Mr. Cooper raised the

10  shirt and indicated that he had a weapon, that the

11  four of them, any one of them, could take steps to

12  protect themselves, correct?

13      A    They would have to be doing it to meet the

14  satisfaction of the law, to prevent a forcible

15  felony or defend themselves or another from serious

16  bodily harm.

17      Q    Certainly, it would not be unreasonable

18  for someone once a person knowing all the facts that

19  we know from them, right?  He's being belligerent

20  and he's drunk, he's upset because they're not doing

21  what he wants them to do and now he has displayed a

22  firearm, certainly it would be -- it would not be a

23  surprise to you if a person had a reasonable

24  apprehension that this person might harm them in

25  that point in time, right?

[77]

1      A     Correct.

2      Q     And once he pulls that gun out of his

3   waistband and now has it in his hand, tell me what

4   your understanding is of what Mr. Solon or these,

5   any of these four individuals, would have had the

6   right to do under those circumstances.

7           MR. GRAY:  Still object as to form.  You

8       can answer if you can.

9           MR. ATKINS:  Go ahead.

10          THE WITNESS:  It would still, I mean every

11      situation is different and they would, like I

12      said, have to meet the satisfaction of the law

13      of either defending themselves from a forcible

14      felony or to stop a forcible felony or defend

15      themselves or another from threat of receiving

16      serious bodily harm or death.

17  BY MR. ATKINS:

18      Q     Is it reasonable, is it reasonable under

19   those circumstances for any of those four people to

20   perceive that they were in danger of imminent bodily

21   harm?

22      A     They could have been, yes.

23      Q     Do you agree that at that point in time

24   Matt Solon had the right to act in self-defense to

25   disarm him?

[78]

1      A     Yes, sir.

2      Q     You might have a different answer if
3  Mr. Solon had a gun and shot him.

4      A     That would be a completely different set
5  of circumstances and investigation.

6      Q     Right.  So we can agree that at least up
7  to the point that Matt Solon rushes Mr. Cooper,
8  grabs him, wrestles with him, wrestles the gun away
9  from him and gets him to the ground, whatever
10  happened in that setting, those were all things that
11  he was authorized or that he could do, right?

12      A     At that time, yes.

13      Q     And does he have the same right that you
14  would have to make sure that Mr. Cooper was subdued
15  and couldn't hurt anybody in that framework?  I'm
16  not talking about after he's already on the ground
17  and he walked away.  I'm just talking in that
18  initial interaction.

19      A     I mean I guess he could perform a
20  citizen's arrest, yeah.

21      Q     Well, yeah, I was going to get to that.
22  Right.  So he is now -- now we get to the spot where
23  Mr. Cooper has been disarmed and Mr. Solon is
24  getting really to call 911.

25            He has the right under Georgia law to

[79]

1    perform, as you said, a citizen's arrest, correct?

2         A    Uh-huh.

3         Q    Is that a yes?

4         A    Yes, sir, I'm sorry.

5         Q    That's okay.  And in performing a

6    citizen's arrest he has a right to use reasonable

7    force to keep the person there until law enforcement

8    arrives, correct?

9              MR. GRAY:  Objection as to form.

10             THE WITNESS:  Reasonable force.

11   BY MR. ATKINS:

12        Q    Right.  And certainly if, if what Matt

13   Solon did in that context was as Cooper was trying

14   to get up and his girlfriend was trying to pull him

15   towards the car, if what Matt Solon did was go over

16   and sort of put his foot on him and say you're not

17   going anywhere, I'm calling the cops right now, that

18   wouldn't be unreasonable, would it?

19        A    Merely placing his foot on him and holding

20   him down?

21        Q    Yes.

22        A    No.

23        Q    And this by way of a hypothetical, Officer

24   Hale, if Mr. Cooper had gotten up and tried to get

25   way, what would Mr. Solon have been authorized to do

[80]

1   to keep him on the scene?

2           MR. GRAY:  Objection as to form.

3           THE WITNESS:  I mean that would be

4       something reasonable.

5   BY MR. ATKINS:

6       Q    He can't shoot him?

7       A    He can't shoot him, no.

8       Q    Okay.  Could he tackle and get him to stay

9   there?

10      A    If it was reasonable.

11      Q    Okay.  All right.  So just in terms of the

12  people you're collection evidence from, if I'm

13  reading your report correctly, the individuals that

14  you -- the two individual males that had stopped

15  next to Cooper, they weren't able to give you any

16  meaningful information, correct?

17      A    Correct.

18      Q    You interviewed Loudermilk, Veitengruber

19  and Thompson, and none of the information they gave

20  you led you to conclude at the time anyway, that

21  Mr. Solon had done anything other than act in

22  self-defense?

23      A    At the time, yes, sir.

24      Q    And I keep saying self-defense.  Just so

25  we're clear, he has the right to act both in

[81]

1    self-defense and defense of others, his friends who

2    were there, correct?

3         A    Yes, sir.

4         Q    And Mr. Cooper was drunk, speaking

5    incoherently, he didn't give you any information

6    one way or the other to help form your probable

7    cause determination?

8         A    No, sir.

9         Q    And the same thing could be said about his

10   girlfriend, she was hysterical and didn't give you

11   any information, correct?

12        A    Correct.

13        Q    And we're going to spend plenty of time on

14   the video, but so I promise.  After these initial

15   interviews with Loudermilk, Thompson and

16   Veitengruber, before you made the decision to arrest

17   Matt Solon, did you go back and interview them

18   again?

19        A    Not that I remember.  I believe that might

20   have been when I was giving them the written

21   statements possibly, but I'm not a hundred percent

22   sure.

23        Q    After you watched the video and before you

24   made the decision to arrest Matt Solon, did you go

25   interview them again at that point about what you

[82]

1    saw in the video?

2        A    Not to my recollection.

3        Q    When you got back to the station and

4    before you applied for the arrest warrant for Matt

5    Solon, did you contact any of them and conduct a

6    follow-up interview about the facts that you believe

7    gave rise to probable cause to arrest him?

8        A    No, sir.

9        Q    Before you took the arrest warrant, and I

10   understand that you had already made a warrantless

11   arrest, but before you took the arrest warrant, did

12   you speak to Mr. Cooper and get his side of the

13   story?

14       A    No, sir.

15       Q    Did you go find Ms. Fields and get her

16   side of the story?

17       A    No.

18       Q    So nothing that Mr. Cooper said or didn't

19   say had any role whatsoever in you forming your

20   probable cause determination as to Matt Solon?

21       A    Correct.

22       Q    And the same thing can be said for

23   Ms. Fields.  Nothing she said or did informed your

24   determination of probable cause?

25       A    Correct.

[83]

1      Q    All right.  So in terms of the evidence

2    that you had available to you when you made your

3    probable cause determination, you had the three

4    statements that we talked about:  Loudermilk,

5    Thompson and Veitengruber, right?

6      A    Uh-huh.  Yes, sir.

7      Q    You had Matt Solon's statement, correct?

8      A    Correct.

9      Q    And then you reviewed the videotape,

10   right?

11     A    Correct.

12     Q    I asked you about the photograph.  Was

13   there anything else that impacted your probable

14   cause determination?

15     A    No.

16     Q    Before you made the decision to arrest

17   Mr. Solon, did you confer with Sergeant Horton?

18     A    I don't know if I conferred with him.  I

19   probably would have told him this is what my

20   investigation revealed and these are the actions

21   that I perceive to be the correct way to do it.  And

22   based on my knowledge, that's how I wanted to handle

23   it.

24     Q    When you went in and watched the video at

25   Mazzy's, did anybody else go in with you?  Any of

[84]

1  the officers go in?

2      A    I don't remember.

3      Q    Do you remember talking with Officer

4  O'Brien about what you had seen on the video before

5  you made your decision to arrest?

6      A    I don't remember talking to him but I

7  probably would have come out and said what I had

8  seen.

9      Q    Did you ask -- we'll start with Officer

10  O'Brien.  Did you ask Officer O'Brien whether he

11  agreed with the decision based on what you viewed to

12  arrest Matt Solon of what you charged him with

13  aggravated assault, I believe?

14      A    Mr. Solon?

15      Q    Yes.

16      A    Or battery substantial physical harm.  Am

17  I answering the question about Officer O'Brien?

18      Q    If you could that would be great.  Yes,

19  thank you.

20      A    I don't know specifically remember asking

21  him.  I would typically not ask somebody if they

22  agreed with my decision.  I would lay it out as to

23  what my probable cause and what I developed from my

24  investigation but I don't know that I would have

25  asked him if agreed.

[85]

1    Q    By the time you make your probable cause

2 determination, had you talked to Officer O'Brien

3 about his interaction with Matt Solon that led to

4 him handcuffing Matt and putting him in the back of

5 the police car?

6    A    I believe he had told me at that point he

7 had told me why he put him in the back of the police

8 car.

9    Q    Were you aware of the fact at that point,

10 again before you make your decision to arrest, that

11 Matt Solon had been critical of Officer O'Brien in

12 the moments before he was detained?

13    A    I don't know if I knew specifics like

14 that.  I just knew that he had detained him.

15    Q    Okay.  This will be -- we're going to

16 play the dash CAM video that we think is from

17 O'Brien's car.  Correct us if we're wrong about

18 this, officer Hale, it's either yours or his.  I'm

19 pretty sure it's O'Brien.

20         MR. ATKINS:  All right.  Go ahead.

21              (Video)

22 BY MR. ATKINS:

23    Q    I thought I remembered we heard some radio

24 traffic.  All right.

25    A    That's not Officer O'Brien.

[86]

1      Q    Is that you?

2      A    That's one of the back-up officers that

3  would have arrived -- I don't know.

4      Q    Back it up just a little bit.

5      A    'Cause I can see, it appears that those

6  are mine and O'Brien's cars.

7      Q    Yours and O'Brien's right there?

8      A    Yes.

9      Q    O'Brien would be the one probably a little

10  to the right and yours is the one sort of directly

11  in front of us.

12     A    I believe so.  I don't know whose camera

13  that is.  I don't, I don't know.  Unless they get

14  out I couldn't tell you.

15          MR. ATKINS:  I'll tell you what.  Let's

16      save yourselves.  Unless you think you can put

17      your hands on it pretty quick.

18          MR. GRAY:  They never come to us labeled

19      as we would like them.

20          MR. ATKINS:  I'll tell you what, Zack.

21      Let's take some time and just go first to

22      O'Brien's body CAMs.

23  BY MR. ATKINS:

24     Q    And before we start it, first of all for

25  the record, this is the first video clip --

[87]

1    A    Okay.

2    Q    -- from Officer O'Brien's body CAM.

3    A    Okay.

4    Q    And when I say clip, we didn't create the

5    clips.  This is how the body CAM was produced to us.

6    A    Okay.

7         MR. GRAY:  Have you ever watched this

8    before?

9         THE WITNESS:  Not that I recall.

10   BY MR. ATKINS:

11   Q    If we look in the -- on the left-hand side

12   is that you standing next to a black man?

13   A    It looks like it.  Yeah, I think that's

14   me.

15        MR. ATKINS:  All right.  Go ahead.

16                  (Video)

17   BY MR. ATKINS:

18   Q    Pause it for just a minute.  I know it's

19   hard because we're -- the dialogue is between

20   O'Brien and Solon.  But what I'm interested in is

21   what's going on between you this guy over here.  So

22   maybe let's just back it up a little bit.  I should

23   have told you that to begin with.

24        When I'm watching this and I know we can't

25   hear very well, if you turn it a little bit you can

[88]

1    catch some of volume or some of the speech.  But it

2    looks to me like he is trying to tell you what

3    happened.

4        A     So if I -- I want to say he was pointing

5    and saying I was parked over there and then I saw

6    this guy.  I don't remember him telling me anything

7    about what happened other than he said he was parked

8    over there and then this happened.  And then he

9    didn't see any, anything pertinent or I wouldn't

10    have let him go.

11        Q     Do you remember him telling you anything

12    about how he -- how Mr. Cooper who we can see lying

13    on the ground on the right-hand side had a gun and

14    had pulled it out?

15        A     I don't remember him saying that.

16           MR. ATKINS:  Okay.  Go ahead and play it.

17                 (Video)

18           MR. ATKINS:  Pause it there for a minute.

19    BY MR. ATKINS:

20        Q     I understand you're not participating in

21    this dialogue.  I just want to ask you this, Officer

22    Hale.

23           Have you heard Mr. Solon say anything up

24    to this point that strikes you as, you know, as

25    belligerent or confrontational towards Officer

[89]

1    O'Brien?

2         A    Not really, no.

3         Q    And I know it was Officer O'Brien, not

4    you, but given what you've heard so far is there

5    anything about what you've heard from Mr. Solon that

6    would cause you to fear for officer safety at that

7    point?

8         A    Based on audio alone, no.

9              MR. ATKINS:  Okay.  All right.  Go ahead

10        and play it.

11                        (Video)

12             MR. ATKINS:  Pause it for just a minute.

13   BY MR. ATKINS:

14        Q    The man that you see just sort of came in

15   the picture and came out, is that Sergeant Horton?

16        A    I would have to see it.  Yes, that's

17   Sergeant Horton.

18        Q    And at this point on the scene the folks I

19   know about are you, O'Brien, Horton and then we know

20   that the two Cobb County officers are sort of

21   standing to your left as we look?

22        A    Okay.

23        Q    Do you remember there being anybody else

24   there from Kennesaw?

25        A    At that time?

[90]

1       Q     Yeah.

2       A     I don't know if they were at that time or

3   not. I don't remember if it was or not.  I know some

4   more officers showed up but I don't know at what

5   point in time.

6              MR. ATKINS:  Okay.  Go ahead and play it.

7                        (Video)

8              MR. ATKINS:  Okay.  Roll it back just a

9         little bit because I get distracted listening

10        the Charles Duvall stuff.

11  BY MR. ATKINS:

12       Q     Because now it seems to be -- this person

13  you're talking to is, seems like he's being fairly

14  descriptive.

15             MR. ATKINS:  Go ahead.

16                       (Video)

17             MR. ATKINS:  So right there, pause it.

18  BY MR. ATKINS:

19       Q     He sort of gestures with hands like I

20  thought I heard the word gun but that's me.

21             Do you remember any of this as you watch

22  this?

23       A     I don't remember this, no.

24             MR. ATKINS:  All right.  Go ahead and play

25        it.

[91]

1              (Video)

2          MR. ATKINS:  Go ahead and pause it.

3    BY MR. ATKINS:

4      Q    And again, I understand it's Officer

5    O'Brien and not you, but at least from what we can

6    on the video, it appears there was one incident

7    where Officer O'Brien thinks he's reaching around to

8    try to get in his pocket, right?

9      A    That's what, yeah.

10     Q    That's what he says.  Do you hear Matt say

11   I'm just trying to pull up my pants or something

12   like that?

13     A    I wasn't paying particular close attention

14   to the audio.  I was watching it.

15     Q    And it looks now he's handcuffing him.

16     A    That's what it looks like, yeah.

17     Q    We can agree that there weren't repeated

18   times, at least, when we can see on this video of

19   Matt Solon trying to reach into his pockets, right?

20     A    I mean from the audio, yes.

21          MR. ATKINS:  And right -- roll it back

22       just a hair.  Right about there.

23                    (Video)

24          MR. ATKINS:  And so let's pause it for

25       just a minute.

[92]

BY MR. ATKINS:

   Q   The last thing Matt Solon says before the cuffs go on is you're not exactly being cooperative either, right?  Is that a yes?

   A   Yes, sir.

   Q   And you can see his hands on the hood of the car or on the trunk of the car as he's saying that, right?

   A   It appears so, yeah.

         MR. ATKINS:  I guess for completeness sake go ahead and roll it through.

                   (Video)

BY MR. ATKINS:

   Q   Okay.  First of all, did Mr. Solon appear to resist at all as the officer was handcuffing him?

   A   I mean really all I could see is the audio but it doesn't appear so -- or hear the audio.

   Q   Well, did you hear him saying anything during that, you know, as he's being sort of escorted back to the car that seemed to be confrontational or like he was trying to resist at all?

   A   No, sir.

   Q   Did he maintain a calm tone of voice?

   A   Yes, sir.

[93]

1      Q     And he asked at the end, you know, did I

2  do something wrong, correct?

3      A     Yes, sir.

4      Q     And we agree at that point in time at

5  least where you were in your investigation, y'all

6  didn't know if he had done something wrong, correct?

7      A     Correct.

8      Q     And that's what Officer Horton tells him

9  he's being detained while --

10     A     Officer O'Brien.

11     Q     Excuse me, Officer O'Brien.  You're being

12  detained while we investigate, correct?

13     A     Yes, sir.

14     Q     Go ahead and play the next clip.

15           And Mr. Gray brought this up and I should

16  have asked you this to begin with.  If I understand

17  what you're telling me is you don't remember seeing

18  any of these videos before today?

19     A     No, sir.

20     Q     I'll represent to you that at least the

21  way this body CAM video has been produced to us,

22  after Matt Solon is put in the back of the car, it

23  either cuts out or it's turned off, I don't know.

24  But it stops.

25     A     Okay.

[94]

 1     Q    And then it comes back on here.

 2     A    Okay.

 3          MR. ATKINS:  Go ahead.

 4                    (Video)

 5          MR. ATKINS:  Pause it just a minute.

 6   BY MR. ATKINS:

 7     Q    Who is that person who's walking in the

 8   foreground?  We'll get a better look at him later.

 9     A    I think that's Officer Hall that no longer

10   works with us.

11     Q    He no longer works with y'all?

12     A    No, sir.

13     Q    He appears to be in a different uniform

14   that you all.  Was he CID?

15     A    No, that would be a bike patrol.

16     Q    Okay.

17          MR. ATKINS:  Okay.  Go ahead.

18                    (Video)

19   BY MR. ATKINS:

20     Q    The guy in the foreground now is one of

21   the Cobb County officers, right?

22     A    I don't know his name.

23                    (Video)

24   BY MR. ATKINS:

25     Q    You would be 44 in there?

[95]

1        A     Correct.

2              MR. ATKINS:  Pause it for just a moment.

3   BY MR. ATKINS:

4        Q     You heard Officer O'Brien say supposedly

5   or something that guy -- that guy pointing, I think

6   back to his car towards Matt, took a gun from him

7   and hit him on the head.

8        A     I didn't hear him say that.  I think

9   that's what he was talking about.

10       Q     Do you have any idea where he would have

11  gotten that information from at this point?

12       A     I do not.

13       Q     I mean at this stage of the investigation

14  did you even know that?

15       A     I don't believe so.

16       Q     The woman that he's talking to right now,

17  did you -- did you interview her separately, too?

18       A     I would have.  She -- that was -- I don't,

19  I don't know.

20             MR. SOLON:  Shayna.

21             THE WITNESS:  Shayna?  Is that Thompson?

22             MR. ATKINS:  Yeah.

23             THE WITNESS:  Yeah, I would have spoken

24      with her.

25             MR. ATKINS:  Go ahead.

[96]

1                      (Video)

2    BY MR. ATKINS:

3         Q    And that's you in the foreground?

4         A    I think that was me that was standing

5    there.

6         Q    Talking to one of the other people?

7         A    I think so.  Yeah right there.

8              MR. ATKINS:  Pause it just for a moment.

9         Is that -- I'm asking you, Matt, for the

10        record.

11             MR. SOLON:  That's Melissa Veitengruber.

12   BY MR. ATKINS:

13        Q    So the woman that you're talking to as I

14   understand it would have been Melissa Veitengruber.

15   And you remember interviewing her.  That's all.

16        A    I do, yes, sir.

17        Q    Okay.  And at some point you talked to the

18   guy in blue, too, Mr. Loudermilk?

19        A    Yes, sir.

20             MR. ATKINS:  All right.  Go ahead and play

21        it.

22                      (Audio)

23             MR. ATKINS:  Stop it for just a minute.

24   BY MR. ATKINS:

25        Q    Do you recognize the other voice on there?

[97]

1          A     That's Sergeant Horton.

2          Q     And the last thing you hear Sergeant

3    Horton saying is I got a problem with him.

4          A     I believe he said I've got no problem.

5                MR. GRAY:  He said I've got no problem.

6                MR. ATKINS:  Oh, okay.

7                THE WITNESS:  When he said he put him in

8          the back, he said I've got no problem with

9          that.

10               MR. ATKINS:  Play it back.  You may be

11         exactly right and I may have just understood.

12                         (Audio)

13   BY MR. ATKINS:

14         Q     So you hear that as I've got no problem

15   with that.

16         A     Yeah, he has a pretty strong Southern

17   accent, I guess.  He runs his words together.

18         Q     Fair enough.  Other than --

19               MR. ATKINS:  Go ahead.

20                         (Video)

21   BY MR. ATKINS:

22         Q     I think he's going back to his car to get

23   witness statements.  I think you had asked him to go

24   get --

25         A     He's going back.

[98]

1      Q     Do you remember asking him to go back and

2   get some witness statement forms?

3      A     I don't remember asking him but that's not

4   uncommon.

5                        (Video)

6   BY MR. ATKINS:

7      Q     So one question that I had that I'm about,

8   Officer, is why weren't any -- it seemed unusual to

9   me that given the circumstances Officer O'Brien

10  would allow Shayna just to go in to her own car that

11  way.

12           Was there -- were you all comfortable

13  enough with the three of them where you didn't think

14  they presented a threat to you all at all?

15     A     I can't say from his perspective what he

16  was thinking at that time.  I really don't know.

17  That would be a question for him.

18     Q     Fair enough.  From your own perspective,

19  was there anything they had done that raised any

20  suspicion or concern?

21     A     No, sir.

22     Q     -- from an officer safety standpoint?

23     A     No.

24           MR. ATKINS:  Okay.  Go ahead.

25                        (Video)

[99]

1          MR. ATKINS:  Let's pause for just a

2      moment.

3  BY MR. ATKINS:

4      Q    It looks like you're getting information

5  from Cooper and his girlfriend?

6      A    It looks like I'm writing down off the

7  driver's license information.

8      Q    Okay.

9      A    I would be writing down, writing down

10  their information on a note pad.

11      Q    Fair enough.  All I can see is the bald

12  head sort of next to you.  Who is that?

13      A    Officer Redwine.  And it looks to me like

14  he showed four fingers like he was asking him

15  clerical questions as to if he was conscious.

16      Q    Basically doing a -- I can't remember what

17  it's called now --

18      A    -- alert and oriented status.

19          MR. ATKINS:  All right.  Go ahead.

20                     (Video)

21  BY MR. ATKINS:

22      Q    And the person we hear crying, that's his,

23  Cooper's girlfriend, right?

24      A    Yes.  Yes, sir.

25          MR. ATKINS:  All right.  And let's go with

[100]

1          the next one.

2                          (Video)

3               MR. ATKINS:  All right.  Let's pause it

4          real quick just so we can reorient ourselves.

5     BY MR. ATKINS:

6          Q     So in this video we see -- you're the

7     officer that's getting ready to take the handcuffs

8     off Mr. Solon, right?

9          A     Correct.

10         Q     And, obviously, he's in the foreground.

11    And we know that this is Officer O'Brien's body CAM.

12              MR. ATKINS:  All right.  Go ahead.

13                          (Video)

14              MR. ATKINS:  Pause it for just a minute.

15    BY MR. ATKINS:

16         Q     So you say to him I appreciate you being

17    cooperative and his initial response is no problem.

18    And then he goes on the to say next time I won't

19    call you guys.

20         A     Yes, sir.

21         Q     And this is really your first interaction

22    with Mr. Solon, right?

23         A     Yes, sir.

24         Q     We hear Officer O'Brien saying and you

25    wonder why -- I think the end of the sentence is

[101]

1    you're in the back of a police car or words to that

2    effect.

3              MR. ATKINS:  Go ahead and roll it back

4         real quick so I'm not putting words in

5         O'Brien's mouth.

6                        (Audio)

7              MR. ATKINS:  Let's pause it right here.

8    BY MR. ATKINS:

9         Q    At this point in time do you know how long

10   Solon had been in the back of the car?

11        A    I don't.

12        Q    As I understood what you told me earlier

13   today, you had at that point pretty much done

14   everything in your investigation except for watch

15   the video, right?

16        A    And speak with Mr. Solon.

17        Q    This is the second to last step in the

18   investigation?

19        A    Yes, sir.

20        Q    I want you to just assume for purposes of

21   this question that by this time he'd been in the

22   back of the car with a margin of error of five

23   minutes or so, about 30 minutes, half an hour or

24   somewhere in that neighborhood.

25              MR. GRAY:  You want him to assume that's

[102]

1      true.

2  BY MR. ATKINS:

3      Q    I do want you to assume that's true

4  because frankly I don't remember exactly how long it

5  was.

6      A    Okay.

7      Q    And I don't want to have to watch the

8  video to find out.

9      A    I got you.

10     Q    So assuming that's true -- well, first of

11 all, you didn't know that, you weren't paying

12 attention, right?  You were doing your

13 investigation, right?

14     A    Correct.

15     Q    But can you understand why he might be a

16 little frustrated at this oint?

17     A    Assuming that, yes.

18     Q    Okay.  And he's certainly expressing his

19 frustration and being critical but he's not being

20 belligerent, is he?

21     A    I mean belligerent is all in perspective,

22 I guess.

23     Q    True.  Fair enough.  Well, did you feel

24 like he was being belligerent towards you?

25     A    I don't know belligerent is maybe not the

[103]

1    word I would use.  But definigtely maybe

2    confrontational again.  Hostile.

3         Q    He had an attitude, I guess is the way --

4         A    Yes, sir.

5         Q    All right.  And he -- I think the last

6    thing we heard him say before we paused it was he

7    doesn't understand -- he doesn't understand why he's

8    is in this position.  I think now we're going to

9    hear an interaction between him and Officer O'Brien.

10             MR. ATKINS:  Go ahead.

11                       (Video)

12   BY MR. ATKINS:

13        Q    All right.  First of all, we watched that

14   first body CAM clip.  You never heard Mr. Solon

15   refer to himself as a hero, did you?

16        A    I don't recall hearing that.

17        Q    Okay.  Just generally, I mean, how long,

18   how long have you worked with Officer O'Brien?

19        A    At the time?

20        Q    Yes.

21        A    Maybe a year and a half, maybe.

22        Q    Had you been on scenes with him before?

23        A    Yeah.

24        Q    The demeanor that he exhibits on this

25   videotape in his interactions with Mr. Solon that

[104]

1    we've seen, is that generally indicative of how he

2    speaks to citizens on the scene?

3        A    From my experience, depending on the scene

4    it's similar.

5        Q    Okay.  We can agree that Mr. Solon is

6    saying to him in that first video that we watched,

7    that first body CAM that we watched.  Mr. Solon

8    saying to him look I don't think you're being

9    particularly cooperative either.  That's not a

10   reason to put some -- to detain somebody, is it?

11       A    The statement in and of itself?

12       Q    The statement in and of itself, yes.

13            MR. GRAY:  Objection as to form.

14            THE WITNESS:  The statement in and of

15        itself, no.

16   BY MR. ATKINS:

17       Q    Of the things you saw in that first video

18   and I grant you that there may be things going on

19   that you can't see and you weren't paying attention

20   to that, you were interviewing other people.  But

21   from what you see and hear on that video other than

22   the one thing we hear about him reaching back and

23   trying to pull up his pants, did you see or hear

24   anything else that would have merited detaining

25   Mr. Solon at that point?

[105]

1    A    Based on that clip that I saw, no.

2    Q    All right.  And we, you know, watched this

3    through and certainly in those first interactions

4    with you and then a few seconds later with Officer

5    Solon when you tell him to lose the attitude, he's

6    calm but he's pretty darn critical.

7    A    That's fair.

8    Q    All right.  I mean he's -- I think I've

9    called him a smartass before and I'll call him that

10   again.  I mean he was being kind of a smartass to

11   you, right?

12   A    That's fair to say.

13   Q    And was it, was it right after this

14   interaction that you began your interview with him?

15   A    I believe so.

16   Q    Again, Officer O'Brien is the only guy

17   with a body CAM and I'll represent to you from what

18   we can tell from seeing this, the body CAM ends

19   essentially right at, where you see him start to

20   walk away.

21   A    Yes, sir.

22   Q    If I understand the scene and everything

23   we've talked about, Officer O'Brien's body CAM was

24   the only video and audio tape device that any of the

25   Kennesaw officers had on them at the scene.

[106]

1      A     I believe so.  That's how it appears.

2      Q     And you're standing right next to

3    O'Brien's car, correct?

4      A     Correct.

5      Q     And if you open O'Brien's car door is it

6    possible that the audio inside the car would pick up

7    your interview?

8      A     It's possible but I don't have a key to

9    his car.

10     Q     I was going to ask you about that because

11   I see there's a couple of other tapes you'll see

12   officers going and opening his rear car doors.  I

13   thought only the officer who --

14     A     So if he -- I don't know if that car has a

15   key fob.  Some of them have the key fob where he

16   could lock and uplock it remotely.

17          MR. ATKINS:  Okay.  Let's go to the --

18          let's go and look at the surveillance video.

19          And do we have one of the ones that go all way

20          through or do we only have the ones for the

21          three clips?

22          MR. GRAY:  I only have the three clips.

23          MR. ATKINS:  Can you believe that they

24          literally split one and two kind of --

25          MR. GRAY:  I don't know what they did or

[107]

1    if they --

2           MR. ATKINS:  Oh, no, I'm not complaining.

3    I think whoever did the editing -- prepared

4    them for us, essentially because I guess they

5    were big, you know.

6      (An off the record discussion ensued.)

7           MR. ATKINS:  Let's actually go back on.

8  BY MR. ATKINS:

9      Q    And I'm sorry, Officer Hale, before we

10  even watch this let me try to lay a little bit of a

11  foundation.  There was a, I guess the manager from

12  Mazzy's was still there, right?

13     A    Yes.

14     Q    And you located him and he told you that

15  they had some video surveillance of the parking lot.

16     A    Correct.

17     Q    He took you inside to watch that, correct?

18     A    Correct.

19     Q    Did he have a big screen?  Was it a

20  computer monitor?

21     A    It was a computer monitor.

22     Q    And he just rewound it, rewound the

23  surveillance and played it?

24     A    That's all he knew how to do was rewind it

25  and play it.

[108]

1      Q      As I understand it you weren't the person

2    the next day somebody went and actually secured a

3    copy of it for evidence.

4      A      Correct.  The manager that night had no

5    idea how to secure the copy to give it to us so the

6    next day when the general manager was there they did

7    that.

8      Q      Did you -- did you instruct or leave

9    instructions for what, sort of what length of the

10   clip, you know, timestamps that they should pull?

11     A      I don't remember specifically tell them

12   timestamps to pull.

13     Q      And I guess Mr. Gray just hinted to this,

14   you have since watched the copies of the

15   surveillance footage that we have, right?

16     A      Correct.  We watched it this morning.

17     Q      And you believe, your recollection is that

18   the copy you saw was clearer than this?

19     A      I believe on the smaller screen in there

20   it was clearer.  It definitely appeared to be more

21   clear than that one.

22     Q      All right.  So this is the beginning and

23   what we see is some folks down here in the

24   right-hand side.  There's two cars parked there.

25     A      Uh-huh.

[109]

1    Q    Some people are congregating around one of

2    those cars, right?

3    A    Yes, sir.

4    Q    And then we see a group of people off in

5    the foreground off in the distance.

6    A    Correct.

7    Q    And did you form the understanding during

8    your investigation those people off in the

9    foreground, that was Matt Solon and his three

10   friends?

11   A    Correct.

12        MR. ATKINS:  All right.  Let's go ahead

13        and play it and we can fast-forward a little

14        bit through this thing.  Okay.  Go ahead.  It

15        looks like it's stuck.  We may not be able to

16        go that wide.  He's right.  The wider you go

17        you start to lose detail.

18        (Discussion ensued off the record.)

19                    (Video)

20   BY MR. ATKINS:

21   Q    All right.  So we now see two people

22   walking away from those cars we saw down on the

23   right-hand side.

24   A    They're walking away from that area, yeah.

25   I don't know if they were by the cars or came out of

[110]

1      the business.

2           Q      Fair enough.  And is it your understanding

3      that that was Mr. Cooper and his girlfriend?

4                 MR. GRAY:  You want to stop it?

5                 MR. ATKINS:  Let's stop it.

6      BY MR. ATKINS:

7           Q      So here we're here at, I think 418, of a

8      five-minute 32-second video.

9           A      Uh-huh.

10          Q      Right.  I transposed the numbers, didn't

11     I?  And we see in the foreground it looks like we

12     see Cooper walking over towards Matt Solon's group?

13          A      Correct.

14          Q      And his girlfriend, at least for now, sort

15     of stays back by their car.

16          A      Correct.

17                MR. ATKINS:  All right.  Go ahead.

18                      (Video)

19     BY MR. ATKINS:

20          Q      As you're watching this video back at the

21     time and we can sort of watch him sort of, him

22     standing over near them, what did you see?  What did

23     you interpret happening during this stretch we've

24     been watching here where he's talking with them?

25          A      It just looks like he's having a

[111]

1    conversation and at some point in time it looks

2    they're kind of motioning, maybe, for him to leave

3    or getaway from them.

4        Q    There were, just in the last few seconds

5    they're a couple of times where we froze it right

6    now, it looks almost like he's bending down or

7    something like that.

8        A    Yeah, I'm not sure.  I can't say.

9             MR. ATKINS:  All right.  Go ahead.

10                       (Video)

11   BY MR. ATKINS:

12       Q    So tell me again, and again I'm trying to

13   put you back at the time, right?  You're watching

14   this video for the first time and then in that last

15   few seconds we see him kind of backing away from

16   them.

17       A    Yes.

18       Q    Tell me what you, how you were

19   interpreting what you were seeing at that point in

20   time.

21       A    It looks like from what I'm interpreting

22   they told him to leave and he's kind of becoming

23   belligerent with them or argumentative, and his

24   girlfriend has come over and is trying to get him to

25   leave them alone or walk away.  And it almost looks

[112]

1    like she is pulling him away.

2        Q    During that sort of starting with the

3    moment where he's first -- in the last one -- where

4    we first see him sort of take a step back, did you

5    see from there to now where we are, were you able to

6    tell at the time whether he had pulled a gun?

7    Whether he had still shown the gun?  Did you see

8    anything that confirmed that to you?

9        A    I wasn't able to determine if he -- at

10   what point he pulled the gun or where he had pointed

11   it.

12              MR. ATKINS:  Okay.  Go ahead.

13                    (Video)

14              MR. ATKINS:  Stop it right there.

15   BY MR. ATKINS:

16       Q    And again, I mean it's incredibly unclear

17   to me, anyway.  Tell me what you're seeing or what

18   you were seeing when, at this moment in time.

19       A    Can we back it up?  I'm sorry.  I was

20   reading my report.

21                    (Video)

22              THE WITNESS:  It looks like his girlfriend

23         is pushing him back and now that's when he's

24         charged and tackled.

25              MR. ATKINS:  Okay.  So let's, just play it

[113]

1      back and play it right through, you know, once

2      he's on the ground.

3                    (Video)

4           MR. ATKINS:  All right.  Go ahead and stop

5      it for just a minute.

6  BY MR. ATKINS:

7      Q    First of all, before we talk about the

8  confrontation, do you see the headlights in the

9  background?

10     A    Are those headlights?  It looks like

11 headlights facing forward.

12     Q    Yeah, you may be right.  It maybe

13 taillights.

14     A    I believe they are taillights, yeah.

15     Q    Do you remember as you watched the video

16 that one of those two cars that was pulling out

17 actually sort of slowed down and came to a stop as

18 the confrontation took place?

19     A    I do remember that, yes, sir.

20     Q    Okay.  So you're sitting there.  It's June

21 26 of 2017 and you're watching this for the first

22 time.

23          What did you see during this stretch that

24 we just watched?

25     A    It's like at this stretch based on the

[114]

1   testimony that I got and then watching the video,
2   that this was the point in time where the
3   confrontation had occurred between Cooper and the
4   group.  And then Mr. Solon had tackled him.  And
5   once he was on the ground it looks like he strikes
6   him a couple of times and then Mr. Cooper stays on
7   the ground and Mr. Solon gets up.
8       Q   Was there anything about this interaction
9   that you felt supported your probable cause
10  determination for arresting Matt Solon up to this
11  point?
12      A   What I believed I used this for for my
13  probable cause is once he's on the ground after he
14  strikes him, the threat is over and now this -- now
15  there is no reasonable reason -- no reason to
16  continue to use force against Mr. Cooper.
17      Q   All right.  Now that he's on the ground
18  and Matt Solon is up and he no longer has a weapon,
19  right?
20      A   Yes, sir.
21      Q   So the strikes at the, you know, sort of
22  at the tail end of this interaction, that's not what
23  you relied on for your problem cause?
24      A   Correct.
25          MR. ATKINS:  Go ahead.  Zack, can you make

[115]

1      it, can you make it smaller?  I think it'll be

2      a lot of clearer.  Instead of going full

3      display.  I noticed that back at my office even

4      if we've got to get up.  We both have loud

5      enough voices.  Let's just roll it back.

6                      (Video)

7   BY MR. ATKINS:

8      Q    So he is up now on him.  Is that -- go

9   back.  Just roll it again.  So he's tackled him now.

10  And he hits him and then he gets up off of him.

11     A    Yes.  And he walks away.

12     Q    Starts to walk away from him.

13     A    Yes.

14     Q    Right about -- he started walking.  And

15  right about now --

16     A    He picks something up.

17     Q    He picks something up.  And you

18  recollection is --

19            MR. GREENAMYER:  Do you want to pull a

20      timestamp on it?

21            MR. ATKINS:  Yes.  So that's at 37 seconds

22      into a four-minute 52-second video.

23  BY MR. ATKINS:

24     Q    And just to be clear, when you're watching

25  this in the store, it's not split up into three

[116]

1   different videos.  You're watching it all the way

2   through.

3       A    Yeah.

4       Q    And your recollection is that Matt Solon

5   told you that he was picking up the gun at this

6   point.

7       A    Correct.

8       Q    Is it, is it possible that he told you

9   that the clip had come out during the struggle and

10  he's picking up the clip?

11      A    No, sir.  He told me he was picking the

12  gun up.  As a matter of fact, he told me he picked

13  up the gun and unloaded it.

14          REPORTER INTERRUPTION:  I'm sorry.  I

15      didn't hear that last part.

16          THE WITNESS:  He said he picked up the gun

17      and unloaded it from what I recall.

18          MR. ATKINS:  All right.  Go ahead and roll

19      it.

20                  (Video)

21          MR. ATKINS:  Stop for a minute.

22  BY MR. ATKINS:

23      Q    As you looked at the video in its original

24  form, could you tell what he was picking up?

25      A    So in the original form it appears that he

[117]

1    picks up a black object and then based on his

2    statement I believed it to be the gun by putting

3    those two pieces of the puzzle together.

4        Q    Sure.  I just want to make sure that you

5    couldn't actually visually tell that was the gun as

6    opposed to a clip or some other black object.

7        A    No, sir.

8        Q    You put those two pieces of --

9        A    -- I put those two pieces of the puzzle

10   together, yes, sir.

11       Q    Fair enough.

12           MR. ATKINS:  All right.  Go ahead.

13                     (Video)

14           MR. ATKINS:  So stop it.

15   BY MR. ATKINS:

16       Q    Is that interaction we just saw, is that

17   what you saw that led you to believe that Matt Solon

18   had hit him at that point in time?

19       A    Yes, sir.

20           MR. ATKINS:  From the timestamps -- let's

21       back up so we can actually get the print

22       timestamp.

23           I'll tell you what.  Let's do it this way.

24       Why don't we back it up and let -- if you'll

25       just tell us -- tell him to stop, okay, when

[118]

1      you see sort of the key point.

2                    (Video)

3           THE WITNESS:  Right there.

4           MR. ATKINS:  So that's at 49 seconds into

5      the video.

6  BY MR. ATKINS:

7      Q    And again when you're watching it in its

8  native form, tell me exactly what you saw in that

9  moment.

10     A    At the original scene so what I saw is

11 Mr. Cooper on the ground, people kind of standing

12 around.  It didn't look like at the time he was

13 trying to get up or doing anything.  He was just on

14 the ground and there were people there that if he

15 were to take off running or anything like that.  And

16 then Mr. Cooper picked up an object, which was, you

17 know, putting the pieces of the puzzle together --

18           MR. GRAY:  You said Cooper.

19           THE WITNESS:  I'm sorry, Solon.  Picked up

20      the gun and came back and he struck Mr. Cooper

21      in the head.  And after the strikes him in the

22      head, Mr. Cooper jumps up like he's in fear and

23      then runs and then collapses a short time

24      later.

25 BY MR. ATKINS:

[119]

1      Q      He hadn't gotten up yet, correct?

2      A      No, sir.

3             MR. ATKINS:  Go ahead.

4                    (Video)

5    BY MR. ATKINS:

6      Q      So the people here we see in the

7    foreground walking away, that's Matt and someone

8    else, right?

9      A      Correct.

10     Q      And now we see --

11     A      -- Cooper run off.

12     Q      Cooper sort of go off towards the light

13   pole and then kind of veers off to the right and

14   falling down, right?

15     A      Yes, sir.

16     Q      Could you tell in the video in its native

17   form, could you tell that Mr. Solon had the gun in

18   his hand?  Could you see the gun?

19     A      Could I see the gun itself?

20     Q      Yes.

21     A      No, sir.

22     Q      Could you see -- or what did you see?

23     A      I saw like a black object in his hand.

24     Q      And you saw a striking motion?

25     A      Yes.

[120]

1    Q    Did you -- how many times did he strike
2  him?
3    A    It appeared like he struck him once with
4  the object.
5    Q    Okay.  Anything else in this video that
6  sort of informed your decision making?
7    A    Again, the fact that the incident seemed
8  to be over and Mr. Cooper was unarmed at the time
9  and seemed like everything was kind of subdued to
10  the point where the scene was relatively safe and
11  there was a lapse in the time between he was on the
12  ground from the tackle to going back and picking up
13  the gun and then striking Mr. Cooper in the head.
14    Q    Now, unfortunately the cam was not synched
15  with Kennesaw's.  The 911 says 2:01.15 a.m.
16    A    It's possible because we didn't get the
17  call until to 2:04, I believe, when I was
18  dispatched.
19    Q    I think you'll hear that by this point
20  Matt was already, had been on the phone with 911?
21    A    Okay.
22    Q    But that's neither here nor there because
23  you're not listening to the 911 audio in your car.
24    A    Correct.
25    Q    Okay.  Anything else from this video?

[121]

1        A     Just the fact that it showed me the

2   probable cause that he had struck Mr. Cooper in the

3   head with the gun based -- putting those two pieces

4   of the puzzle together, because I used his statement

5   and the video to determine the probable cause that a

6   crime had been committed.

7              THE WITNESS:  Can I sit down?

8              MR. ATKINS:  Yes, go ahead.  Yeah.

9   BY MR. ATKINS:

10       Q     Was the video in its native form clear

11  enough for you so that you believe you would have

12  had probable cause even in the absence of

13  Mr. Solon's statement?

14       A     I believe so.

15       Q     Would you have had any reason to know what

16  was in his hands without Mr. Solon's statement?

17       A     No.  Can I clarify?

18       Q     Please, yes.

19       A     So I would have probable cause to charge

20  him with the act of battery against Mr. Cooper but I

21  might not have had the probable cause for the

22  firearm without his statement.

23       Q     Why didn't you -- when you came back out

24  why didn't you ask -- strike that.

25              When you came back out and before you

[122]

1   actually made the warrantless arrest of Matt Solon,

2   his friends were still on the scene, right?

3        A    I believe so.

4        Q    And it looks like when we were watching

5   the video that one of his friends and just based on

6   the color of the shirt it looked like it was

7   Loudermilk, kind of walked him away from there?

8        A    Correct.

9        Q    Did you go back and ask Loudermilk about

10  what happened in this moment?

11       A    I did not.

12       Q    Did you ask either of the other women who

13  were on the scene?

14       A    I did not.

15       Q    Why not?

16       A    Because I felt the, based on Mr. Solon's

17  statement and the video, I'd established enough

18  probable cause to make my arrest.

19       Q    Is it fair to say that Mr. Solon's

20  statement was critical to your probable cause

21  determination?

22            MR. GRAY:  He just answered that.

23       Objection to form.

24            MR. ATKINS:  Well, don't answer it for

25       him.

[123]

1          MR. GRAY:  Well, you can't ask him the

2     same question.  He said he had probable cause

3     --

4          MR. ATKINS:  Whoa, whoa, whoa.  That's an

5     objection to form, Harvey.  If you want to make

6     an objection to form then you can.

7          MR. GRAY:  Well, then you're not going to

8     ask him the same question again 'cause he

9     already answered it.

10         Do you want her to read it back?

11         MR. ATKINS:  I think it was a different

12    question.

13         MR. GRAY:  It's not a different question.

14    You asked him specifically if he had probable

15    cause independent of his statement and he

16    answered that.  And he said I did for the

17    battery but not for using the gun.

18         MR. ATKINS:  Okay.

19         MR. GRAY:  He couldn't be clearer on that.

20 BY MR. ATKINS:

21    Q    If you had not had Mr. Solon's statement

22 in that moment, would you have investigated further?

23    A    If I didn't have his statement, yes, sir.

24    Q    Would you taken the time to confirm what

25 you thought you saw in the video by speaking to the

[124]

1    other witnesses on the scene?

2        A    It's possible.

3                        (Documents were marked for

4                        identification as Plaintiff's

5                        Exhibit No. 9.)

6    BY MR. ATKINS:

7        Q    All right.  I am showing you what has been

8    marked as Exhibit No. 9.  These are the criminal

9    warrants, as I understand, that you took first

10   involving Dwight David Cooper and then the others

11   against Matt Solon.

12       A    Correct.

13       Q    And if I understood your testimony

14   earlier, and it actually has a date on them, you

15   took out these warrants essentially when you got

16   back to headquarters, completed your incident

17   report, and filled out your warrants.

18       A    I would have typed it up and then had to

19   wait on the judge to call me back.

20       Q    When -- tell me how that works.  When the

21   judge called you back did you speak to her?

22       A    Yes, we do a video conference with them.

23       Q    Okay.  And are you placed under oath?

24       A    Yes.

25       Q    And do you talk about the facts that you

[125]

1    believe support the warrant?

2        A    Yes.

3        Q    Tell me why you charged Cooper or only

4    sought a warrant for four counts of simple assault.

5        A    Based on previous cases that I've been not

6    necessarily involved in or handled but have been

7    around in my time in Cobb County, the warrants for

8    an aggravated assault in that nature require that

9    the gun, you definitively know that the gun was

10   pointed at somebody and that they were -- they say

11   they were in fear of their life.

12       Q    Do you remember whether you asked any of

13   the four alleged victims whether they were in fear

14   for their life?

15       A    I did not.  In my training and experience

16   with -- and I say training, with the interviews and

17   interrogations and then my experience, when

18   somebody's in fear for their life, they don't need

19   it to be asked directly of them.  That's one of

20   first things they'll tell you.

21       Q    They would say something like I could have

22   gotten killed tonight?

23       A    Yes.

24       Q    Okay.  When you spoke to the Magistrate

25   about the warrants for Matt Solon, did you -- the

[126]

1    factual allegations that you've listed in here say

2    said accused did use a Glock 23 pistol to strike the

3    victim in the head after the victim had been

4    restrained on the ground by bystanders to ensure he

5    stayed down.

6              MR. GRAY:  Is this Exhibit 10 yet?

7              MR. ATKINS:  Nine.

8              THE WITNESS:  It's the same warrant

9         stapled together.

10   BY MR. ATKINS:

11        Q    Did I read that correctly?

12        A    Correct.

13        Q    And I'm not picking on your grammar.  I

14   just want to make sure we're clear.  The to ensure

15   he stayed down is meant to modify his statement,

16   that that's why he struck him.

17        A    Correct.

18        Q    When you talked to the Magistrate, what

19   did you tell her to support the warrant?

20        A    The same thing that I write here is that,

21   and I believe I would have told her I watched the

22   video of the incident.

23        Q    Did you tell her as well that Matt Solon

24   had said that he went -- that he after Mr. Cooper

25   was on the ground and being restrained that he went

[127]

1   back over and hit him to ensure he stayed down?

2       A    I believe I would have said it, yeah.

3       Q    I mean you kind of had to tell --

4       A    I mean I would have had to tell her that

5   because the way the warrants are written this would

6   be my probable cause statement and I would basically

7   tell her or testify to her to what was said to me.

8       Q    And the only person who said anything to

9   you like that according to your testimony is Matt

10  Solon?

11      A    Correct.

12      Q    So no one else said to you that Matt went

13  back over, hit him with the gun and said I'm doing

14  it so you can say down or words to that effect?

15      A    Correct.

16                     (Documents were marked for

17                     identification as Plaintiff's

18                     Exhibit No. 10.)

19  BY MR. ATKINS:

20      Q    I'm showing you what's been marked as

21  Plaintiff's Exhibit No. 10 which is a composite

22  exhibit taken from documents we received from the

23  DA's office relating to Dwight David Cooper's

24  prosecution from the night of this incident.  It

25  looks like the District Attorney's office ultimately

[128]

1    indicted Mr. Cooper on four counts of aggravated

2    assault not simple assault, correct?

3         A    Correct.

4         Q    Did they speak to you before they sort of

5    changed the charge to a felony aggravated assault?

6         A    No, I showed up to Grand Jury and found

7    out.

8         Q    Do you remember whether the two cases,

9    the case against Mr. Cooper and the case against

10   Mr. Solon, were they indicted before the Grand Jury

11   on the same day?

12        A    So I don't remember the one against

13   Mr. Solon ever being presented to a Grand Jury.

14        Q    It may not have gotten that far.

15        A    I don't remember ever going to a Grand

16   Jury on a that, no.

17        Q    Okay.

18        A    If they had of been, they would have been

19   on the same day.

20        Q    So you were the person who testified

21   before the Grand Jury, right?

22        A    Correct.

23        Q    And based on the information you

24   provided to the Grand Jury they ultimately indicted

25   Mr. Cooper for the charges listed in the indictment.

[129]

1        A     Correct.

2        Q     In the plea sheet that Mr. Cooper signed

3    at the time of his plea, if you'll look at page two

4    of that plea sheet?

5        A     Yes, sir.

6        Q     When he's asked how he pleads to the

7    charge as guilty or not guilty he says guilty,

8    right?

9        A     Yes, sir.

10       Q     And then are you in fact guilty, the

11   answer written to it is yes, right?

12       A     Correct.

13       Q     Do you acknowledge there's a factual basis

14   to support the entry of the plea and the answer is

15   yes, right?

16       A     Correct.

17       Q     And you see in a minute that ultimately

18   only Count Two is the one he pleads to so we'll just

19   read that real quick.

20       A     Okay.

21       Q     In Count 2 he was charged with aggravated

22   assault.  He did on June 27th 2017 make an assault

23   upon the person of Matthew Scott Solon with a deadly

24   weapon to wit a firearm contrary to the laws of said

25   State, the good order, peace and dignity thereof.

[130]

1          So when you testified before the Grand

2     Jury you gave the Grand Jury a factual basis to

3     support a probable cause determination that Dwight

4     Cooper committed an aggravated assault against Matt

5     Solon, right?

6          A     I testified to what happened and since the

7     District Attorney had upgraded to aggravated

8     assault, the Grand Jury felt the same way that

9     aggravated assault fit.

10         Q     Okay.  And ultimately that's what he pled

11    guilty to, right?

12         A     Correct.

13         Q     So we can run through this real quickly.

14    So the next, the last three pages are just the

15    sentence sheet itself.

16         A     Okay.

17         Q     Two pages.  And you see on here that Count

18    Two, the aggravated assault which is the one we just

19    read, that's the one he pled guilty to, correct?

20         A     Correct.

21         Q     The other three were nolle processed and

22    then he also --

23         A     -- five and six --

24         Q     -- yeah, he pled to five and six, right?

25         A     Correct.

[131]

1      Q    CTS is credit for time served, right?  If
2   you know?
3      A    I don't know.
4      Q    Okay.  The last page just so the record is
5   complete, the last page is the nolle process for the
6   other three counts.
7      A    Okay.
8                       (Documents were marked for
9                       identification as Plaintiff's
10                      Exhibit No. 11.)
11  BY MR. ATKINS:
12     Q    I am showing you now what has been marked
13  as Plaintiff's Exhibit No. 11, and I'll submit to
14  you that this is a Dismissal that was filed in
15  Mr. Solon's case on October 18th of 2017.
16          Had you seen this document before today?
17     A    Not that I've ever seen, no.
18     Q    When were you made aware that the charges
19  had been dismissed against him?
20     A    To be honest I don't ever recall being
21  formally informed that they were dismissed against
22  him.  I just know I never went to trial on it, so I
23  didn't really know.
24     Q    This is filed in the Magistrate Court of
25  Cobb County and it's got a warrant number next to

[132]

1    it.

2           Is that consistent with your recollection

3    that the case never got indicted?

4        A    That was be consistent, yes.

5        Q    And ultimately the reason that was given

6    was insufficient evidence to prove guilt beyond a

7    reasonable doubt.  The above-named individual acted

8    in self-defense and defense of others by disarming

9    and subduing an individual who approached him and

10   then proceeded to brandish a firearm, correct?

11       A    That's what it says.

12       Q    Can we agree, Officer, that if Mr. Cooper

13   sustained the injury to his head when Mr. Solon was

14   disarming and subduing him, that that would not have

15   given you probable cause to arrest him?

16       A    No, because he still came back and stuck

17   him after the fact.

18       Q    Let me ask a better question.

19       A    Okay.

20       Q    Same question.  Let's assume that he

21   doesn't come back and strike him.

22       A    Okay.

23       Q    But that the injuries that he sustains he

24   sustains during the course of the initial

25   confrontation and disarming and subduing.

[133]

1      A    Does that -- that in and of itself is

2  evidence?

3      Q    Yes, if that's the --

4      A    No, no.

5      Q    And even if -- and well, even if let me

6  make sure for clarity sake.  Even if he goes back

7  and had struck him after he subdued him on the

8  ground, if it didn't result in significant injury he

9  would have at best been charged with misdemeanor

10 battery, right?

11     A    I charged him with misdemeanor battery

12 anyway.  Battery visible harm is a misdemeanor.

13     Q    You're absolutely right.  Thank you.

14 Okay.

15                    (Documents were marked for

16                    identification as Plaintiff's

17                    Exhibit No. 12.)

18 BY MR. ATKINS:

19     Q    Let me show you my favorite document in

20 the whole case.  I'm showing you what's been marked

21 as Plaintiff's Exhibit No. 12.

22     A    Okay.

23     Q    Have you ever seen this before?

24     A    I had seen it when the attorney came by

25 the office to speak with us originally.

[134]

1      Q    All right.  It is dated June 12th of 2019.

2  Do you see that there?

3      A    Yes, sir.

4      Q    The original Dismissal in Mr. Solon's case

5  we just looked at was October 18th of 2017.

6      A    Okay.

7      Q    Do you know how this document came to

8  exist?

9      A    I really don't, no.

10     Q    Do you remember when you were served with

11 the lawsuit in this case?

12     A    Correct.  Yes, sir I do.  I do remember

13 it.

14     Q    Okay.  Sorry I was distracted and not

15 listening to your answer.

16     A    Don't ask me what day it was because I

17 don't remember that.

18     Q    I'm not going to ask you what day it was.

19 I'm not sure it ultimately matters because the

20 record will speak for itself on that.  All right.

21          So in any event you don't know anything

22 about this document?

23     A    I don't know anything about this, no.

24     Q    Officer, just to real quickly --

25     A    -- yes --

[135]

1      Q    -- you know that Matt Solon filed an I.A.

2  Complaint against you and Officer O'Brien as it

3  related to this incident, right?

4      A    Yes.

5      Q    Were you interviewed separately because of

6  or as part of that?

7      A    By Lieutenant Shumpert, yes.

8      Q    Now is Lieutenant Shumpert was he sort of

9  the lieutenant for your shift?

10     A    He would the lieutenant over night watch

11 so he is in charge of both night shifts or was at

12 the time.

13     Q    Right.  Because when I was looking through

14 the Internal Affairs policy, there's a sort of level

15 one and level two complaints and if it's a level two

16 complaint it's sort of the investigation is done by

17 the supervisor for the shift.  Does that sound

18 right?

19     A    I would have to look at the levels but of

20 them is that way, yes.

21     Q    I forgot to give this to you.

22                     (Documents were marked for

23                     identification as Plaintiff's

24                     Exhibit No. 13.)

25

[136]

BY MR. ATKINS:

    Q    So just very quickly -- well, first question.  I mean did you actually see the written complaint yourself?

    A    I don't ever remember seeing the written complaint.  I just remember being talked to by Lieutenant Shumpert or interviewed, I guess, by Lieutenant Shumpert about it.

    Q    Was the interview recorded?  If you know.

    A    I don't know.

    Q    If you look at the second page down at the bottom beginning with eventually, it's right after I never told that's scratched out there?

    A    Yes.

    Q    He sort of describes the statement and he says that he never said the gun ever fell to the ground.  He said the magazine fell to the ground and that's when I went back to make sure it was away from the attacker.  I did not tell him that I went back to strike him but rather I placed my foot on him to make sure he stays down while I call the police.  Which is obviously very different than what you recall about his statement.

    A    Correct.

    Q    And we can agree that if what you saw on

[137]

1   that video was, in fact, him putting his foot on him

2   and not striking him, putting his foot on him would

3   not have given you probable cause to arrest him.

4        A     If it had been his foot, not striking him

5   but he struck him.

6        Q     Now, I don't entirely understand why the

7   only place these seem to appear is with the I.A.

8   report because I don't think they're part of the

9   I.A. report.  I think they were part of your

10  investigative report.

11       A     They are.  I have no idea why they're with

12  the I.A. report.

13       Q     I just wanted to confirm that.  There are

14  three statements after that.

15       A     They're back to back.  They're front to

16  back on that one.  At least they are on mine.

17       Q     You've got all three?

18       A     I've got all three.

19       Q     Well, that's the important copy.  And the

20  statement, the first one is the statement of

21  Melissa, right?

22       A     Yes.

23       Q     Then on the back page I guess it must

24  be --

25       A     -- that's Loudermilk.

[138]

1      Q      Loudermilk and then --

2      A      -- Thompson --

3      Q      -- Thompson.   These were the statements

4 that were taken at the scene, correct?

5      A      Correct.

6      Q      And you, and you reviewed these and are

7 these generally consistent with what you remember

8 being told?

9      A      Correct.

10     Q      Okay.   There was a fair amount of news

11 coverage that surrounded this case at some point

12 after the arrest, before the lawsuit, somewhere in

13 that neighborhood.   Did you see any of that?

14     A      I chose not to watch it.   I was told by my

15 parents and I said I don't want to watch it.

16     Q      I'm assuming this is the first time you've

17 been a defendant in a lawsuit?

18     A      It is.

19     Q      Other than your parents, did anybody else

20 come up to you and talk to you about that?

21     A      The Chief had mentioned it so that -- he

22 had mentioned it to me to just be aware in case -- I

23 think I was working maybe the day that it aired.

24     Q      Okay.

25     A      Or shortly thereafter and he just made me

[139]

1   aware of it in case I was, anybody recognized me or

2   brought it up to me that it was there.

3        Q    At some point after the incident, do you

4   remember having some interaction with Matt Solon?  I

5   can't remember --

6        A    -- it was a traffic stop.

7        Q    Traffic stop.  Did you recognize him when

8   you pulled him over?

9        A    I didn't recognize him when I pulled him

10  over, no.

11       Q    Did you realize who he was when he gave

12  you his driver's license?

13       A    No, I didn't recognize him.  I still

14  didn't recognize his name at that point.  I think he

15  brought up something about it at some point in the

16  traffic stop and that's what made me realize who he

17  was.

18       Q    Neither one of you had any problems during

19  that traffic stop, right?

20       A    I didn't have any problems.  I can't speak

21  for him.

22       Q    Fair enough.

23            MR. ATKINS:  I think I'm done here.  If

24       you can me five minutes to go talk to Zack and

25       Matt we should be finished.

[140]

1          (A short recess was taken.)

2   BY MR. ATKINS:

3      Q    All right.  Let's go back on the record.

4   I just want to go back and ask you a couple more

5   things about that video and as you saw it that

6   night.

7          When you looked at the video after

8   Mr. Cooper is on the ground, Mr. Solon is standing

9   over by the light post so he's just reached down and

10  picked up whatever it is he's picked up.

11         First of all if I understood your

12  testimony what you remember seeing was that he

13  picked up a black object, you couldn't tell what it

14  was?

15     A    Correct.

16     Q    Was -- could you tell how many people were

17  standing around Mr. Cooper?

18     A    About three or four.

19     Q    Okay.

20     A    I would have to go back and watch it to

21  refresh my memory.

22     Q    Okay.

23     A    Yeah, it was three or four.

24     Q    All right.  Could you tell whether

25  Mr. Cooper was lying on his back or on his stomach?

[141]

1       A    I could not.

2       Q    Could you tell whether his head was closer

3   to the light or closer to the camera?

4       A    It appeared that his head was closer to

5   the camera.

6       Q    Since you had been on the scene and seen

7   the people who were there when you got there, could

8   you identify who the three or four were that were

9   standing around him?

10      A    It looked like Loudermilk and then the

11  females and then Mr. Solon -- Mr. Solon was walking

12  around and Cooper was on the ground and then

13  Ms. Fields was somewhere in that, the vicinity.

14  They had all come to that vicinity, basically.

15      Q    All right.  As you sit here today is there

16  anything that if you encountered the same scene

17  tonight that you would have done differently?

18      A    No.

19           MR. ATKINS:  All right.  That is all the

20      questions I have.

21              (DEPOSITION CONCLUDED).

22       (Signature contained on following page.)

23

24

25

[142]

_____

JOSHUA ALAN HALE

Sworn to and subscribed before me,

this the _____ day of _____, 2020.

_____

Notary Public

My commission expires:

[143]

1              E R R A T A   S H E E T

2    I, JOSHUA ALAN HALE, do hereby certify that I have

3    read the foregoing deposition and that to the best

4    of my knowledge said deposition is true and correct

5    (with the exception of the following corrections

6    listed below).

7

8    Page/ line /  correction          reason

9    _____/ _____/ _____  _____

10   _____/ _____/ _____  _____

11   _____/ _____/ _____  _____

12   _____/ _____/ _____  _____

13   _____/ _____/ _____  _____

14   _____/ _____/ _____  _____

15   _____/ _____/ _____  _____

16   _____/ _____/ _____  _____

17   _____/ _____/ _____  _____

18   _____/ _____/ _____  _____

19   _____/ _____/ _____  _____

20   _____/ _____/ _____  _____

21   _____/ _____/ _____  _____

22   _____/ _____/ _____  _____

23   _____/ _____/ _____  _____

24   _____/ _____/ _____  _____

25

[144]

1                    C E R T I F I C A T E

2    G E O R G I A:

3    FULTON COUNTY:

4              I hereby certify that the foregoing

5    transcript was taken down, as stated in the caption,

6    and the questions and answers thereto were reduced

7    to typewriting under my direction; that the

8    foregoing pages 1 through 143 represent a true,

9    complete and correct transcript of the evidence

10   given upon said hearing; am in compliance with

11   O.C.G.A. Section 9-11-28(d) and Section 15-14-37(a)

12   and (b); and I further certify that I am not of kin

13   or counsel to the parties in the case; not in the

14   regular employ of counsel for any of said parties;

15   nor am I in anywise interested in the result of said

16   case.

17        This the 8th day of March, 2020.

18

19        _____
          Debra J. Puckett, B-1188

20

21

22

23

24

25

[145]

1                    AMENDED CERTIFICATE

2    STATE OF GEORGIA

3    COUNTY OF FULTON

4

5           I hereby certify that in addition to the

6    certification made on Page 144 of the transcript,

7    more than thirty (30) days provided the deponent to

8    read and sign the original transcript has expired.

9    Therefore, the original is being filed without

10   signature of the witness.

11          This the ____ day of April, 2020.

12

13

14                        Debra J. Puckett, B-1188

                          Certified Court Reporter

15

16

17

18

19

20

21

22

23

24

25

**A**

**a.m** 1:13 120:15
**abbreviated** 70:23
**ability** 48:25
**able** 9:25 27:17
60:7,15,25
65:18 80:15
109:15 112:5,9
**above-named**
132:7
**absence** 121:12
**absolutely** 65:5
133:13
**accent** 97:17
**access** 18:15
**accommodations**
12:7
**accuracy** 18:4
**accused** 126:2
**acknowledge**
129:13
**act** 68:23 70:20
77:24 80:21,25
121:20
**acted** 132:7
**acting** 58:6
**action** 40:22 75:6
**actions** 83:20
**activate** 12:15
20:25 24:6
25:18
**activated** 21:3
25:4,5
**activates** 21:1
**active** 17:10
**activity** 31:1
43:11
**actual** 32:1
**Acworth's** 18:20
**add** 56:10
**addition** 145:5
**administrative**
9:11
**admission** 57:23
**advised** 38:15
**Affairs** 135:14
**affirmative** 46:6
**African-Americ...**
47:24 48:4
**African-Americ...**
47:24
**agency** 2:15
**aggravated** 84:13
125:8 128:1,5
129:21 130:4,7
130:9,18
**aggressor** 58:8

**ago** 27:12 73:8
**agree** 67:2 72:25
73:13 76:6
77:23 78:6
91:17 93:4
104:5 132:12
136:25
**agreed** 84:11,22
84:25
**agreement** 5:8
**ahead** 7:15 38:3
77:9 85:20
87:15 88:16
89:9 90:6,15,24
91:2 92:11
93:14 94:3,17
95:25 96:20
97:19 98:24
99:19 100:12
101:3 103:10
109:12,14
110:17 111:9
112:12 113:4
114:25 116:18
117:12 119:3
121:8
**air** 68:15 70:8,25
**aired** 138:23
**al** 5:4
**Alan** 1:10 2:3 6:5
6:12 142:4
143:2
**alert** 99:18
**allegations** 126:1
**alleged** 125:13
**allegedly** 57:17
**allow** 98:10
**allowed** 5:8
**allows** 25:8
**Amand** 1:15 2:11
3:11
**ambulance** 43:14
**Amended** 4:19
145:1
**ammo** 47:8
**amount** 138:10
**answer** 32:3 69:17
74:3,4,4 75:9
77:8 78:2
122:24 129:11
124:19 134:15
**answered** 122:22
123:9,16
**answering** 84:17
**answers** 144:6
**Antoine** 47:21
**anybody** 51:2

78:15 83:25
89:23 138:19
139:1
**anymore** 21:23
32:15,19
**anyway** 14:23
33:18 37:16
49:22 80:20
112:17 133:12
**anywise** 144:15
**apologize** 12:5
27:25 60:4
**appear** 49:22 51:8
60:17 64:14
71:3 92:14,17
137:7
**appearance** 60:20
71:6
**APPEARANCES**
3:1
**appeared** 53:21
60:14 68:4,5
108:20 120:3
141:4
**appears** 8:1,11
12:9 47:6 48:7
53:24 86:5 91:6
92:9 94:13
106:1 116:25
**applicable** 58:2
**applied** 82:4
**applying** 61:8
**appreciate** 100:16
**apprehension**
76:24
**approach** 74:9
**approached** 51:12
71:21,21 132:9
**appropriate** 24:7
**April** 145:11
**area** 10:10 11:15
109:24
**argumentative**
111:23
**armed** 34:3 41:12
41:14,24,25
65:17,20 72:13
74:11,20
**arrest** 73:3 78:20
79:1,6 81:16,24
82:4,7,9,11,11
83:16 84:5,12
85:10 122:1,18
132:15 137:3
138:12
**arresting** 114:10
**arrive** 18:25 42:4

42:6 43:12 47:5
**arrived** 34:8
36:16 40:24,25
41:3 42:10,13
47:6 52:7,8 86:3
**arrives** 79:8
**Article** 2:6
**asked** 49:23 53:13
56:1 67:7 68:8
72:8,11 73:8
83:12 84:25
93:1,16 97:23
123:14 125:12
125:19 129:6
**asking** 11:12 15:6
21:13 59:7
67:18 84:20
96:9 98:1,3
99:14
**assault** 73:6 84:13
125:4,8 128:2,2
128:5 129:22,22
130:4,8,9,18
**assigned** 34:7,15
40:9,10,16 41:9
**assist** 41:13
**Associates** 1:21
2:9,10,12,14,16
10:21 11:1
**Association** 9:6,12
10:21 11:1
**assume** 7:12 12:23
101:20,25 102:3
132:20
**assuming** 15:10
16:4 76:7
102:10,17
138:16
**Atkins** 3:3,4 4:4
5:2 6:9 7:15,21
15:22 17:6
19:15 23:23
24:2 30:17 37:9
39:3 65:5,10
73:20 74:2
75:12 77:9,17
79:11 80:5
85:20,22 86:15
86:20,23 87:10
87:15,17 88:16
88:18,19 89:9
89:12,13 90:6,8
90:11,15,17,18
90:24 91:2,3,21
91:24 92:1,10
92:13 94:3,5,6
94:17,19,24
95:2,3,22,25

96:2,8,12,20,23
96:24 97:6,10
97:13,19,21
98:6,24 99:1,3
99:19,21,25
100:3,5,12,14
100:15 101:3,7
101:8 102:2
103:10,12
104:16 106:17
106:23 107:2,7
107:8 109:12,20
110:5,6,17,19
111:9,11 112:12
112:14,15,25
113:4,6 114:25
115:7,21,23
116:18,21,22
117:12,14,15,20
118:4,6,25
119:3,5 121:8,9
122:24 123:4,11
123:18,20 124:6
126:7,10 127:19
131:11 133:18
136:1 139:23
140:2 141:19
**Atlanta** 1:2,18,23
3:5,8 10:9
**attached** 49:9
**attacker** 136:19
**attempting** 71:10
**attend** 11:13
**attended** 11:10
**attention** 41:15
91:13 102:12
104:19
**attitude** 103:3
105:5
**attorney** 7:3,7,9
28:8 130:7
133:24
**Attorney's** 127:25
**attribute** 55:14
**audio** 21:9 22:8
23:4,11 24:5,7
27:17 45:22
89:8 91:14,20
92:16,17 96:22
97:12 101:6
105:24 106:6
120:23
**Audio/Video** 4:11
**audios** 20:13
**August** 16:9,10
**authority** 26:19
**authorized** 75:6

78:11 79:25
**auto** 8:21 33:23
**available** 20:8
24:13 27:3 44:3
44:4,5,6,10 83:2
**Avenue** 3:4
**aware** 36:15,17,20
37:21 38:19,21
58:4 64:2 71:20
85:9 131:18
138:22 139:1

**B**

**b** 2:13 15:17,25
41:8 44:3 45:8
74:8 144:12
**B-1188** 144:19
145:14
**B1188** 1:20 2:20
**babysitter** 11:20
**back** 13:5 29:5
33:24 34:10
36:14,14 39:24
44:14 53:23
54:16,23 55:4
55:16,25 59:3,8
61:4 63:3 81:17
82:3 85:4,7 86:4
87:22 90:8
91:21 92:20
93:22 94:1 95:6
97:8,10,22,25
98:1 101:1,3,10
101:22 104:22
107:7 110:15,20
111:13 112:4,19
112:23 113:1
115:3,5,9
117:21,24
118:20 120:12
121:23,25 122:9
123:10 124:16
124:19,21 127:1
127:13 132:16
132:21 133:6
136:18,20
137:15,15,16,23
140:3,4,20,25
**back-up** 41:9 86:2
**backed** 53:16
**background** 49:2
113:9
**backing** 111:15
**bald** 99:11
**based** 35:13 83:22
84:11 89:8
105:1 113:25

117:1 121:3
122:5,16 125:5
128:23
**basic** 35:1
**basically** 10:5
24:12 39:10
43:23 46:12
99:16 127:6
141:14
**basis** 129:13
130:2
**Bates** 12:2
**batkins@edmo...**
3:5
**batteries** 13:2
**battery** 13:7,7,11
28:14,14 29:8
84:16 121:20
123:17 133:10
133:11,12
**becoming** 111:22
**began** 52:20
105:14
**beginning** 14:18
22:14 31:10,13
32:4 108:22
136:12
**begins** 26:24
**behalf** 3:2,10
**believe** 9:7,9
12:19 13:3
15:12 16:6
18:21 19:3,4,8
23:9 25:22 28:3
39:20 42:19
43:7,8 45:10
53:5,8 57:8 60:2
60:7 61:4 63:23
66:12 74:11
81:19 82:6
84:13 85:6
86:12 95:15
97:4 105:15
106:1,23 108:17
108:19 113:14
117:17 120:17
121:11,14 122:3
125:1 126:21
127:2
**believed** 114:12
117:2
**belligerent** 69:20
76:19 88:25
102:20,21,24,25
111:23
**belts** 20:1
**bending** 111:6

**Bernard** 47:21
**best** 54:5 62:21
71:15 74:3,4,4
133:9 143:3
**better** 30:25 31:16
69:23 94:8
132:18
**beyond** 132:6
**bifurcate** 54:4
**big** 16:17 58:5
107:5,19
**bike** 94:15
**Bill** 4:17
**Billy** 10:13
**bit** 54:2 57:25
86:4 87:22,25
90:9 107:10
109:14
**black** 87:12 117:1
117:6 119:23
140:13
**blame** 16:20
**bleeding** 38:16
48:23 60:14
61:3 70:14
**blip** 16:8
**blood** 64:14,18,21
**blue** 96:18
**Board** 2:6
**bodily** 76:16
77:16,20
**body** 12:15,20
13:2,5,9,11
24:22,24 25:4
27:23 28:2,12
28:15 29:11,14
29:17,23 57:6
63:25 86:22
87:2,5 93:21
100:11 103:14
104:7 105:17,18
105:23
**border** 37:1
**boss** 11:1
**bottom** 12:3 19:21
42:24 136:12
**bought** 18:21
**Boulee** 5:6
**Brad** 59:6,10,11
59:13
**brakes** 31:22
**brandish** 132:10
**brandished** 53:16
**break** 14:19 16:24
65:4
**brief** 6:22
**briefly** 16:8

**Brieske** 1:15 2:11
3:11
**brought** 93:15
139:2,15
**bullets** 66:3
**business** 56:20
110:1
**busted** 46:5,17
**butt** 58:14
**button** 21:8 25:7
**buttons** 44:24
**bystanders** 126:4

**C**

**C** 144:1,1
**CAD** 35:17 37:13
47:11 51:9
**CAFN:1:19-CV...**
1:4
**call** 6:19,20 34:5
34:19 35:4,8,9
35:10,10,21
36:16,21,22
37:3 38:23
40:16,17 41:8
42:11,15,16,21
42:23,25 43:3,5
44:12 45:2,8,11
45:14 47:12,18
50:25 51:13,20
78:24 100:19
105:9 120:17
124:19 136:21
**called** 51:8 70:15
99:17 105:9
124:21
**calling** 55:9 79:17
**calls** 7:10 40:13
43:9,9 51:18
**calm** 35:24 92:24
105:6
**cam** 24:22 27:23
28:2,12 29:11
29:14,18,23
57:7 63:25
85:16 87:2,5
93:21 100:11
103:14 104:7
105:17,18,23
120:14
**camera** 12:16
13:5 27:21
28:15 32:12,14
33:17 86:12
141:3,5
**cameras** 12:20
13:2,9

**CAMs** 24:24 25:5
86:22
**capability** 20:23
**capable** 27:20
**capacity** 15:10,13
16:4
**caption** 144:5
**car** 20:13,13,22
20:24 21:3,14
21:22 22:6,9
23:10 25:2
30:11 33:13,15
34:18 40:6
45:22 52:10,13
55:16,22 57:11
61:20 62:5
66:13 79:15
85:5,8,17 92:7,7
92:20 93:22
95:6 97:22
98:10 101:1,10
101:22 106:3,5
106:6,9,12,14
110:15 120:23
**card** 56:20
**care** 60:13
**caring** 61:8
**cars** 86:6 108:24
109:2,22,25
113:16
**case** 2:15,15,17
9:9 25:9 27:23
32:25 34:14
40:10,23,24
128:9,9 131:15
132:3 133:20
134:4,11 138:11
138:22 139:1
144:13,16
**cases** 125:5 128:8
**catch** 88:1
**cause** 44:24 45:13
51:12 58:3,10
60:24 63:11
64:8,23 73:2
81:7 82:7,20,24
83:3,14 84:23
85:1 86:5 89:6
114:9,13,23
121:2,5,12,19
121:21 122:18
122:20 123:2,8
123:15 127:6
130:3 132:15
137:3
**caused** 70:18 71:7
**CCR** 1:20 2:20

**ceases** 75:19,24
76:1
**cell** 37:3,4 52:11
52:15 57:2
center 31:22 36:3
75:21
**CEO** 10:25
**certain** 20:22
**certainly** 23:12
29:8 76:17,22
79:12 102:18
105:3
**certificate** 8:18,25
145:1
**certification** 8:5
145:6
**Certifications** 4:9
**certified** 2:8 8:2
12:1 145:14
**certify** 143:2
144:4,12 145:5
**cetera** 27:5,7,8
**change** 5:16 41:21
**changed** 32:17,18
128:5
**channel** 36:10
**charge** 2:16 13:14
13:14 121:19
128:5 129:7
135:11
**charged** 73:5
84:12 112:24
125:3 129:21
133:9,11
**charges** 128:25
131:18
**Charles** 90:10
**check** 22:19 23:7
31:14,15,20
35:24 39:18,19
39:22 49:2 51:8
**checked** 33:20
**checking** 22:12
43:24
**cherry** 12:6
**Chief** 138:21
**chose** 138:14
**Chris** 11:8
**church** 11:9,13
**CID** 94:14
**cigarette** 53:13
67:18 72:8
**circumstances**
77:6,19 78:5
98:9
**citizen** 73:16 76:6
**citizen's** 78:20

79:1,6
**citizens** 27:4
104:2
**City** 6:15
**clarify** 38:4
121:17
**clarity** 133:6
**class** 9:24 18:16
**classes** 19:1
**clean** 10:4
**clear** 17:23 45:9
45:10 54:25
61:13 80:25
108:21 115:24
121:10 126:14
**clearer** 108:18,20
115:2 123:19
**clearing** 45:14
**clerical** 99:15
**clip** 86:25 87:4
93:14 103:14
105:1 108:10
116:9,10 117:6
**clips** 87:5 106:21
106:22
**close** 10:15 91:13
**closed** 45:12
**closer** 141:2,3,4
**CLR** 45:8
**Cobb** 36:7,22 37:5
37:16,25 38:5
41:2,10,11
47:15 89:20
94:21 125:7
131:25
**code** 39:24,25
41:14
**collapses** 118:23
**collect** 32:21
**collection** 80:12
**colon** 45:8
**Colonial** 16:13
**color** 122:6
**column** 34:4
**come** 13:5 22:17
41:13 84:7
86:18 111:24
116:9 132:21
138:20 141:14
**comes** 5:11 41:4
53:23 94:1
**comfortable** 10:7
98:12
**coming** 7:6 8:10
61:4 67:17
**comment** 50:25
**comments** 45:2

commission 142:9
committed 121:6
130:4
communicate
35:6 36:2
complainant
38:14,15,16
complaining
107:2
complaint 135:2
135:16 136:4,6
complaints 135:15
complete 131:5
144:9
completed 34:12
71:18 124:16
completely 49:11
49:19 78:4
completeness
92:10
compliance
144:10
component 18:7
composite 127:21
computer 44:21
107:20,21
concern 42:3
98:20
concerned 12:14
conclude 80:20
CONCLUDED
141:21
conclusion 73:19
conduct 63:11,21
82:5
conducted 30:9
42:1 56:23 63:9
63:24
conducting 29:13
confer 83:17
conference 16:18
124:22
conferred 83:18
123:24 137:13
confirm 45:24
123:24 137:13
confirmed 62:15
62:19,20 112:8
confrontation
113:8,18 114:3
132:25
confrontational
70:2,4 71:24
88:25 92:21
103:2
confronted 68:18
73:16
congregating

109:1
conscious 99:15
conserve 28:14
consider 27:3
considered 64:16
consistent 24:9
132:2,4 138:7
contact 25:19 82:5
contacted 2:10
contacts 27:3
34:20
contained 37:22
66:15 141:22
context 29:7 79:13
continually 66:19
continue 114:16
contract 2:12
contract/agree...
2:14
contractor 2:9
contrary 129:24
controller 16:14
conversation 62:9
62:10 111:1
Cooper 44:13
48:20 49:24
52:18 53:12,20
53:24 54:9 55:2
58:12 59:1
60:12 61:1 62:2
66:13 67:17,19
68:5,10,13,18
69:19,24 70:11
70:24 71:11,20
73:3 74:20 76:9
78:7,14,23
79:13,24 80:15
81:4 82:12,18
88:12 99:5
110:3,12 114:3
114:6,16 118:11
118:16,18,20,22
119:11,12 120:8
120:13 121:2,20
124:10 125:3
126:24 128:1,9
128:25 129:2
130:4 132:12
140:8,17,25
141:12
Cooper's 60:2,6
99:23 127:23
cooperative 92:3
100:17 104:9
copies 108:14
cops 79:17
copy 108:3,5,18

137:19
corner 12:3 38:12
correct 8:12 9:6
24:16 30:23
31:1 38:1 43:25
48:20 55:17
56:24 58:8 67:8
71:12,22 72:23
73:6 74:13,16
74:21 75:7,15
75:16,18 76:12
77:1 79:1,8
80:16,17 81:2
81:11,12 82:21
82:25 83:7,8,11
83:21 85:17
93:2,6,7,12 95:1
100:9 102:14
106:3,4 107:16
107:17,18 108:4
108:16 109:6,11
110:13,16
114:24 116:7
119:1,9 120:24
122:8 124:12
126:12,17
127:11,15 128:2
128:3,22 129:1
129:12,16
130:12,19,20,25
132:10 134:12
136:24 138:4,5
138:9 140:15
143:4 144:9
correction 143:8
corrections 143:5
correctly 24:14
80:13 126:11
Council 2:7
counsel 2:15 3:1
144:13,14
counseling 12:10
12:14 24:18,20
28:22
count 54:12
129:18,21
130:17
counts 125:4
128:1 131:6
County 2:4 36:22
37:5,16 41:2,10
41:11 47:15
89:20 94:21
125:7 131:25
144:3 145:3
couple 19:19
27:12 53:21

58:15 59:4
106:11 111:5
114:6 140:4
course 19:17
132:24
court 1:1 2:6,8,11
131:24 145:14
cover 2:16 17:22
18:1
coverage 138:11
covered 74:8
covers 74:6
create 87:4
created 32:16
35:17,19
credit 131:1
crime 62:25 73:3
121:6
crimes 18:24
criminal 4:16 19:3
49:2,11,19,23
69:2 124:8
critical 85:11
102:19 105:6
122:20
criticizing 56:16
CROSS-EXAM...
6:8
crying 99:22
CTS 131:1
cuffs 92:3
curious 13:8
26:18
currently 6:13
11:14
customary 2:17
cut 13:5
cuts 93:23

_____

D

D 4:2
DA's 127:23
Daily 4:12 30:20
damage 26:14
31:15
danger 77:20
darn 105:6
dash 61:22 85:16
date 124:14
dated 134:1
dates 8:14
daughter 11:21
David 48:20
124:10 127:23
day 10:10 13:25
15:4 16:18
22:16,17,18

23:1,14,20
24:22 40:7
42:17,20,21,23
43:5 108:2,6
128:11,19
134:16,18
138:23 142:7
144:17 145:11
days 145:7
DB 32:12
deadly 17:16,19
18:2 73:10,15
73:17 129:23
deals 12:13,14
66:5
death 77:16
Deb 1:21 2:9,10
2:12,14,16 5:22
debpuckett@be...
1:25
Debra 1:20 2:20
144:19 145:14
December 8:2
16:22,23
decide 16:15
64:17
decided 8:25
decision 66:6,9,11
81:16,24 83:16
84:5,11,22
85:10 120:6
defend 76:15
77:14
defendant 138:17
Defendants 1:8
3:10
defending 77:13
defense 81:1
132:8
definitely 103:1
definitely 47:17
108:20
definitively 125:9
delay 25:9
demeaning 68:1
demeanor 71:7
103:24
denied 72:7
department 4:10
6:15 13:15,22
16:22 17:15
19:18 22:23
26:12 27:14
department-issu...
33:4
departments
39:15

depend 42:8
depending 21:2
104:3
depends 51:10,15
deponent 145:7
deposed 6:6 14:6
deposition 1:10
2:2,12,12,16 5:3
5:14 7:2 141:21
143:3,4
derogatory 67:20
72:4
described 61:19
describes 67:17
136:15
describing 65:23
67:25
description 44:6
65:19
descriptive 71:1
90:14
detail 30:2 109:17
detailed 37:12
detain 66:6,9
104:10
detained 55:19
66:24 67:3,6
85:12,14 93:9
93:12
detaining 104:24
determination
52:24 58:4,11
64:8,23 81:7
82:20,24 83:3
83:14 85:2
114:10 122:21
130:3
determine 60:25
112:9 121:5
determined 52:11
52:15 58:11
62:13,24
developed 84:23
device 105:24
devices 24:7 26:19
27:6
dialogue 87:19
88:21
diesel 8:17,20
different 15:7
39:15,16 49:8
49:19 77:11
78:2,4 94:13
116:1 123:11,13
136:22
differently 141:17
difficult 54:3,4

[ 4 ]

**digital** 27:6
**dignity** 129:25
**direct** 19:8
**directed** 72:5
**direction** 144:7
**directly** 38:5
  86:10 125:19
**director** 9:11
**disarm** 77:25
**disarmed** 55:3
  58:12 59:2
  78:23
**disarming** 66:2
  132:8,14,25
**disclosure** 2:1,7
**discount** 2:17
**discovery** 19:17
**discretion** 51:18
**discussion** 107:6
  109:18
**Dismissal** 4:18,19
  131:14 134:4
**dismissed** 63:1
  131:19,21
**disobeying** 66:19
**dispatch** 4:14 34:5
  34:6,15 35:18
  36:23 39:12,12
  43:13 49:3,12
  65:15,17
**dispatched** 21:19
  34:19 38:18,24
  39:8 41:6,23
  43:13 45:25
  120:18
**dispatcher** 38:6
  46:1,3 47:17
  51:10,16,17
**dispatchers** 36:5
**display** 115:3
**displayed** 76:21
**displays** 74:18
**distance** 109:5
**distinct** 54:25
**distracted** 90:9
  134:14
**District** 1:1,1 5:5
  127:25 130:7
**DIVISION** 1:2
**document** 27:3,8
  131:16 133:19
  134:7,22
**documentation**
  25:20
**documents** 4:8
  7:18,23 17:3
  19:12 23:24

30:14 37:6
38:25 65:7
124:3 127:16,22
131:8 133:15
135:22
**doing** 9:8 27:20
  29:10 40:21
  44:11 76:13,20
  99:16 102:12
  118:13 127:13
**door** 57:9 106:5
**doors** 106:12
**double** 23:16 69:5
**doubt** 71:7 132:7
**drawn** 61:21
**drew** 52:12
**drive** 35:11
**driver's** 39:9
  43:17,24 45:5
  47:21 48:19
  49:1,10,14
  50:17,23 99:7
  139:12
**driving** 34:18
  38:19 40:6
  46:15
**drop** 74:15
**dropped** 54:19
**drunk** 76:20 81:4
**dual** 8:19
**Due** 60:13
**duly** 6:6
**duties** 24:9
**duty** 15:10 16:5
**Duvall** 90:10
**DV** 33:17
**Dwight** 48:20
  124:10 127:23
  130:3

_____

**E**

**E** 4:2 43:7 143:1,1
  143:1 144:1,1,2
**earlier** 24:19 60:1
  101:12 124:14
**East** 1:17 3:12
**edge** 37:3
**editing** 107:3
**Edmond** 3:4
**effect** 101:2
  127:14
**effort** 57:1 64:3
**eight** 13:15
**either** 21:1,3
  24:11 25:17
  77:13 85:18
  92:4 93:23

104:9 122:12
**elective** 8:23
**emergency** 19:25
  43:8
**employ** 144:14
**employed** 6:14
  16:25
**encounter** 74:10
**encountered** 26:9
  43:25 141:16
**encounters** 24:15
**ends** 105:18
**enforcement** 8:12
  9:16 43:9 73:9
  75:17 79:7
**English** 2:12
**enjoyed** 8:24
**enrollment** 8:19
  8:21
**ensued** 54:19
  107:6 109:18
**ensure** 126:4,14
  127:1
**enter** 64:8
**entered** 45:2,8
**entire** 25:19 28:4
**entirely** 137:6
**entity** 49:11
**entries** 39:5 44:18
**entry** 129:14
**equation** 64:9
**equipment** 4:11
  20:7 24:5,13
  25:18 26:3
  31:24,25 32:3,5
  33:8,10
**error** 101:22
**Es** 43:8
**escorted** 92:20
**essentially** 51:17
  55:1 57:23
  69:13 70:24
  105:19 107:4
  124:15
**established**
  122:17
**et** 5:4 27:5,7,8
**evening** 14:25
**event** 33:17 56:22
  134:21
**events** 39:11
**eventually** 9:2
  41:1 58:11
  136:12
**everybody** 52:16
**everybody's** 41:7
**evidence** 32:21

80:12 83:1
108:3 132:6
133:2 144:9
**exactly** 22:9 47:1
  61:19 92:3
  97:11 102:4
  118:8
**Examination** 4:4
**examined** 6:6
**example** 35:1 51:7
  74:10
**examples** 28:21
**exception** 143:5
**excuse** 44:4 74:22
  93:11
**executed** 29:4
**exhibit** 4:7 7:20
  17:5 19:14,17
  24:1,4 30:16
  37:8,11 39:2
  65:9 124:5,8
  126:6 127:18,21
  127:22 131:10
  131:13 133:17
  133:21 135:24
**exhibits** 103:24
**exist** 134:8
**exists** 27:4
**experience** 8:12
  9:3 104:3
  125:15,17
**expired** 9:7,8
  145:8
**expires** 142:9
**explain** 12:17
**explains** 11:5
**exploring** 16:12
**exposed** 68:10
**expressed** 56:8
**expressing** 102:18
**eyes** 35:20

_____

**F**

**F** 144:1
**face** 46:5,17
**facing** 62:1,2,4
  113:11
**fact** 23:3 45:1
  68:11 85:9
  116:12 120:7
  121:1 129:10
  132:17 137:1
**facts** 72:25 73:1
  76:7,18 82:6
  124:25
**factual** 126:1
  129:13 130:2

**failed** 12:15
**fair** 9:1 11:25
  58:18 76:4,4
  97:18 98:18
  99:11 102:23
  105:7,12 110:2
  117:11 122:19
  138:10 139:22
**Fairfax** 9:10
**fairly** 69:20 90:13
**falling** 119:14
**falls** 53:25
**familiar** 20:23
**family** 11:24
**far** 19:7 20:10,24
  34:15 89:4
  128:14
**fast-forward**
  109:13
**favorite** 133:19
**fear** 89:6 118:22
  125:11,13,18
**February** 12:10
**Federal** 5:9
**feel** 10:7 35:13
  102:23
**fell** 136:16,17
**felony** 76:15 77:14
  77:14 128:5
**felt** 61:9 66:8
  114:9 122:16
  130:8
**females** 50:9
  67:20 141:11
**Ferry** 1:17 3:12
**Fields** 50:3 59:25
  60:1,2 82:15,23
  141:13
**fifth** 42:23
**fight** 46:10,13
  54:18,20
**figure** 5:12
**file** 4:8 7:24 12:8
**filed** 26:16 131:14
  131:24 135:1
  145:9
**filled** 124:17
**finally** 11:18 50:2
  50:11
**financial** 2:17
**find** 82:15 102:8
**fine** 6:20
**fingers** 99:14
**finicky** 22:4
**finish** 15:18
**finished** 139:25
**fire** 76:3

**firearm** 53:16
  76:22 121:22
  129:24 132:10
**firearms** 9:16 10:1
**first** 8:1 9:10,22
  11:19 12:20
  21:21 31:4
  36:13,22 37:18
  39:4 41:11
  43:16 47:20,25
  61:18,24 63:5,7
  64:13 65:12
  71:20 73:13
  74:11 86:21,24
  86:25 92:14
  100:21 102:10
  103:13,14 104:6
  104:7,17 105:3
  111:14 112:3,4
  113:7,21 124:9
  125:20 136:2
  137:20 138:16
  140:11
**fit** 130:9
**five** 10:7 15:12
  16:6 45:9,10
  67:14 101:22
  130:23,24
  139:24
**five-minute** 110:8
**Floyd** 10:20 11:5
**fob** 106:15,15
**folks** 10:19 13:9
  89:18 108:23
**follow-up** 82:6
**following** 2:7
  141:22 143:5
**follows** 6:7
**foot** 55:8 79:16,19
  136:20 137:1,2
  137:4
**footage** 108:15
**force** 17:16,17,19
  17:22 18:2,7
  73:10,15 74:7
  74:13 75:11
  79:7,10 114:16
**forcible** 76:14
  77:13,14
**foregoing** 143:3
  144:4,8
**foreground** 94:8
  94:20 96:3
  100:10 109:5,9
  110:11 119:7
**forgot** 135:21
**forgotten** 16:3

**form** 5:10 12:10
58:3 69:24
73:18,23 75:8
77:7 79:9 80:2
81:6 104:13
109:7 116:24,25
118:8 119:17
121:10 122:23
123:5,6
**formally** 131:21
**forming** 82:19
**forms** 98:2
**forward** 113:11
**forwarded** 26:11
**fought** 53:17
**found** 128:6
**foundation** 107:11
**four** 13:18,19 15:3
17:20 18:10
39:20 43:20,20
53:12 66:5
67:14 76:11
77:5,19 99:14
125:4,13 128:1
140:18,23 141:8
**four-minute**
115:22
**frame** 17:13
**framework** 78:15
**frankly** 102:4
**friend** 10:15
**friends** 11:24
54:21 81:1
109:10 122:2,5
**front** 52:9 86:11
137:15
**froze** 111:5
**frustrated** 102:16
**frustration** 102:19
**full** 6:10 15:10,12
16:4 115:2
**FULTON** 2:4
144:3 145:3
**functioning** 24:14
28:12
**further** 65:19
123:22 144:12

_____
**G**
**G** 144:2,2
**gather** 60:9
**general** 4:17
18:25 74:6
108:6
**generally** 24:6
103:17 104:1
138:7

**Georgia** 1:1,18,23
2:2,7,8 3:5,8,13
5:5 10:21,25
74:6 78:25
145:2
**gestures** 90:19
**getaway** 111:3
**getting** 12:20,21
47:15 78:24
99:4 100:7
**girlfriend** 52:19
60:2,5,6 79:14
81:10 99:5,23
110:3,14 111:24
112:22
**give** 17:7 32:15
34:25 39:24
49:3,4,6 63:16
74:3 80:15 81:5
81:10 108:5
135:21
**given** 2:17 15:9
23:10 46:18
65:1 89:4 98:9
132:5,15 137:3
144:10
**giving** 81:20
**Glock** 126:2
**gloves** 61:15
**go** 7:15,16 8:21
11:15 17:21
19:21 30:1
31:10,12,14
33:24 34:21
37:4 38:3 44:2
45:16 55:8 77:9
79:15 81:17,24
82:15 83:25
84:1 85:20
86:21 87:15
88:10,16 89:9
90:6,15,24 91:2
92:3,11 93:14
94:3,17 95:25
96:20 97:19,23
98:1,10,24
99:19,25 100:12
101:3 103:10
106:17,18,19
107:7 109:12,14
109:16,16
110:17 111:9
112:12 113:4
114:25 115:8
116:18 117:12
119:3,12 121:8
122:9 139:24

140:3,4,20
**goes** 20:24 41:8,10
44:13,14 53:22
100:18 133:6
**going** 14:13 29:1
30:1 35:8 37:13
38:2,2,8 40:19
40:20 41:24
45:19 55:9
57:25 58:19
59:6,20 74:12
74:15 75:1,5
78:21 79:17
81:13 85:15
87:21 97:22,25
103:8 104:18
106:10,12 115:2
120:12 123:7
128:15 134:18
**good** 129:25
**gotten** 66:16
79:24 95:11
119:1 125:22
128:14
**grabs** 78:8
**graduate** 8:15
**graduation** 8:14
**grammar** 126:13
**Grand** 128:6,10
128:13,15,21,24
130:1,2,8
**grant** 104:18
**Gray** 1:15 2:11
3:11,11 5:13 6:3
15:18,20 23:16
23:21 73:18,24
75:8 77:7 79:9
80:2 86:18 87:7
93:15 97:5
101:25 104:13
106:22,25
108:13 110:4
118:18 122:22
123:1,7,13,19
126:6
**great** 84:18
**greater** 73:15
**GREENAMYER**
115:19
**GREENAMYRE**
3:7
**grew** 11:16
**ground** 52:9 53:19
53:20 54:20
55:3 59:2 75:25
76:2 78:9,16
88:13 113:2

114:5,7,13,17
118:11,14
120:12 126:4,25
133:8 136:17,17
140:8 141:12
**group** 15:23 48:11
48:16,17 50:5,6
50:10 53:12
54:9,18 67:20
68:16 71:21
72:5,23 109:4
110:12 114:4
**groups** 15:2
**guess** 10:13 11:18
13:11 15:2,6
25:12 31:8,13
69:23 72:22
78:19 92:10
97:17 102:22
103:3 107:4,11
108:13 136:7
137:23
**guidelines** 39:22
**guilt** 132:6
**guilty** 129:7,7,7
129:10 130:11
130:19
**gun** 9:17 10:16
38:15,17 46:4
46:13,17,20
47:8 52:16
53:18 54:9,17
54:19,23 58:14
58:16,17,18
59:3,8 61:20
65:17,19 68:14
68:19 70:5,8,12
70:24 72:17,20
74:22 75:2,4,14
77:2 78:3,8
88:13 90:20
95:6 112:6,7,10
116:5,12,13,16
117:2,5 118:20
119:17,18,19
120:13 121:3
123:17 125:9,9
127:13 136:16
**guy** 87:21 88:6
94:20 95:5,5
96:18 105:16
**guys** 100:19

_____
**H**
**H** 143:1
**hair** 91:22
**Hale** 1:6,10 2:3

5:3,4 6:5,12,13
7:22 24:3 27:24
30:18 37:10
57:20 66:7
79:24 85:18
88:22 107:9
142:4 143:2
**Hale's** 27:23
**half** 101:23
103:21
**Hall** 94:9
**hand** 52:10 77:3
119:18,23
**handcuffed** 55:19
67:4
**handcuffing** 85:4
91:15 92:15
**handcuffs** 55:23
67:5,6 100:7
**handgun** 52:9
68:11
**handing** 56:20
**handle** 40:23
83:22
**handled** 10:1
40:18 56:16
125:6
**handling** 9:25
19:25
**hands** 52:13 61:22
62:6 66:20
86:17 90:19
92:6 121:16
**hanging** 29:9
**happen** 5:21
**happened** 22:10
25:21 64:17
78:10 88:3,7,8
122:10 130:6
**happening** 110:23
**happens** 21:18
47:20
**happy** 56:5
**hard** 87:19
**harm** 76:16,24
77:16,21 84:16
133:12
**Harvey** 3:11 25:9
123:5
**head** 14:11 48:22
53:23 54:24
55:4 58:14 59:4
59:9 60:14,21
60:21,23 61:2,4
70:15 95:7
99:12 118:21,22
120:13 121:3

126:3 132:13
141:2,4
**heading** 21:19
45:7
**headlights** 113:8
113:10,11
**headquarters**
44:9,15 124:16
**hear** 20:17 21:17
21:17,23 35:4
35:14 36:7
44:19 66:19
87:25 91:10
92:17,18 95:8
97:2,14 99:22
100:24 103:9
104:21,22,23
116:15 120:19
**heard** 85:23 88:23
89:4,5 90:20
95:4 103:6,14
**hearing** 103:16
144:10
**help** 22:23 26:11
81:6
**hero** 103:15
**hgray@grsmb.c...**
3:13
**high** 8:15 11:17
**higher** 41:15
**hinted** 26:8
108:13
**hired** 6:24
**histories** 50:23
**history** 47:21
48:20 49:11,19
49:23 50:17
**hit** 44:24 95:7
117:18 127:1,13
**hits** 115:10
**hold** 13:14
**holding** 79:19
**hollow** 66:2
**honest** 12:22 13:3
56:3 131:20
**Honorable** 5:6
**hood** 92:6
**Horton** 1:6 29:21
29:23 41:4 64:7
66:23,25 83:17
89:15,17,19
93:8 97:1,3
**Horton's** 33:2
**hospital** 10:21,25
44:13
**Hostile** 103:2
**hour** 14:23 17:19

18:9 50:15
101:23
**hours** 16:18 17:20
**hubcaps** 31:21
**hundred** 81:21
**hurt** 78:15
**hypothetical**
79:23
**hysterical** 60:7
81:10

_____
**I**
_____
**I.A** 4:20 135:1
137:7,9,12
**I.T** 22:23
**idea** 24:13 95:10
108:5 137:11
**identification** 7:19
17:4 19:13
23:25 30:15
37:7 39:1 65:8
124:4 127:17
131:9 133:16
135:23
**identified** 61:21
**identify** 141:8
**imminent** 77:20
**impacted** 83:13
**implemented**
18:13
**important** 137:19
**impression** 69:19
69:24
**inadvertently**
45:12
**inartfully** 41:19
**incident** 4:13 7:13
12:22 13:10,24
16:3 20:9 26:16
27:11 30:4
45:11 52:3,23
58:2 62:12 91:6
120:7 124:16
126:22 127:24
135:3 139:3
**include** 18:12 31:3
**incoherently**
71:12 81:5
**incredibly** 112:16
**incriminatory**
57:22
**independent** 2:9
73:2 123:15
**independently**
66:11
**indicate** 62:13
**indicated** 28:10

**indicative** 104:1
**indicted** 128:1,10
128:24 132:3
**indictment** 4:17
128:25
**individual** 43:22
80:14 132:7,9
**individually** 1:7
**individuals** 61:25
62:9 63:5,7 71:2
77:5 80:13
**inform** 65:18
**information** 35:1
37:22,24 38:4
38:20 46:19,22
60:10 66:14,15
80:16,19 81:5
81:11 95:11
99:4,7,10
128:23
**informed** 82:23
120:6 131:21
**initial** 78:18 81:14
100:17 132:24
**injured** 61:1
**injuries** 132:23
**injury** 60:21
64:12 132:13
133:8
**input** 44:25,25
45:3,7 51:11
**inputting** 45:6
47:17
**inside** 22:6 45:22
57:11 106:6
107:17
**inspect** 61:6
**inspected** 61:15
**inspection** 32:1
33:14
**installation** 26:4
**instruct** 9:25
108:8
**instructing** 10:17
**instructions** 108:9
**Instructor** 9:22
12:1
**insufficient** 132:6
**insulting** 68:1
**interaction** 78:18
85:3 100:21
103:9 105:14
114:8,22 117:16
139:4
**interactions**
103:25 105:3

**interested** 87:20
144:15
**internal** 22:6
135:14
**interpret** 110:23
**interpreting**
111:19,21
**interrogations**
19:5 125:17
**INTERRUPTI...**
116:14
**interrupts** 25:19
**interview** 29:13
30:9 56:23 57:2
57:6,10 65:1
67:15 70:18,22
81:17,25 82:6
95:17 105:14
106:7 136:9
**interviewed** 30:4
30:12 52:22
53:4 60:8 80:18
135:5 136:7
**interviewing** 19:5
52:21 54:12
96:15 104:20
**interviews** 27:5,8
29:10 63:9,21
63:24 64:4
71:18 81:15
125:16
**intoxicated** 60:15
60:18,20 68:6
71:4,11 72:2
**inventory** 31:9,20
**investigate** 69:2,9
93:12
**investigated**
123:22
**investigating**
18:24
**investigation**
40:21 52:20
53:7 62:25 78:5
83:20 84:24
93:5 95:13
101:14,18
102:13 109:8
135:16
**investigative** 4:15
137:10
**involved** 62:14
125:6
**involving** 124:10
**irrelevant** 33:18
**issue** 5:10 26:3
32:15

**issued** 27:14 32:23
**issues** 22:25
**it'll** 115:1
**Ivy** 1:22

_____
**J**
_____
**J** 1:20 2:20 3:3
144:19 145:14
**jacks** 20:1
**jail** 44:14
**January** 1:12 2:20
9:10
**jerk** 54:5
**JL** 44:19
**job** 9:15
**joined** 9:15
**Joseph** 10:20
**Joshua** 1:6,10 2:3
5:3,4,13 6:5,12
142:4 143:2
**judge** 5:6 73:24
124:19,21
**Judgmental** 18:17
**Judicial** 2:7
**July** 6:24
**jumps** 118:22
**June** 13:10 31:6
113:20 129:22
134:1
**juror** 9:11
**jury** 10:10 128:6
128:10,13,16,21
128:24 130:2,2
130:8
**justified** 66:8

_____
**K**
_____
**keep** 61:9 66:19
79:7 80:1,24
**Kennesaw** 6:15,22
8:10 11:15,17
15:1,14 16:8
17:10 24:5 36:3
38:24 39:4
89:24 105:25
**Kennesaw's**
120:15
**kept** 8:4
**Kevin** 10:20
**key** 106:8,15,15
118:1
**kicked** 38:16
**kid** 11:20
**killed** 125:22
**kin** 144:12
**kind** 26:23 27:10
39:5,15 43:11

53:17,25 58:5
62:4,5 63:14
105:10 106:24
111:2,15,22
118:11 119:13
120:9 122:7
127:3
**kinding** 62:1
**kinds** 10:4
**Kirsten** 50:3
**knew** 29:17 72:20
85:13,14 107:24
**know** 5:11 7:3,4
9:7,20 10:6,14
11:5 12:6 13:1,3
14:19,19 17:12
17:13 22:8,9,20
23:2 24:10,11
24:22 28:13,18
28:22 30:10
32:13 34:20
35:14,16 36:12
37:21 39:22
40:20,24 41:16
41:16 42:20
44:5,13,23,23
44:25 45:3,3,6
46:25 48:14
54:6,6,17 56:9
58:1,7,16 59:13
60:3,19,24
63:15,25 68:1
69:21 72:16
73:5,17 74:19
74:20 76:19
83:18 84:20,24
85:13 86:3,12
86:13 87:18,24
88:24 89:3,19
89:19 90:2,3,4
92:19 93:1,6,23
94:22 95:14,19
98:16 100:11
101:9 102:11,25
105:2 106:14,25
107:5 108:10
109:25 113:1
114:21 118:17
121:15 125:9
131:2,3,22,23
134:7,21,23
135:1 136:9,10
**knowing** 76:18
**knowledge** 18:14
57:13 59:5
62:21 64:5
83:22 143:4

**known** 11:2,4
36:13

_____
**L**
_____
**L** 42:24
**labeled** 86:18
**lack** 30:25
**lapse** 120:11
**law** 8:11 9:15
24:10 43:9 73:9
75:17 76:14
77:12 78:25
79:7
**laws** 58:2 74:5
129:24
**lawsuit** 134:11
138:12,17
**lawyers** 12:5
**lay** 84:22 107:10
**layer** 50:15
**laying** 52:9
**lead** 50:21
**learned** 65:23
**learning** 46:16
**leave** 6:4 16:15
53:15 54:22
67:10 72:8,12
108:8 111:2,22
111:25
**led** 60:3 69:8
80:20 85:3
117:17
**left** 16:8 62:5
89:21
**left-hand** 87:11
**legal** 73:19
**length** 108:9
**lesser** 73:15
**let's** 7:15 10:23
11:19 13:22
20:7 24:12
45:16 52:3,25
58:18 67:13
76:5 86:15,21
87:22 91:24
99:1,25 100:3
101:7 106:17,18
107:7 109:12
110:5 112:25
115:5 117:20,23
132:20 140:3
**letter** 43:6
**level** 41:15 135:14
135:15,15
**levels** 135:19
**license** 43:17

47:21 48:19
49:1,10,14
50:17,23 51:8
51:24 99:7
139:12
**licenses** 39:10,13
43:20,24 45:5
**lieutenant** 135:7,8
135:9,10 136:7
136:8
**life** 9:5 13:7,11
28:14 125:11,14
125:18
**lifts** 74:19
**light** 119:12 140:9
141:3
**lights** 21:3,18
31:20
**Lindsay** 3:4
**line** 5:24 37:1
47:16 143:8
**link** 22:3
**linked** 22:11
36:22
**linking** 22:4
**list** 19:23
**listed** 126:1
128:25 143:6
**listen** 7:10
**listening** 41:7 90:9
120:23 134:15
**lists** 9:18
**literally** 106:24
**litigation** 2:18
**little** 39:14 45:22
54:2 57:25 86:4
86:9 87:22,25
90:9 102:16
107:10 109:13
**live** 10:9
**LLP** 2:11 3:4,7
**load** 10:3
**located** 107:14
**lock** 106:16
**log** 30:20 39:5,7
**Logan** 46:1
**long** 9:5 18:17
101:9 102:4
103:17,18
**longer** 58:13 76:1
94:9,11 114:18
**look** 7:8,13 12:2
25:23 26:23
33:7 35:10 38:2
38:3,8,11 42:23
43:22 44:6
87:11 89:21

94:8 104:8
106:18 118:12
129:3 135:19
136:11
**looked** 24:18
50:11 52:18
60:15 61:7,14
64:16,18,19
116:23 122:6
134:5 140:7
141:10
**looking** 26:4
60:25 64:21
66:13 135:13
**looks** 16:21 42:10
43:10,13,15,20
45:11,13,25
47:19 50:2,12
50:16 67:15
87:13 88:2
91:15,16 99:4,6
99:13 109:15
110:11,25 111:1
111:6,21,25
112:22 113:10
114:5 122:4
127:25
**loose** 53:18
**Lopez** 50:12
**lose** 105:5 109:17
**loss** 26:14
**lot** 12:6,24 13:13
30:2 107:15
115:2
**loud** 115:4
**Loudermilk** 48:8
59:7,13,17 65:1
67:15,18 68:5
68:13,21 69:8
71:3,19 76:7
80:18 81:15
83:4 96:18
122:7,9 137:25
138:1 141:10
**Loudermilk's**
68:25
**Ls** 43:9
**lying** 88:12
140:25
**Lyra** 47:21

_____
**M**

**magazine** 136:17
**Magistrate** 28:25
125:24 126:18
131:24
**main** 61:3

**maintain** 92:24
**maintenance** 23:8
26:5 31:9,19
**making** 56:15
64:7 120:6
**male** 38:15,16,16
52:10 65:23
**male's** 38:17
**males** 62:13 80:14
**man** 87:12 89:14
**manager** 107:11
108:4,6
**manually** 21:1,7
25:5 45:2
**maps** 32:19
**March** 144:17
**margin** 101:22
**Marietta** 11:16
**mark** 7:16
**marked** 7:18 17:3
19:12 23:24
24:4 30:14,19
37:6,11 38:25
65:7 124:3,8
127:16,20 131:8
131:12 133:15
133:20 135:22
**Markham** 11:18
**mass** 75:21
**Matt** 30:3 36:13
36:15,18,21
46:20,25 47:2,7
50:16 53:4 55:1
57:20 58:6,23
59:2,7 61:21
62:5 63:10
65:18,24 66:6
66:24 67:2
68:18 69:2
70:19 77:24
78:7 79:12,15
81:17,24 82:4
82:20 83:7
84:12 85:3,4,11
91:10,19 92:7
93:22 95:6 96:9
109:9 110:12
114:10,18 116:4
117:17 119:7
120:20 122:1
124:11 125:25
126:23 127:9,12
130:4 135:1
139:4,25
**matter** 5:3 116:12
**matters** 134:19
**Matthew** 1:3 3:15

5:4 129:23
**Mazzy** 38:14
**Mazzy's** 62:4
83:25 107:12
**MBC** 44:20,20,25
45:4
**mean** 9:23 25:15
40:17 41:20
42:6,15 44:3
61:20 62:19
69:21 77:10
78:19 80:3
91:20 92:16
95:13 102:21
103:17 105:8,10
112:16 127:3,4
136:3
**meaningful** 80:16
**means** 9:24 40:19
42:16 44:9
46:12
**meant** 126:15
**mechanic** 8:21
**medical** 43:8,8
60:13
**meet** 76:13 77:12
**Melissa** 48:12
59:23 96:11,14
137:21
**member** 9:5
**memory** 140:21
**men** 48:4
**mentioned** 16:7
138:21,22
**Merely** 79:19
**merited** 104:24
**method** 27:3
**Metro** 43:14
**mic** 20:14 21:10
22:1,5,25 23:8
23:13,17,20,21
23:22
**Michael** 1:6,6
48:8
**micro-cassette**
27:6
**microphone** 22:6
**microphones**
57:11
**Midway** 26:21
**military** 9:3
**mind** 6:19 11:12
**mine** 51:20 86:6
137:16
**mini-recorders**
27:7
**minimum** 13:19

17:20
**minus** 6:22 50:16
**minute** 6:23 17:8
38:9 43:23
87:18 88:18
89:12 91:25
94:5 96:23
100:14 113:5
116:21 129:17
**minutes** 39:18,20
47:4 50:16
101:23,23
139:24
**misconduct** 69:2
**misdemeanor**
133:9,11,12
**mistake** 60:4
**mistakes** 5:15
**mister** 6:16,19
**Mitchell** 3:7
**mobile** 44:21
**modify** 126:15
**Moffett** 1:15 2:11
3:11
**mom** 11:2
**mom's** 11:1
**moment** 76:9 95:2
96:8 99:2 112:3
112:18 118:9
122:10 123:22
**moments** 72:16
85:12
**monitor** 107:20
107:21
**morning** 7:9
42:20 108:16
**motion** 119:24
**motioning** 111:2
**Mountain** 11:17
**mouth** 63:2 101:5
**move** 68:8
**multiple** 41:5

_____
**N**

**N** 4:2
**N.E** 1:17 3:12
**name** 6:10 44:19
48:2 59:15
94:22 139:14
**named** 36:18,21
**National** 9:6,12
**native** 118:8
119:16 121:10
**nature** 125:8
**near** 57:16 110:22
**nearby** 57:5 64:1
**necessarily** 125:6

**necessary** 27:2
61:9
**need** 14:18 25:14
41:13 60:13
125:18
**needed** 8:23
**needs** 40:22
**negative** 23:16
69:5
**neighborhood**
101:24 138:13
**neither** 120:22
139:18
**never** 10:1 14:5
28:4 32:17 70:8
86:18 103:14
131:22 132:3
136:13,16
**news** 23:1
**nice** 12:7
**night** 13:25 14:2
15:4 22:10 23:1
27:11 28:6,12
31:1,4 33:1
62:11 64:13
108:4 127:24
135:10,11 140:6
**Nine** 126:7
**nod** 14:11
**Noggle** 11:8
**nolle** 130:21 131:5
**normally** 45:4
**Northern** 1:1 5:5
**Notary** 142:8
**note** 22:21 99:10
**notes** 35:9,10,19
**nothing's** 29:1
**notice** 5:7 9:5 30:2
**notify** 22:22 41:11
**noticed** 115:3
**NRA** 9:21,25
10:18
**number** 34:14
40:2,5,7 44:18
51:11,12,14,15
51:19 56:8
131:25
**numbers** 40:4
110:10

_____
**O**

**O** 144:2
**O'Brien** 1:6 28:10
29:9 30:12
40:25 51:7,18
52:17 56:14,17
56:19 57:5

61:22 63:21
64:1 66:11,16
84:4,10,10,17
85:2,11,19,25
86:9 87:20 89:1
89:3,19 91:5,7
93:10,11 95:4
98:9 100:24
103:9,18 105:16
135:2
**O'Brien's** 28:2
30:10 33:7
55:16 57:9
85:17 86:6,7,22
87:2 100:11
101:5 105:23
106:3,5
**O.C.G.A** 2:13
144:11
**oath** 124:23
**object** 52:10 53:23
73:18 77:7
117:1,6 118:16
119:23 120:4
140:13
**objection** 73:22
75:8 79:9 80:2
104:13 122:23
123:5,6
**objections** 5:9
**observe** 66:8,10
**observed** 52:6,8
52:10
**obviously** 18:17
20:11 44:12
51:4 58:5 61:17
100:10 136:22
**occurred** 63:18
114:3
**October** 131:15
134:5
**odd** 33:19,21
**office** 115:3
127:23,25
133:25
**officer** 4:9,12 6:17
6:18 7:22 24:3
25:17,20 27:22
27:24 28:2,10
29:8 30:10,11
30:18,20 33:7
37:10 40:11,22
40:25 50:21,24
51:4,5,7,18,24
52:4,17 55:16
56:14,17,19
57:5,9,20 61:22

62:23 63:20
64:1 66:7,10,16
73:13,14 79:23
84:3,9,10,17
85:2,11,18,25
87:2 88:21,25
89:3,6 91:4,7
92:15 93:8,10
93:11 94:9 95:4
98:8,9,22 99:13
100:7,11,24
103:9,18 105:4
105:16,23
106:13 107:9
132:12 134:24
135:2
**officers** 13:17 15:2
15:9,11,23 16:4
24:6 30:9 41:2
41:10 57:15
65:18 74:7 84:1
86:2 89:20 90:4
94:21 105:25
106:12
**offices** 1:14 2:11
**official** 24:8
**Oh** 42:18 46:11
97:6 107:2
**oint** 102:16
**okay** 6:25 8:20 9:9
10:3,12 11:3,12
11:22,25 12:12
13:16,22 14:2,8
14:10,16,20,22
14:24 15:6,8,14
15:19 16:7,15
18:16,23 19:16
20:21 21:24
24:25 25:17
26:7,22 27:9,14
28:1,10,16,21
30:1,13 31:5,7
31:16,19 32:4,8
34:1 36:12,20
37:14,17 38:10
38:23 40:3,9,15
40:24 42:10,18
43:6 44:22 45:7
45:16,17,23
49:6 50:4,7 51:1
51:17 52:25
54:14,25 56:19
58:21,22 59:14
59:16,19 61:18
62:7,12 63:8
65:13 66:18
69:7 72:11 74:1

74:4,9 79:5 80:8
80:11 85:15
87:1,3,6 88:16
89:9,22 90:6,8
92:14 93:25
94:2,16,17
96:17 97:6
98:24 99:8
102:6,18 103:17
104:5 106:17
109:14 112:12
112:25 113:20
117:25 120:5,21
120:25 123:18
124:23 125:24
128:17 129:20
130:10,16 131:4
131:7 132:19,22
133:14,22 134:6
134:14 138:10
138:24 140:19
140:22
**Old** 1:22
**old-fashioned**
37:16
**older** 11:24
**once** 14:23 29:4
32:10 42:9 52:6
52:8,15 62:15
62:19,19 76:18
77:2 113:1
114:5,13 120:3
**ones** 43:22 106:19
106:20
**open** 35:10 57:9
106:5
**opening** 106:12
**operator** 34:20
46:1 47:11
**opposed** 117:6
**option** 25:13,15
**orally** 63:15
**order** 129:25
**orders** 66:19
**ordinary** 73:16
76:5
**oriented** 99:18
**original** 116:23,25
118:10 134:4
145:8,9
**originally** 133:25
**Osorio** 50:12
**ot** 37:4
**outside** 19:8
**outstanding** 49:7
49:15

---

**P**

**Paces** 1:17 3:12
**pack** 21:10 22:1,5
22:25 23:8,14
**pad** 99:10
**page** 4:3,7 5:23,24
12:3 25:23
26:21 31:3,8
39:4 45:16
129:3 131:4,5
136:11 137:23
141:22 145:6
**Page/** 143:8
**pages** 31:4 130:14
130:17 144:8
**panel** 31:1
**pants** 91:11
104:23
**paperwork** 34:12
44:11
**paragraph** 26:6
65:12,22 66:5
66:15 67:14
**parents** 138:15,19
**parked** 88:5,7
108:24
**Parker** 10:20,23
**parking** 107:15
**part** 17:9 18:4
53:6 58:16
116:15 135:6
137:8,9
**participating**
88:20
**particular** 91:13
**particularly** 104:9
**parties** 2:17
144:13,14
**partner** 41:9
**party** 2:15,18
**pastor** 11:9,10,11
**patient** 56:2
**patrol** 6:17 19:23
34:18 52:9
55:16 94:15
**patrols** 15:24,24
**pause** 87:18 88:18
89:12 90:17
91:2,24 94:5
95:2 96:8 99:1
100:3,14 101:7
**paused** 103:6
**pavement** 64:14
**paying** 91:13
102:11 104:19
**payment** 9:8
**peace** 129:25

**pending** 5:5
**people** 10:1 42:3
43:24 52:19,21
53:13,21 59:17
61:8 63:10 67:7
69:20 77:19
80:12 96:6
104:20 109:1,4
109:8,21 118:11
118:14 119:6
140:16 141:7
**perceive** 77:20
83:21
**percent** 81:21
**Perfect** 70:3
**perform** 78:19
79:1
**performance** 24:8
**performing** 79:5
**person** 34:3 36:16
36:21 40:16
41:12,14,24
48:22 49:7
50:22 55:2 63:9
65:22 67:3
74:15,18,19
75:14,24 76:18
76:23,24 79:7
90:12 94:7
99:22 108:1
127:8 128:20
129:23
**person's** 51:15
**personal** 27:15,16
32:24 57:2
**personnel** 4:8 7:23
**perspective** 98:15
98:18 102:21
**pertaining** 19:7
**pertinent** 88:9
**phone** 27:10 32:22
32:23 33:2 37:3
37:4 49:7 52:11
52:15 57:3
120:20
**phones** 27:12
**photograph** 83:12
**photographs** 64:6
64:8,11,12
**phrased** 41:19
69:10
**physical** 84:16
**pick** 22:8 54:2
106:6
**picked** 54:23 57:6
57:10 59:3
116:12,16

118:16,19
140:10,10,13
**picking** 12:6,8
59:8 61:11
116:5,10,11,24
120:12 126:13
**picks** 49:15 53:22
115:16,17 117:1
**picture** 32:20
89:15
**pictures** 33:5
64:20
**pieces** 28:3 31:22
117:3,8,9
118:17 121:3
**Piedmont** 3:8
**pipeline** 16:13,14
**pistol** 9:20,21,22
12:1 126:2
**pistols** 10:1
**place** 113:18
137:7
**placed** 36:14,16
36:20,21 124:23
136:20
**placing** 79:19
**Plaintiff** 1:4 3:2
**Plaintiff's** 4:7 7:19
17:4 19:13
23:25 24:4
30:15,19 37:7
37:11 39:1 65:8
124:4 127:17,21
131:9,13 133:16
133:21 135:23
**plan** 8:20,21 9:8
**play** 85:16 88:16
89:10 90:6,24
93:14 96:20
97:10 107:25
109:13 112:25
113:1
**played** 64:22
107:23
**plea** 129:2,3,4,14
**pleads** 129:6,18
**please** 6:10 121:18
**pled** 130:10,19,24
**plenty** 81:13
**Plott** 38:14
**plus** 50:16
**pocket** 91:8
**pockets** 66:20
91:19
**point** 21:23 53:15
53:18 54:10
55:15 56:5 58:7

58:7,25 66:3
68:9,16 69:3
71:14 72:12
75:14 76:25
77:23 78:7
81:25 85:6,9
88:24 89:7,18
90:5 93:4 95:11
96:17 101:9,13
104:25 111:1,19
112:10 114:2,11
116:6 117:18
118:1 120:10,19
138:11 139:3,14
139:15
**pointed** 68:16
70:9 72:23
112:10 125:10
**pointing** 88:4 95:5
**Polaroid** 32:14
**pole** 119:13
**police** 6:15 55:10
70:15 73:14
74:7 85:5,7
101:1 136:22
**policies** 19:10,16
**policy** 12:16,18
19:18 24:5,6,10
25:22 39:21,21
135:14
**poorly** 69:10
**portion** 32:3
**position** 16:11
103:8
**possible** 65:3
106:6,8 116:8
120:16 124:2
**possibly** 29:12
41:25 81:21
**post** 8:1 17:18,24
18:9,25 140:9
**potential** 73:17
**practically** 40:17
**preference** 6:1,2
**prepare** 7:2 26:11
30:22
**prepared** 44:16
74:13 107:3
**present** 3:15
56:15
**presented** 58:13
98:14 128:13
**preserving** 29:8
**press** 21:7
**pressure** 61:9,10
**presume** 36:10
37:4

**pretty** 85:19
86:17 97:16
101:13 105:6
**prevent** 76:14
**previous** 125:5
**primary** 40:11,22
**print** 117:21
**printed** 49:4
**prior** 8:10,11
**priority** 35:14,21
**privilege** 5:11
**probable** 58:3,10
64:7,23 73:2
81:6 82:7,20,24
83:3,13 84:23
85:1 114:9,13
121:2,5,12,19
121:21 122:18
122:20 123:2,14
127:6 130:3
132:15 137:3
**probably** 27:12
32:17 36:12
37:15 47:14
59:15 83:19
84:7 86:9
**problem** 97:3,4,5
97:8,14 100:17
114:23
**problems** 13:1,13
26:9 28:11
139:18,20
**procedure** 19:3
**proceeded** 132:10
**process** 131:5
**processed** 130:21
**produced** 19:16
87:5 93:21
**product** 33:23
**program** 8:19
**prohibited** 2:13
**promise** 81:14
**proper** 9:25 24:8
28:12
**property** 55:24
**prosecution**
127:24
**protect** 75:6,15
76:12
**prove** 132:6
**provide** 2:11,14
25:20
**provided** 46:22
65:20 128:24
145:7
**public** 19:25 74:6
142:8

**Puckett** 1:20,21
2:9,10,12,14,16
2:20 144:19
145:14
**pull** 21:21 70:24
79:14 91:11
104:23 108:10
108:12 115:19
**pulled** 38:15 46:4
46:17 54:9,17
68:10 70:7
72:12,17 88:14
112:6,10 139:8
139:9
**pulling** 112:1
113:16
**pulls** 75:5 77:2
**purely** 5:19
**purpose** 19:24
**purposes** 5:8
101:20
**pursuant** 2:6 5:7
**pushing** 112:23
**put** 24:12 42:21
44:5 50:24
51:14,18 52:12
55:8 61:15,21
63:2 74:21
79:16 85:7
86:16 93:22
97:7 104:10
111:13 117:8,9
**putting** 47:11
85:4 101:4
117:2 118:17
121:3 137:1,2
**puzzle** 117:3,9
118:17 121:4

――――――――――――
**Q**
――――――――――――
**qualification** 18:3
**qualify** 17:24 18:1
**question** 5:10 12:9
15:7 17:8 23:17
31:16 66:6
69:11 72:22
73:21,22 84:17
98:7,17 101:21
123:2,8,12,13
132:18,20 136:3
**questions** 7:24
19:19 21:13
24:23 58:5
63:15 73:12
99:15 141:20
144:6
**quick** 7:16,17,24

12:9 19:11,19
33:25 86:17
100:4 101:4
129:19
**quickly** 13:23
130:13 134:24
136:2

――――――――――――
**R**
――――――――――――
**R** 143:1,1 144:1,2
**radio** 35:7,12 36:7
39:5,7 40:2,3,5
40:7 41:7 46:19
46:23 51:11,12
51:14,15,19
85:23
**raise** 42:2
**raised** 76:9 98:19
**ran** 43:20 48:7,12
48:19 50:12,16
51:24 70:11
**range** 9:17 10:17
17:18,21 20:22
**rates** 21:17
**reach** 91:19
**reached** 72:17
140:9
**reaches** 75:4
**reaching** 91:7
104:22
**react** 41:22
**reactivate** 13:6
**read** 5:14 123:10
126:11 129:19
130:19 143:3
145:8
**reading** 12:22
80:13 112:20
**ready** 100:7
**real** 7:16,17 19:11
33:24 45:21
100:4 101:4
129:19 130:13
134:24
**realize** 139:11,16
**really** 13:23 70:9
78:24 89:2
92:16 98:16
100:21 131:23
134:9
**rear** 106:12
**reason** 10:17
21:13 24:19
68:22 69:1
104:10 114:15
114:15 121:15
132:5 143:8

**reasonable** 76:23
77:18,18 79:6
79:10 80:4,10
114:15 132:7
**reasoning** 28:19
**recall** 30:3 43:23
53:10 57:15
59:6,22,24
62:10 71:5,9
87:9 103:16
116:17 131:20
136:23
**received** 18:23
34:4,5 127:22
**receiving** 37:24
38:5 77:15
**recess** 65:6 140:1
**recognize** 96:25
139:7,9,13,14
**recognized** 139:1
**recollection** 21:22
22:24 51:23
55:1 66:21 82:2
108:17 115:18
116:4 132:2
**record** 6:11 14:9
14:15 25:10,18
27:5 57:1 61:14
64:3 86:25
96:10 107:6
109:18 131:4
134:20 140:3
**recorded** 136:9
**recorder** 27:6
**recording** 4:11
24:5 25:19
26:19 27:6 28:6
**recordings** 24:9
27:18,20
**reduced** 144:6
**Redwine** 99:13
**refer** 37:13 43:6
103:15
**references** 10:11
**referral** 2:16
**refers** 43:3
**refresh** 140:21
**regardless** 40:6
**regular** 19:8
144:14
**Regulations** 2:6
**related** 17:16
26:16 73:10
135:3
**relates** 19:18
**relating** 127:23
**relationship** 10:24

**relative** 10:14
**relatively** 41:3
120:10
**relayed** 47:15
**relaying** 38:6
**released** 62:15,18
**relevant** 62:25
**relied** 114:23
**remain** 40:7 67:7
**remained** 8:4
16:25
**remember** 12:21
22:12,16,18
30:6,11 31:24
38:18,21 46:15
48:1,2,3,9,10,14
50:8,9,13 52:1,5
55:7,11 56:2,3
56:14,17,19
57:18 59:7,20
59:24 61:3 62:8
62:22 63:4,6,8
64:11 66:22,25
67:22,25 68:3,7
71:14,16 81:19
84:2,3,6,20 88:6
88:11,15 89:23
90:3,21,23
93:17 96:15
98:1,3 99:16
102:4 108:11
113:15,19
125:12 128:8,12
128:15 134:10
134:12,17 136:5
136:6 138:7
139:4,5 140:12
**remembered**
85:23
**remind** 6:3
**remotely** 106:16
**removed** 7:23
68:14
**reopened** 45:12
**reorient** 100:4
**repairs** 26:5
**repeated** 91:17
**report** 4:12,13,14
4:15,20 7:13
26:10,15 32:16
35:17 37:13,13
39:4 40:21
44:16,17 45:11
47:11 51:9
62:12 64:25
80:13 112:20
124:17 137:8,9

137:10,12
**reporter** 2:8,15
  116:14 145:14
**reporting** 2:6,11
  2:14,15
**reports** 30:20,22
**represent** 37:12
  93:20 105:17
  144:8
**request** 23:8
  49:12,20
**requested** 49:14
**requests** 51:25
**require** 125:8
**required** 17:18
  19:24
**requirement**
  17:19
**requires** 18:9
  73:19
**reserve** 5:9,21
**resist** 92:15,21
**respond** 39:23
  73:22
**responding** 65:18
**response** 100:17
**responsible** 50:22
**restarts** 42:19,20
**restrained** 126:4
  126:25
**result** 133:8
  144:15
**return** 49:9,10
**reveal** 70:5
**revealed** 72:13
  83:20
**reviewed** 7:4 83:9
  138:6
**revoked** 8:8
**revolver** 74:21
**rewind** 107:24
**rewound** 107:22
  107:22
**Rifle** 9:6,12
**right** 5:2,13 6:1,21
  6:23 7:4,12,15
  8:2 10:22 11:6
  12:2 14:3,6,17
  14:25 16:7,9,22
  17:1,7,25 18:3
  19:10 20:1 22:7
  23:12 24:20
  25:5,14,21 26:1
  26:12,16 27:22
  29:11,15,18
  30:13 31:11
  32:12 33:3,6,20

33:24 34:14,15
  34:16,21,25
  36:2,5,25 37:2,2
  37:25 38:8 39:6
  43:10,14,17,20
  46:11 47:19
  48:1 49:2,18
  50:17 52:3 54:3
  55:23 56:10
  57:16,22 60:3,5
  60:17 61:19
  62:17 63:20
  65:11,24 66:5
  66:14 67:13
  68:8,11 69:14
  70:3,9 73:14
  75:2,13,22 76:4
  76:19,25 77:6
  77:24 78:6,11
  78:13,22,25
  79:6,12,17
  80:11,25 83:1,5
  83:10 85:20,24
  86:7,10 87:15
  89:9 90:17,24
  91:8,19,21,22
  92:4,8 94:21
  95:16 96:7,20
  97:11 99:19,23
  99:25 100:3,8
  100:12,22 101:7
  101:15 102:12
  102:13 103:5,13
  105:2,8,11,13
  105:19 106:2
  107:12 108:15
  108:22 109:2,12
  109:16,21
  110:10,17 111:5
  111:9,13 112:14
  113:1,4,12
  114:17,19
  115:14,15
  116:18 117:12
  118:3 119:8,13
  119:14 122:2
  124:7 128:21
  129:8,11,15
  130:5,11,24
  131:1 133:10,13
  134:1,20 135:3
  135:13,18
  136:12 137:21
  139:19 140:3,24
  141:15,19
**right-hand** 12:3
  31:9 38:11

88:13 108:24
  109:23
**rise** 73:2 82:7
**road** 1:17,22 3:8
  3:12 35:20
**role** 64:22 82:19
**roll** 90:8 91:21
  92:11 101:3
  115:5,9 116:18
**room** 16:17,18
**rotate** 15:5 40:13
**rotating** 13:20
**rotation** 40:12,14
**roughly** 41:1
  43:12
**rounds** 10:6
**routinely** 13:18
**rude** 14:14
**rule** 73:24
**Rules** 2:6 5:9
**run** 13:24 19:11
  39:10 43:17
  45:5 48:25 49:1
  49:1,23 51:12
  119:11 130:13
**running** 39:13
  47:20 50:22
  52:1 118:15
**runs** 51:2 53:25
  97:17 118:23
**rushes** 78:7
**Rust** 1:15 2:11
  3:11

―――――――――
         **S**
―――――――――
**S** 3:11 46:1,4,9
  143:1
**safe** 9:25 120:10
**safety** 19:25 89:6
  98:22
**sake** 92:10 133:6
**Salesforce** 1:16
  3:12
**salesperson** 9:18
**Samsung** 27:13
  27:17
**satisfaction** 76:14
  77:12
**save** 86:16
**saw** 9:19 51:3 52:6
  64:13 70:4,24
  70:25 82:1 88:5
  104:17 105:1
  108:18 109:22
  117:16,17 118:8
  118:10 119:23
  119:24 123:25

136:25 140:5
**saying** 23:18 55:7
  55:11 68:7
  80:24 88:5,15
  92:7,18 97:3
  100:24 104:6,8
**says** 5:25 12:15
  27:2 44:3,6,20
  44:24 45:8,8
  46:4,20 91:10
  92:2 120:15
  129:7 132:11
  136:16
**scan** 36:8
**scenario** 75:11
**scene** 18:25 21:19
  24:15 25:13
  28:23 29:9,20
  32:21 34:8 35:1
  35:11,24 36:17
  38:19 39:9,17
  40:25,25 42:1,3
  42:9,10,13
  43:13,14,17,25
  45:25 46:16
  47:5,7,13,25
  48:4 50:1,21
  51:5 52:7,8
  57:16 59:1 63:1
  63:5,7 64:7,19
  64:21 67:3,8
  74:9 80:1 89:18
  104:2,3 105:22
  105:25 118:10
  120:10 122:2,13
  124:1 138:4
  141:6,16
**scenes** 103:22
**school** 8:15 11:17
**Scott** 129:23
**scratched** 136:13
**screen** 107:19
  108:19
**SE** 3:4
**Sean** 48:8
**search** 12:23 13:4
  28:24,25 29:4
**Seat** 20:1
**second** 18:6 25:23
  26:23 31:3,8
  101:17 136:11
**seconds** 47:6
  72:16 105:4
  111:4,15 115:21
  118:4
**Section** 144:11,11
**secure** 108:5

**secured** 108:2
**see** 5:12,15 11:19
  18:16 22:12
  26:25 34:14
  35:17,18 39:5
  61:18,24 62:14
  66:18 67:13
  75:5 86:5 88:9
  88:12 89:14,16
  91:18 92:6,16
  99:11 100:6
  104:19,21,23
  105:19 106:11
  106:11 108:23
  109:4,21 110:11
  110:12,22
  111:15 112:4,5
  112:7 113:8,23
  118:1 119:6,10
  119:18,19,22,22
  129:17 130:17
  134:2 136:3
  138:13
**seeing** 41:12 51:13
  93:17 105:18
  111:19 112:17
  112:18 136:5
  140:12
**seen** 7:12 11:25
  20:11 21:16
  23:11 28:3
  37:18 58:20
  62:20,24 84:4,8
  104:1 131:16,17
  133:23,24 141:6
**select** 33:23 36:8
**self-defense** 58:6
  68:23 70:20
  77:24 80:22,24
  81:1 132:8
**send** 5:22,23
  22:23
**sentence** 26:24
  100:25 130:15
**separate** 49:11
  58:19 74:5
**separately** 95:17
  135:5
**sergeant** 29:20,21
  29:23 32:23
  33:1,3 41:4 64:6
  66:22,23,25
  83:17 89:15,17
  97:1,2
**sergeant's** 32:22
**series** 30:19
**serious** 41:17

76:15 77:16
**served** 131:1
  134:10
**service** 34:11
  45:15 74:21,24
**services** 2:11,14
**set** 21:2 22:4,5
  39:21 78:4
**setting** 29:1 78:10
**seven** 5:24 15:11
**sexually** 68:1
**Shapiro** 3:7
**Sharon** 11:18
**Shayna** 95:20,21
  98:10
**sheet** 32:1 129:2,4
  130:15
**shift** 13:20,23,25
  13:25 14:3 15:1
  15:9 22:14
  28:17,18 30:23
  31:11,13 32:5
  33:3 135:9,17
**shifts** 13:24 14:1
  15:4,4,4 28:15
  28:19 135:11
**shirt** 68:10 72:13
  74:19 76:10
  122:6
**shoot** 10:6 75:14
  75:18,19,21
  80:6,7
**shooter** 17:11
**shoots** 75:5
**short** 54:1 65:6
  118:23 140:1
**shortly** 68:9
  138:25
**shot** 10:8 78:3
**show** 10:10
  133:19
**showed** 90:4 99:14
  121:1 128:6
**showing** 24:3
  30:18 33:10
  37:10 124:7
  127:20 131:12
  133:20
**shown** 112:7
**Shumpert** 135:7,8
  136:7,8
**side** 31:9 66:12
  82:12,16 87:11
  88:13 108:24
  109:23
**sign** 145:8
**signal** 34:2 35:2

41:21 46:10,12
46:12 74:10
**signature** 141:22
145:10
**signed** 129:2
**significant** 133:8
**similar** 69:13
104:4
**simple** 73:6 125:4
128:2
**simply** 29:9
**simulator** 18:12
18:15,18
**sir** 6:11 7:14 8:9
9:4,17 14:4 16:1
16:23 17:2 18:5
18:8,11,20
19:22 20:2,15
20:18,20 21:12
21:15 23:15
24:17,21 25:3,6
25:11,16,22
26:2,13,17 27:1
27:19 29:3,6,16
29:19,22 30:5,7
30:21,24 31:2
32:11 33:16,19
34:6,9,24 35:3
36:4,6,11 38:13
40:5 41:18 42:5
42:14 43:15,18
43:21 44:1,17
46:8,14 47:9,22
48:6,21,24
49:21 53:2 55:6
55:12,18,21,24
56:7,11,18,25
57:4,12,24 58:9
58:17 60:11
63:17,19,23
65:21,25 66:4
66:17 67:6,9,12
67:21,24 68:3
68:12,17,24
69:4,4,15,18,22
70:21 71:13,17
71:23 72:1,3,6
72:10,15,19,21
72:24 73:4,7,11
74:14,17,25
75:3,23 78:1
79:4 80:23 81:3
81:8 82:8,14
83:6 92:5,23,25
93:3,13,19
94:12 96:16,19
98:21 99:24

100:20,23
101:19 103:4
105:21 109:3
113:19 114:20
116:11 117:7,10
117:19 119:2,15
119:21 123:23
129:5,9 134:3
134:12
**siren** 21:3
**sit** 48:15 52:5
66:23 121:7
141:15
**sitting** 16:17
36:25 113:20
**situation** 77:11
**six** 5:24 130:23,24
**sixth** 67:14
**slowed** 113:17
**small** 16:8
**smaller** 108:19
115:1
**smartass** 105:9,10
**smoke** 67:19
**Solon** 1:3 3:15 5:4
30:3 36:13,15
44:14 48:10
52:17,22 53:17
53:22 54:12,22
55:1,7,14 57:2
57:17,20 58:6
58:13 59:7
63:10 65:24
66:6,24 67:2
68:18,22 70:11
70:19,25 76:6
77:4,24 78:3,7
78:23 79:13,15
79:25 80:21
81:17,24 82:5
82:20 83:17
84:12,14 85:3
85:11 87:20
88:23 89:5
91:19 92:2,14
93:22 95:20
96:11 100:8,22
101:10,16
103:14,25 104:5
104:7,25 105:5
109:9 114:4,7
114:10,18 116:4
117:17 118:19
119:17 122:1
124:11 125:25
126:23 127:10
128:10,13

129:23 130:5
132:13 135:1
139:4 140:8
141:11,11
**Solon's** 48:17 50:5
50:10,17 69:2
83:7 110:12
121:13,16
122:16,19
123:21 131:15
134:4
**somebody** 23:10
36:18 41:25
84:21 104:10
108:2 125:10
**somebody's** 28:24
125:18
**somewhat** 70:23
**son** 11:23
**soon** 41:3
**SOP** 4:10,11
**sorry** 6:16 14:8
15:19 25:23
26:21 34:24
38:3 42:22
45:13 46:8 69:5
72:10 79:4
107:9 112:19
116:14 118:19
134:14
**sort** 12:17 29:7
30:4 36:25
40:15 41:14
42:2 52:25
56:10 58:1,1
61:25 65:14
79:16 86:10
89:14,20 90:19
92:19 99:12
108:9 110:14,21
110:21 112:2,4
113:17 114:21
118:1 119:12
120:6 128:4
135:8,14,16
136:15
**sorts** 57:23,24
**sought** 125:4
**sound** 135:17
**sounds** 33:17
**Southern** 97:16
**speak** 71:10 82:12
101:16 124:21
128:4 133:25
134:20 139:20
**speaking** 7:7
59:20 71:11

81:4 123:25
**speaks** 104:2
**specific** 18:24
51:23 67:22
**specifically** 28:17
52:1 59:21 63:6
73:9 84:20
108:11 123:14
**specifics** 85:13
**speech** 88:1
**spelled** 5:17
**spend** 81:13
**split** 15:23 106:24
115:25
**spoke** 30:3 47:25
60:1 62:22
69:12 125:24
**spoken** 28:5,7
62:23 95:23
**spot** 78:22
**St** 1:15 2:11 3:11
**stage** 95:13
**stamp** 12:2
**stand** 45:9
**standard** 17:9
**standing** 56:18
57:16 62:1,5
63:4 87:12
89:21 96:4
106:2 110:22
118:11 140:8,17
141:9
**standpoint** 98:22
**stapled** 126:9
**start** 10:23 21:2
25:10 52:25
54:17 65:11
84:9 86:24
105:19 109:17
**started** 10:17
68:15 70:8,14
115:14
**starting** 69:24
112:2
**Starts** 115:12
**stat** 45:10
**state** 2:2 6:10 74:5
129:25 145:2
**stated** 62:14 144:5
**statement** 28:20
55:13,14 57:17
57:21,22 63:16
68:12 83:7 98:2
104:11,12,14
117:2 121:4,13
121:16,22
122:17,20

123:15,21,23
126:15 127:6
136:15,23
137:20,20
**statements** 52:21
56:12,15,23
63:12 68:2 69:1
81:21 83:4
97:23 137:14
138:3
**STATES** 1:1
**station** 82:3
**status** 99:18
**stay** 36:10 57:5
80:8
**stayed** 30:12
52:17 54:24
126:5,15 127:1
**stays** 110:15
114:6 136:21
**step** 101:17 112:4
**steps** 9:22 75:15
76:11
**stint** 6:22
**stomach** 140:25
**stop** 21:7 27:5
35:23 71:15
75:18 77:14
96:23 110:4,5
112:14 113:4,17
116:21 117:14
117:25 139:6,7
139:16,19
**stopped** 67:11
80:14
**stops** 27:8 93:24
**store** 115:25
**story** 69:13 82:13
82:16
**stretch** 110:23
113:23,25
**strike** 36:14 56:13
57:14 120:1
121:24 126:2
132:21 136:20
**strikes** 53:23
88:24 114:5,14
114:21 118:21
**striking** 59:8
119:24 120:13
137:2,4
**strong** 97:16
**struck** 54:23 55:4
58:14 59:3
60:21,23 118:20
120:3 121:2
126:16 133:7

137:5
**struggle** 116:9
**stuck** 109:15
132:16
**stuff** 7:17 32:25
90:10
**subdued** 55:3
58:12 59:2
78:14 120:9
133:7
**subduing** 132:9
132:14,25
**subject** 32:25 46:4
46:16 47:7
54:19 65:17,19
65:20,23 70:14
74:11
**submit** 131:13
**subscribed** 142:6
**subsection** 74:8
**substantial** 84:16
**Suite** 3:8
**Sullivan** 10:13
**summarize** 30:25
35:13
**summarizing**
65:14
**summary** 39:6,11
43:11 70:23
**supervisor** 22:22
26:10 32:2,4
135:17
**support** 125:1
126:19 129:14
130:3
**supported** 114:9
**suppose** 49:17
**supposed** 20:4,5
25:20 26:9,15
29:5,14 32:6
34:21 39:19
67:10
**supposedly** 95:4
**sure** 12:25 13:3
14:9,14 15:18
21:16 22:2,18
23:2,9 27:19
29:25 35:23
47:16,18 52:13
54:13,21,24
60:22 61:13
62:17 63:13
64:10,12 74:12
78:14 81:22
85:19 111:8
117:4,4 126:14
133:6 134:19

136:18,21
**surprise** 36:24
76:23
**surprised** 23:4
39:14 51:3
**surrounded** 58:2
138:11
**surveillance**
106:18 107:15
107:23 108:15
**survey** 42:9
**suspect** 68:22
70:19
**suspended** 8:7
**suspicion** 98:20
**sustained** 132:13
**sustains** 132:23
132:24
**sworn** 6:6 142:6
**Sydney** 50:3
59:25
**synched** 120:14
**system** 17:22
18:21 39:16
**systems** 20:14
25:1

_____
**T**

**T** 143:1,1 144:1,1
**tackle** 80:8 120:12
**tackled** 53:17
54:10,18 112:24
114:4 115:9
**tail** 114:22
**taillights** 113:13
113:14
**take** 8:25 13:14
14:18,23 15:20
29:7 32:20 33:4
35:20 63:14
65:4 69:16 75:6
75:15 76:11
86:21 100:7
112:4 118:15
**taken** 5:3,7 19:4
40:22 47:7 65:6
123:24 127:22
138:4 140:1
144:5
**takes** 12:23
**talk** 6:22 13:22
20:7 52:3 57:25
61:25 63:15
64:25 66:7
71:10 76:5
113:7 124:25
138:20 139:24

**talked** 7:3 48:4
83:4 85:2 96:17
105:23 126:18
136:6
**talking** 29:10 63:4
63:6 71:15
78:16,17 84:3,6
90:13 95:9,16
96:6,13 110:24
**tape** 105:24
**tapes** 106:11
**taught** 10:18
75:21
**technically** 15:3
**telephone** 33:4
**tell** 7:1 17:14 19:1
20:9 35:7 39:25
47:2 49:8 52:5
68:4 75:2 77:3
86:14,15,20
88:2 105:5,18
108:11 111:12
111:18 112:6,17
116:24 117:5,23
117:25,25 118:8
119:16,17
124:20 125:3,20
126:19,23 127:3
127:4,7 136:19
140:13,16,24
141:2
**telling** 33:10 38:7
39:11 53:14
66:23,25 67:18
71:8,14,16 88:6
88:11 93:17
**tells** 93:8
**template** 32:16
**ten** 10:7 39:18
**tended** 52:18
**terms** 13:9 18:23
40:17 55:13
80:11 83:1
**testified** 128:20
130:1,6
**testify** 127:7
**testimony** 5:16,17
23:13 114:1
124:13 127:9
140:12
**thank** 28:2 40:3
69:10 84:19
133:13
**thanked** 56:1
**theft** 26:14
**thereof** 129:25
**thereto** 144:6

**thing** 14:17 19:9
28:4,7 33:21
47:20 53:6
71:15 81:9
82:22 92:2 97:2
103:6 104:22
109:14 126:20
**things** 8:24 10:4
12:7 13:12 14:8
17:23 19:23
20:3,6 26:15
32:18 35:24
39:12 43:16
45:5 54:4 56:8
56:16 61:18,24
63:18 68:9 72:4
74:12 75:1
78:10 104:17,18
125:20 140:5
**think** 9:14 26:8
36:18 37:15
41:1 45:21 47:4
47:23 85:16
86:16 87:13
94:9 95:5,8 96:4
96:7 97:22,23
98:13 100:25
103:5,8 104:8
105:8 107:3
110:7 115:1
120:19 123:11
137:8,9 138:23
139:14,23
**thinking** 41:24
98:16
**thinks** 91:7
**third** 26:5,24
**thirty** 145:7
**Thompson** 70:22
71:3,19 76:8
80:19 81:15
83:5 95:21
138:2,3
**thought** 9:18
11:25 68:5
85:23 90:20
106:13 123:25
**threat** 58:13
73:17 75:19,24
76:1,2 77:15
98:14 114:14
**three** 13:18,19
26:5 61:25
63:10 67:14
71:2 73:1 83:3
98:13 106:21,22
109:9 115:25

130:14,21 131:6
137:14,17,18
140:18,23 141:8
**three-month**
16:24
**ticket** 22:23 26:11
**time** 10:8,13
12:19,24 14:19
15:12 16:3
17:13,21 18:14
18:15,19,22
20:8 21:16
23:10 25:1
31:25 35:21
36:13 41:1 42:8
43:12 45:21
49:22 52:12,14
52:17 53:18
54:1,11 58:4,22
58:25 64:13
66:12 68:22,24
69:9 71:18
76:25 77:23
78:12 80:20,23
81:13 85:1
86:21 89:25
90:2,5 93:4
98:16 100:18
101:9,21 103:19
110:21 111:1,13
111:14,20 112:6
112:18 113:22
114:2 117:18
118:12,23 120:8
120:11 123:24
125:7 129:3
131:1 135:12
138:16
**times** 58:15 59:4
91:18 111:5
114:6 120:1
**timestamp** 115:20
117:22
**timestamps**
108:10,12
117:20
**tire** 20:1
**tires** 31:21
**today** 8:5 52:5
66:23 93:18
101:13 131:16
141:15
**told** 14:18 16:2
35:15 36:18
37:23 52:12
53:3,13 55:1
58:23 59:1

62:22 65:15
67:23 68:13
70:11 72:7 76:8
83:19 85:6,7
87:23 101:12
107:14 111:22
116:5,8,11,12
126:21 136:13
138:8,14
**tone** 92:24
**tonight** 125:22
141:17
**top** 26:1 61:5
**touch** 75:2
**Tower** 1:16 3:12
**traffic** 27:5,8 36:7
85:24 139:6,7
139:16,19
**trained** 9:19 75:17
**training** 17:9,11
17:15 18:7,12
18:18,23 19:1,8
73:9 125:15,16
**transcribed** 5:14
**transcript** 5:22
144:5,9 145:6,8
**transferred** 38:23
**transmission**
31:23
**transpired** 53:11
54:8
**transposed**
110:10
**trial** 131:22
**trick** 25:24
**tried** 9:9 67:10
79:24
**triggers** 41:15
**true** 76:9 102:1,3
102:10,23 143:4
144:8
**trunk** 92:7
**truth** 71:8
**try** 14:23 91:8
107:10
**trying** 21:25
25:24 28:14
35:11 45:18
54:5 58:3 64:17
79:13,14 88:2
91:11,19 92:21
104:23 111:12
111:24 118:13
**turn** 21:4,9,18
23:13,17,19,21
23:22 25:8,13
29:5,11 40:12

40:14 87:25
**turned** 29:2 93:23
**two** 10:19 13:24
15:1,4,4,15,16
26:5 31:4 41:2
47:23,24 48:3
50:9 54:20
61:25 62:9 63:5
63:7 67:14 74:5
80:14 89:20
106:24 108:24
109:21 113:16
117:3,8,9 121:3
128:8 129:3,18
130:17,18
135:15,15
**type** 35:9
**typed** 124:18
**typewriting** 144:7
**typically** 17:15
32:2 35:11 42:7
49:5,25 84:21
**typing** 35:18
47:14

_____
**U**

**Uh-huh** 21:20
34:22 42:12
46:6 51:16 58:4
62:3 65:16 79:2
83:6 108:25
110:9
**ultimately** 41:4
73:5,15 127:25
128:24 129:17
130:10 132:5
134:19
**un-holstered** 42:7
**unarmed** 120:8
**unclear** 112:16
**uncommon** 98:4
**understand** 6:21
21:25 53:13
58:10 62:18
73:21 82:10
88:20 91:4
93:16 96:14
102:15 103:7,7
105:22 108:1
124:9 137:6
**understanding**
53:10 54:7 58:1
77:4 109:7
110:2
**understood** 12:18
63:13 97:11
101:12 124:13

140:11
**unfortunately**
120:14
**uniform** 94:13
**unit** 40:1 44:2
**UNITED** 1:1
**unload** 10:3
**unloaded** 116:13
116:17
**unreasonable**
76:17 79:18
**unusual** 98:8
**upgraded** 130:7
**uplock** 106:16
**upset** 53:14 76:20
**urgent** 60:13
**use** 9:2 12:21
17:16,17,22
18:1,7 24:7
26:19 32:21,22
33:1 51:11,13
51:20 73:10,14
74:7,13 79:6
103:1 114:16
126:2
**useful** 60:9
**usual** 2:17
**usually** 10:7 17:20
32:22
**utilize** 75:10
**utilized** 27:7

_____
**V**
**various** 43:24
51:24
**veers** 119:13
**vehicle** 20:3,8,16
31:8 32:1 57:10
**vehicles** 4:10
19:19,24 41:5
**Veitengruber**
48:13 59:23
69:12 70:17
71:3,19 76:8
80:18 81:16
83:5 96:11,14
**versus** 5:4
**vicinity** 141:13,14
**victim** 126:3,3
**victims** 125:13
**Victoria** 48:13
**video** 20:7,11 21:5
21:14 23:3,11
24:5,7 25:18
27:4,20 52:23
53:4,9,21,24
54:7,8,11 57:19

58:20 73:1
81:14,23 82:1
83:24 84:4
85:16,21 86:25
87:16 88:17
89:11 90:7,16
91:1,6,18,23
92:12 93:21
94:4,18,23 96:1
97:20 98:5,25
99:20 100:2,6
100:13 101:15
102:8 103:11
104:6,17,21
105:24 106:18
107:15 109:19
110:8,18,20
111:10,14
112:13,21 113:3
113:15 114:1
115:6,22 116:20
116:23 117:13
118:2,5 119:4
119:16 120:5,25
121:5,10 122:5
122:17 123:25
124:22 126:22
137:1 140:5,7
**videos** 7:8 93:18
116:1
**videotape** 83:9
103:25
**viewed** 84:11
**violence** 41:25
**Virginia** 9:10
**visible** 133:12
**visibly** 60:18 68:6
71:4
**visit** 28:8
**visualize** 45:18
**visually** 61:15
117:5
**voice** 92:24 96:25
**voices** 115:5
**volume** 88:1
**vs** 1:5

_____
**W**
**waistband** 68:14
70:7 72:18 77:3
**wait** 28:23 75:5,13
124:19
**waiting** 13:4 29:1
**waive** 5:19
**waiving** 70:8
**walk** 105:20
111:25 115:12

**walked** 59:3 78:17
122:7
**walking** 59:8 94:7
109:22,24
110:12 115:14
119:7 141:11
**walks** 115:11
**want** 5:21 7:2,4,24
10:10 19:10
24:23 35:16,25
37:21 49:18
54:5 61:13
62:17 65:11
66:7 73:12 88:4
88:21 101:20,25
102:3,7 110:4
115:19 117:4
123:5,10 126:14
135:18 140:4
**wanted** 10:6 12:8
35:19 63:13
83:22 137:13
**wants** 76:21
**warned** 32:24
**warrant** 4:16
12:23 13:4
28:24,25 29:4
44:17 49:10,15
82:4,9,11 125:1
125:4 126:8,19
131:25
**warrantless** 82:10
122:1
**warrants** 49:7,9
124:9,15,17
125:7,25 127:5
**wasn't** 11:10
22:10 24:19
52:13 56:5
60:15 91:13
112:9
**watch** 90:21
101:14 102:7
107:10,17
110:21 135:10
138:14,15
140:20
**watched** 23:3
27:22 28:4
52:23 53:4,9
54:6,8,11,16
57:19 73:1
81:23 83:24
87:7 103:13
104:6,7 105:2
108:14,16
113:15,24

126:21
**watching** 87:24
91:14 110:20,24
111:13 113:21
114:1 115:24
116:1 118:7
122:4
**wave** 68:15 70:24
**way** 5:18 17:9
27:4 35:6 41:21
60:10 61:19
64:9 74:19
79:23,25 81:6
83:21 93:21
98:11 103:3
106:19 116:1
117:23 127:5
130:8 135:20
**ways** 39:16
**we'll** 5:11,22 6:22
14:21 43:22
84:9 94:8
129:18
**we're** 11:24 30:1
38:2,2,8 57:25
58:19 80:25
81:13 85:15,17
87:19 103:8
110:7 126:14
**we've** 14:8 17:12
21:14 104:1
105:23 110:23
115:4
**weapon** 17:21,25
42:1,7 52:12
55:5 72:14
74:16,18,24
76:3,10 114:18
129:24
**week** 32:7,10
33:13
**weekly** 33:14
**welfare** 39:17
**went** 9:24 11:16
16:13 44:14
45:15 52:18,22
54:22 55:3
58:13 59:2
61:22 63:14
83:24 108:2
126:24,25
127:12 131:22
136:18,19
**weren't** 62:25
80:15 91:17
98:8 102:11
104:19 108:1

**whatnot** 18:6
**whatsoever** 82:19
**whoa** 123:4,4,4
**wide** 109:16
**wider** 109:16
**WILLIAM** 3:3
**wit** 129:24
**witness** 6:2 15:19
23:19,22 29:10
29:14 52:21
59:1 65:3 74:1
75:10 77:10
79:10 80:3 87:9
95:21,23 97:7
97:23 98:2
104:14 112:22
116:16 118:3,19
121:7 126:8
145:10
**witnesses** 5:19
73:2 124:1
**woman** 95:16
96:13
**women** 72:5
122:12
**wonder** 100:25
**wondering** 64:15
**Woodward** 3:4
**word** 31:1 69:23
70:3 90:20
103:1
**words** 52:4 63:2
97:17 101:1,4
127:14
**work** 8:10,22
16:13 20:21,22
22:17 39:16
**worked** 6:21
10:16 11:2 20:9
24:24 103:18
**working** 8:24 9:14
22:1,2,13,19
138:23
**works** 94:10,11
124:20
**worried** 13:6
**wouldn't** 38:5
44:10 54:22
64:19 69:16
79:18 88:9
**wound** 61:6
**Wow** 9:13
**wrestle** 70:25
**wrestled** 70:12
**wrestles** 78:8,8
**write** 126:20
**writing** 40:20 99:6

99:9,9
**written** 12:10 14:9
14:20 25:20
26:15 28:22
44:16 63:12,16
81:20 127:5
129:11 136:3,5
**wrong** 5:18 85:17
93:2,6
**wrote** 24:10

_____
**X**
**X** 4:2

_____
**Y**
**y'all** 15:1 38:24
56:10,16 93:5
94:11
**yeah** 10:5 11:7,16
12:4 21:8 25:15
27:21 31:13
33:22 35:22
37:2 39:19 40:8
44:8 46:2 57:24
59:12 61:12
63:11 67:5 70:3
78:20,21 87:13
90:1 91:9,16
92:9 95:22,23
96:7 97:16
103:23 109:24
111:8 113:12,14
116:3 121:8
127:2 130:24
140:23
**year** 10:14 11:23
17:17,20 103:21
**years** 11:2
**yelling** 66:1,2
**youth** 11:9,10,11

_____
**Z**
**Zack** 3:7 86:20
114:25 139:24
**zack@mitchells...**
3:9
**zone** 15:24,25
40:13 41:8
**zones** 15:14,15,16
15:17

_____
**0**

_____
**1**
**1** 4:8 7:20 144:8
**10** 4:17 126:6
127:18,21

**10:20** 1:13
**107** 34:8
**108** 34:10
**11** 4:18 131:10,13
**1144** 40:1
**12** 4:19 16:18
    133:17,21
**12-hour** 14:1
**123** 4:16
**127** 4:17
**12th** 134:1
**13** 4:20 135:24
**131** 4:18
**133** 4:19
**135** 4:20
**143** 144:8
**144** 145:6
**15** 50:15
**15-14-37(a)** 2:13
    144:11
**17** 4:9
**1700** 1:16 3:12
**17420** 74:8
**18th** 131:15 134:5
**19** 4:10 46:12

_____ **2** _____
**2** 4:9 17:5 129:21
**2-15-01** 12:16
**2:01.15** 120:15
**2:04** 42:11 45:25
    120:17
**2:06** 42:13
**2:07** 43:17 47:19
**2:11** 48:7
**2:12** 43:19
**2:13** 48:12
**2:16** 43:19 48:19
    50:2
**2:19** 50:11
**20-** 16:9
**2005** 8:16,19
**2006** 32:17,18
**2009** 6:24,25 8:2
**2010** 6:23
**2016** 12:11 16:9
    17:10
**2017** 13:10 17:10
    31:6 33:18
    113:21 129:22
    131:15 134:5
**2019** 18:16 134:1
**2020** 1:12 2:20
    142:7 144:17
    145:11
**23** 4:11 126:2
**26** 31:6 113:21

**2634** 47:5
**27** 1:12 2:20
**27th** 129:22
**29** 46:4,9,10

_____ **3** _____
**3** 4:10 19:14,18
**3:02** 44:2
**3:11** 50:19
**30** 4:12 11:2 47:6
    101:23 145:7
**30305** 3:8
**30312** 3:5
**30326** 1:18 3:13
**30342** 1:23
**32-second** 110:8
**344** 3:4
**3490** 3:8
**35** 44:7
**37** 4:13 115:21
**38** 4:14
**3rd** 12:10

_____ **4** _____
**4** 4:11 24:1,4
    39:25
**4:38** 45:13
**418** 110:7
**423** 38:11
**438** 44:20
**44** 94:25
**465** 19:21
**49** 118:4

_____ **5** _____
**5** 4:12 30:16,19
**50** 12:3
**51** 42:15,22
**51st** 42:16,21
**52-second** 115:22
**5E** 42:24
**5L** 42:25 43:1

_____ **6** _____
**6** 4:4,13 6:24 37:8
    37:11 44:20
**636** 1:22
**65** 4:15
**650** 3:8
**678-428-3562**
    1:24
**69** 34:2 35:2 41:21
    46:12 74:10
**6tlanta** 3:13

_____ **7** _____
**7** 4:8,14 39:2

_____ **8** _____
**8** 4:15 65:9
**8.B** 2:6
**8th** 144:17

_____ **9** _____
**9** 4:16 124:5,8
**9-11-28(d)** 144:11
**911** 7:10 34:20
    35:4 36:3,16
    46:1,2 47:10
    78:24 120:15,20
    120:23
**950** 1:17 3:12