## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MATTHEW SOLON,

     Plaintiff,

  v.

JOSHUA A. HALE,
MICHAEL O'BRIEN, and
MICHAEL HORTON, individually,

     Defendants.

CIVIL ACTION FILE NO.:

1:19-cv-02467-JPB

## PLAINTIFF'S BRIEF IN OPPOSITION TO SUMMARY JUDGMENT

Drunk, insulting and armed with a gun, Dwight Cooper accosted Solon and his three friends in the dead of night outside a bar in Kennesaw. When Cooper pulled then gun from his waistband, Solon acted heroically. He ran at Cooper, wrenched the gun from his hand before his finger reached the trigger and hit Cooper on the head with the butt of the gun as he fell to the ground. Solon called an ambulance because Cooper was bleeding from the head. The police came too.

When Solon had the temerity to criticize the Defendants for how they handled their investigation, the Defendants taught him a lesson about questioning police authority. First they seized him and put him in the back of a patrol car just three minutes after they arrived in response to **his** 9-1-1 call. But time in the police

car only strengthened Solon's resolve to express his criticism for their actions. That was not the result they anticipated, so they decided to concoct probable cause to arrest him for battery, when his only real offense was "contempt of cop." Solon now seeks to hold Defendants accountable for seizing him on the scene and arresting him without probable cause.

STATEMENT OF FACTS

*A.     The Incident*

On June 27, 2017 at approximately 2 a.m., Matthew Solon, Melissa Veitengruber, Michael Loudermilk and Shayna Thompson were standing together by their cars in the parking lot of Mazzy's Sports Bar & Grill in Kennesaw, Georgia. ("Mazzy's) *See* Veitengruber Decl., ¶ 2; Thompson Decl., ¶ 2.  Dwight Cooper approached Solon and his friends and asked for a cigarette. *See* Veitengruber Decl., ¶ 3; Thompson Decl., ¶ 3. Solon and his friends told Cooper they did not have any cigarettes. Solon Dep. 25:7-8.

Cooper, who was visibly drunk, directed a few derogatory comments at Ms. Veitengruber and Ms. Thompson, prompting someone to say "that it was (sic) time for you to leave." Veitengruber Decl., ¶ 3. Cooper's girlfriend came over and tried to get Cooper to leave but he pushed her away and said, "No, screw this. I'm not leaving. This is BS." Solon 26: 1-5.

Cooper lifted his shirt and displayed a gun tucked in his waistband. Solon

25: 23-24. Solon saw the gun and thought, "this guy is belligerently drunk. I need to do something otherwise it could be me; it could be my girlfriend or my friends who could get shot right now. Solon felt that he and his friends were in "immediate danger." Solon 28: 5-6.[1]

Solon saw Cooper pull the gun out and point it "in our direction." *See* Solon Dep. 27:18–23.  Before Cooper could put his finger on the trigger, Solon "was on him." Solon 28: 2-3. Solon ran at Cooper with "a lot of speed" and hit Cooper in the face with his elbow as he grabbed the "butt end of the weapon" with his other hand. Solon 29: 21-25 – 30:1-2. As he pulled the gun out of Cooper's hand, the ammunition clip fell out. Solon 30: 18-19. Solon, still moving forward, hit Cooper "with the butt end of the weapon in the back of the head at least two times" as his momentum drove Cooper to the ground. Solon 30:12-13, 31:8-9, 36:25–37:8 & 38:16–39:2.

Solon walked away and picked up the ammunition clip. He pulled out his phone to call 9-1-1 but saw that Cooper's girlfriend was trying to drag him to their car. Solon 31: 17-20, 24-25; Veitengruber Decl. ¶ 13 Thompson Decl. ¶12. She was screaming something to the effect of "no, we're leaving, we're leaving. We're

---

[1] Ms. Thompson was terrified when she saw the gun. She testified that, "I have a young child and I was petrified that he was about to lose his mother." When Ms. Veitengruber saw the gun, she "immediately feared for my safety and the safety of my friends because Cooper was drunk, angry and threatening us with a gun."

getting out of here. This isn't a big deal." Solon 32: 11-13.

Solon said it was a "big deal. He just pulled a gun on us. We could have been killed. I'm already calling 911." Solon, 32: 13-17 - 33. Solon walked over to Cooper and put his foot on Cooper's chest to "stop him from leaving." Solon 32: 8-9; 41: 1-6; Veitengruber Decl. ¶ 14. Loudermilk walked Solon away from Cooper. Thompson Decl. ¶15; Veitengruber Decl., ¶ 16 ("I saw Michael Loudermilk pushed (sic) Matt away from the guy.")  Solon did not punch or strike Cooper with the gun when he walked back over to him. *See* Solon Dep. 39:5–17 & 37:14–16.[2]

### B.   O'Brien's seizure

When Defendants arrived on the scene, they knew that Solon was the person who called 911, that he reported he had disarmed an attacker and that the gun was on the ground.  Doc 51-7, Cobb CAD, Hale Dash Cam: 02:06:07; O'Brien Dash Cam: 02:05:39 (Solon pointing to gun on ground between Solon and Defendants). Solon obeyed their commands and stood with his hands on the hood of the car in front of him. *Id.*

---

[2] Ms. Veitengruber had a clear view of what happened when Solon walked back over to Cooper. She recalled that, "Matt did not hit Cooper in the head with the gun. Matt did not hit Cooper at all; he put his foot on him so that he would stay down on the ground." Veitengruber Decl. ¶ 17. Ms. Thompson also had a clear view when Matt walked over to Cooper. She recalled that, "Matt did not hit Cooper in the head with the gun." Thompson Decl. ¶ 14.

A few seconds later, O'Brien walked over and stood behind Solon. After speaking to him for a few moments, O'Brien finally activated his body camera. Solon said he was unarmed and offered to be frisked. O'Brien BC-1 - 00:54:25-32. Solon stated he was a victim who called 911 to report a violent crime. O'Brien BC-1: 00:54:31-37. O'Brien cut him off saying, "I don't know who you are." Solon tried to point out that he had just been confronted by a belligerent drunk with armed with a deadly weapon. He said, "I could've got shot today." O'Brien BC-1: 00:54:43. O'Brien asked him whether he thought people ever lied to the police and told him O'Brien's job involved risking his life. O'Brien BC-1:  00:54:31-50.

After standing with his hands on the trunk of a car for three minutes, Mr. Solon hitched up his shorts with his right hand. O'Brien DC: 02:08:28. It is the only time Solon took his hand off the hood and touched his pants. O'Brien DC: 02:08:28. O'Brien grabbed Solon's hand and putting it back on the trunk of the car. Solon did not resist. O'Brien said, "Don't go reaching into your pockets." Solon calmly replied, "I wasn't. I was just pulling up my shorts." O'Brien BC 00:55:18- 00:55:30. O'Brien then frisked Mr. Solon and found no weapons or contraband on Mr. Solon. O'Brien DC: 02:08:28. Solon criticized O'Brien, saying, "**You're not exactly being cooperative either**." O'Brien BC-1 - 00:55:33. In response, O'Brien immediately handcuffed Solon, escorted him to his patrol car, put him in the back seat and shut the door. O'Brien BC-1:  00:55:52.

O'Brien told Hale that he "had to detain Solon in handcuffs [because] he was **continually** disobeying orders to keep his hands out of his pockets and remain still."   Doc. 51-6.   The video evidence establishes that O'Brien's statement is demonstrably untrue. O'Brien DC: 02:05:29 – 02:08:50; O'Brien BC-1.

In the three minutes prior to his seizure, Solon had (1) placed the gun on the ground and pointed at it, so the Defendants would know where it was;  (2) obeyed the officers' commands by putting his hands on the trunk, (3) told Hale that the gun belonged to Cooper; (4) spoken to O'Brien in a calm tone of voice; (5) attempted to tell O'Brien that he was the victim of a crime; (6) volunteered to be frisked; and (7) pulled up his pants once. O'Brien DC: 02:05:29 – 02:08:50; O'Brien BC-1.   The only thing Solon did *continuously* was criticize law enforcement's response to his 9-1-1 call.

Later, Solon criticized the way he had been treated by the Defendants. He calmly said, "Next time I won't call you, if this is the way it is going to be." O'Brien BC – 5 (Start time is 01:21:26). O'Brien responded, "And you wonder why you're in cuffs." *Id.* O'Brien told Solon why he seized him:  he was in the "back of the car" because he "started having an attitude, reaching into his pockets and saying 'Hey, I'm the hero." O'Brien BC – 5.[3]

---

[3] O'Brien made several derisive references to Solon being a hero at the scene. At one point, Solon overheard a conversation O'Brien was having with another

### C.   Evidence available before Plaintiff charged

Defendant Hale spoke with Cooper and his girlfriend, Sydney Fields. Neither one accused Solon of striking Cooper in the head with the gun after he was disarmed. (Hale Dep. 60: 1-21.) Nothing they said bore on Hale's probable cause determination. (Hale 82: 18-25.)

Hale interviewed Shayna Thompson, Brad Loudermilk and Melissa Veitengruber **before** he spoke to Solon or watched the Mazzy's video. (Hale Dep. 63:8-23.) These three eyewitnesses gave Hale no reason to suspect Solon did anything other than act in self-defense. (Hale Dep. 68: 21-24 – 69: 8-9 (Loudermilk); 70:17-21;  70: 2-25 – 71:1(Veitengruber); 80: 18-23 (Thompson).

Solon was held in O'Brien's car for approximately 24 minutes before Hale finally interviewed him the first time.[4] O'Brien DC: 02:08:28 – 02:34:27. Before he interviewed Solon, Hale conferred with Horton and O'Brien for roughly five minutes. Hale DC 02:27:04 – 02:34:32.

---

officer and yelled, "I only saved their lives" from the back of the police car. O'Brien angrily retorted, "If you're a hero, I'll congratulate you sir." (O'Brien Dash Cam, 02:18:19.) It is clear that O'Brien lacked any empathy for the life or death confrontation Solon had just experienced.

[4] Hale interviewed Solon after speaking to the witnesses but before watching the Mazzy's video. (Hale Dep. 53:3–8).

As Hale took the handcuffs off, Solon criticized the way he had been treated by Defendants. Hale told him to lose the attitude. (O'Brien BC – 5) O'Brien attempted to justify his seizure of Solon and handed him a card so that he could file a complaint. (O'Brien BC – 5) Hale claims Solon admitted to striking Cooper in the head with the gun when he walked back over to him, but <u>Solon unequivocally denies ever making such a statement</u>, and his testimony was corroborated by two eyewitnesses. Thompson Decl., ¶ 17; Veitengruber Decl., ¶ 17.

Hale watched the Mazzy's surveillance video. It is unclear whether O'Brien and Horton also watched the video. Manning DC: 7:46-8:07 (showing Horton walking into Mazzy's behind Hale); O'Brien Dep. 52:14–18 ("I can't recall if I saw the video or not."); Veitengruber Decl., ¶ 22 (recalling that more than one officer went inside.). Defendant Hale conferred with Defendants O'Brien and Horton again after reviewing the Mazzy's video. Manning DC 13:16. Hale interviewed Solon a second time after watching the video and, after speaking to him for a few minutes, signaled to O'Brien, who walked over and arrested Solon. Manning DC 15:20 – 16:58; O'Brien BC-7 (arrest).

After watching the Mazzy's video, Hale did not follow up with Loudermilk, Thompson or Veitengruber and ask whether Solon hit Cooper in the head with the gun when he walked back over to him. Hale Dep. 81: 23-25 – 82: 1-2. Had he done

so, Veitengruber and Thompson would have told him that he was wrong, Solon did not hit Cooper again.  Veitengruber Decl. ¶¶ 17, 25; Thompson Decl. ¶¶ 14, 17. On the scene, when Veitengruber and Thompson realized why Hale was arresting Solon, they tried to tell the officers that Solon did not hit Cooper again. Veitengruber Decl. ¶¶ 24, 25; Thompson Decl. ¶ 22. The officers ignored the evidence offered by these eyewitnesses.

### D.   *Mazzy's surveillance video*

"[T]he quality of the [surveillance] video is poor," Doc. 51-2 ¶ 29, and certainly is not clear enough to tell what happened when Solon walked back over to Cooper after disarming him.[5] *See* Doc. 51-2 (Defendants' Statement of Material Facts).[6] Hale admitted that the surveillance video alone was not enough to make

---

[5] *See* Melvin Dep. 57:12–20 ("Q. Is it your testimony that video clearly and without dispute shows that Matt Solon raised his hand with a gun in it and smacked Mr. Cooper on the head? A. No, sir. It's not my testimony the video clearly shows that. My testimony is that the video shows *something occurred over there*, but I couple that with Mr. Solon's own statement that he went back and struck him, in his words, to subdue him, but he struck him again." (emphasis happened)). *See also* Hale Dep. 108:17–21 (testifying that video he observed at Mazzy's was "clearer" than video produced in discovery); Hale Dep. 117:4–10 (testifying that he could not see Solon pick up the gun in the video); Hale Dep. 121:1–6 (testifying that he used Solon's confession that he struck Cooper with the gun while Cooper was on the ground, along with the video, to put "those two pieces of the puzzle together" to find probable cause).

[6] Although Hale now claims that the video he reviewed at Mazzy's that night was "clearer" than the video provided by Defendants in discovery, the custodian of the original video testified that it is of the same quality as the video that can be seen at Mazzy's on its surveillance system. *See* Verstraete Dec. ¶¶ 8, 11 (testifying that

out whether probable cause existed to arrest Plaintiff.

> Q. If you had not had Mr. Solon's statement in that
> moment, would you have investigated further?
> A. If I did not have his statement, yes. Sir.
> Q. Would you take the time to confirm what you thought
> you saw in the video by speaking to the other witnesses
> on the scene?
> A. It's possible.

Hale Dep. 123:21-25 – 124:1-2; *see also* Hale Dep. 121:1–123:23 (testifying that

"putting those two pieces of the puzzle together, because I used his statement and

the video to determine the probable cause that a crime had been committed."

## ARGUMENT AND CITATION OF AUTHORITY

### I.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the moving party

demonstrates that no disputed issue of material fact exists. *Carter v. Butts Cty*, 821

F.3d 1310, 1318 (11th Cir. 2016). Even when a genuine issue of material fact is

"created solely by the testimony of a party," the case should be put to a jury.

*Feliciano v. City of Miami Beach*, 707 Fed 1244, 1247 (11th Cir. 2013). If a conflict in

---

the surveillance video from Mazzy's was identical to the video provided by
Defendants in discovery). Hale is either mistaken or not telling the truth about the
quality of the video at Mazzy's. Doc. 51-2 at ¶ 30 & Hale Dep. 108:17-21.

the evidence arises, the Court must credit the nonmovant's version. *Id.* at 1248. Even if the Court "believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices." *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006). Credibility determinations and the weighing of evidence "are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This case involves critical video evidence of the underlying incident and the Defendants' conduct on the scene. At summary judgment, a Court confronting video evidence can only use a video to disregard plaintiff's version if it "completely and clearly contradicts" the plaintiff's testimony. *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013).

> As a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature.

*Feliciano*, 707 F3d at 1253.

Defendants invite the Court to disregard the summary judgment standard in multiple instances. Defendants ask the Court to ignore that a material issue of fact remains as to whether Solon ever told Hale that he hit Cooper in the head with the gun after he disarmed him and walked away. Defendants ask the Court to

interpret the surveillance video in the Defendant's favor, even as they concede that the video is of "poor quality," does not utterly discredit Solon's version of events, and concededly is not enough to give rise to probable cause. Defendants' ask the Court to disregard eyewitness testimony and objective evidence that is consistent with Solon's version of events. Finally, Defendants ask the Court to ignore video evidence that *does utterly discredit* O'Brien's purported rationale for seizing Solon just three minutes after arriving on the scene. The Court should reject the Defendants invitation, faithfully apply the summary judgment standard, and deny summary judgment.

## I.    THE FALSE ARREST CLAIM: ON SOLON'S FACTS, THERE IS NO EVIDENCE THAT SOLON COMMITTED ANY CRIME

"Whether an arresting officer possesses probable cause or arguable probable cause naturally depends on the elements of the alleged crime and the operative fact pattern." *Skop*, 485 F.3d at 1137–38. Solon was charged with two crimes: (1) O.C.G.A. § 16-5-23.1 (battery with substantial physical harm); and (2) O.C.G.A. § 16-11-106(b)(1) (possession of a weapon during commission of a crime). The parties agree that the probable cause determination turns on a single question: Under the totality of the circumstances known to the Defendants, would an objectively reasonable officer believe that Solon struck Cooper in the head with the

gun after he was initially disarmed?[7]  Accepting Solon's version of events as true, the answer is "No."

A.  The Defendants Lacked Probable Cause, or even Arguable Probable Cause to Arrest Solon

Solon's version of events is that he struck Cooper twice in the head, causing Cooper's head injury, during the first encounter. Solon walked away from Cooper and picked up the ammunition clip – not the gun – that had fallen out during the struggle. When he saw Cooper's girlfriend pulling Cooper towards his car, Solon walked over and put his foot on his chest – *he did not hit him on the head with the gun*. Three eyewitnesses, Ms. Veitengruber, Mr. Loudermilk and Ms. Thompson were on the scene and corroborated Solon's version of events. Finally, the Mazzy's video, while hardly clear, would allow a reasonable jury to accept Solon's version of events.

So construed, an objectively reasonable officer on the scene would have known that: (a) Solon struck Cooper in the head, causing his injuries, when he initially disarmed him; (b) Solon denied ever striking Cooper in the head after he disarmed him; (c) every eyewitness stated that Solon did not strike Cooper in the

---

[7]Defendants agree that Solon's original use of force – including striking Cooper at least twice in the head with the gun during the initial confrontation – were justified by self-defense and were not relevant to the probable cause determination. (Hale Dep. 77:23–78:1.)

head after he disarmed him; and (d) the Mazzy's video was too grainy, distant and unclear to support probable cause, given the eyewitness testimony and Solon's denial.  In other word, Solon acted in defense of self and others and there was no evidence – thus no arguable probable cause – to arrest Solon for a crime.

Consider Solon's facts alongside Officer Hale's factual basis for probable cause. Hale testified that,

> [The video] showed me the probable cause that he struck Mr. Cooper  in the head with the gun based – putting those two pieces of the puzzle together, because I used his statement and the video to determine the probable cause that a crime had been committed.

(Hale Dep., p 121: 1-6.) But under Solon's facts, Hale did not have the admission that was so critical to his probable cause determination. That, in turn, would allow a reasonable jury to conclude that Hale fabricated evidence to support probable cause, namely, Solon's admission.  Where a party has misrepresented a material fact, a finder of fact is entitled to call the whole of their testimony into doubt.[8]

Putting aside the reasonable inference that Hale fabricated probable cause,

---

[8] *See* Charles A. Wright et al., 10A *Fed. Prac. & Proc. Civ.* § 2726 (3d ed.) ("[I]f the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied . . . ."); *The Santissima Trinidad*, 20 U.S. 283, 339 (1822) ("But where the party speaks to a fact in respect to which he cannot be presumed liable to mistake . . . it is extremely difficult to exempt him from the charge of deliberate falsehood; and Courts of justice, under such circumstances, are bound, upon principles of law, and morality and justice, to apply the maxim *falsus in uno, falsus in omnibus*.").

Hale readily admitted that he would not have relied on the video alone to make a probable cause determination; he would have *investigated further*, perhaps by speaking to the three eyewitnesses on the scene. (Hale Dep. 123: 21-25 – 126: 1-2.) But Hale did not follow up with Loudermilk, Veitengruber and Thompson and confirm what happened when Solon went back over to Cooper "[b]ecause I felt, the based on Mr. Solon's statement and the video, I'd established enough probable cause to make my arrest." (Hale Dep. 121: 25 – 122: 1-18.)[9]  A jury could reasonably conclude that Hale had a duty to investigate further – as he conceded he needed to do – by interviewing the eyewitnesses on the scene, rather than making a probable cause determination based solely upon the Mazzy's video.

The Fourth Amendment requires that law enforcement conduct a reasonable investigation. An officer conducts a constitutionally unreasonable investigation by "turn[ing] a blind eye to exculpatory information" or investigating "in a biased fashion or elect[ing] not to obtain easily discoverable facts." *Kingsland*, 382 F.3d at 1228–29. Where officers have at their fingertips

---

[9] Hale made a second material misrepresentation concerning Solon's statement. According to Hale, Solon told him that the gun fell to the ground during the initial struggle and Solon went back to pick it up.  (Hale Dep. 116.) That is demonstrably untrue. Solon and the eyewitnesses testified that the ammunition clip- not the gun – fell out. Solon Dep. 30:18–31:15. Furthermore, the Mazzy's video supports Solon's testimony that he struck Cooper at least twice with the butt end of the gun in the process of disarming him.

"verifiable exculpatory information" in the face of otherwise "weak evidence," and then "fail[] to look at or inquire about the [evidence]" prior to making an arrest, the officers lack arguable probable cause. *Cozzi*, 892 F.3d at 1294.[10] Finally, for purposes of qualified immunity, officers are charged with knowledge of readily available facts even if they did not bother to discover them at the time of arrest.[11]

Construed in Solon's favor, the facts are that Hale reviewed a grainy video and concluded that Solon went back over and struck Cooper on the head with the gun after disarming him. He had three eyewitnesses on the scene who, upon hearing what he thought he saw on the video, told him he was wrong. Veitengruber Decl. ¶¶ 24, 25. Hale ignored them. Ignoring readily available eyewitnesses on the way to a probable cause determination violates the Fourth Amendment. *See Cozzi*, *supra*.

Hale throws one last hail Mary. He contends that "[d]espite the conflicting testimony of Hale and Solon regarding hat Solon told Hale about his second

---

[10] *See also Turnbull v. Brown*, 4:16-cv-37-HLM, ECF No. 79, at *54–57 (N.D. Ga. Apr. 11, 2018) (finding no arguable probable cause based on an officer's fixation on weak inculpatory evidence and ignoring of strong exculpatory evidence).

[11] *See Cozzi v. City of Birmingham*, 892 F.3d 1288, 1297 (11th Cir. 2018) ("[W]e must also consider the information tending to exculpate Cozzi that was available to Thomas when he made the arrest."); *Kingsland v. City of Miami*, 382 F.3d 1228 (11th Cir. 2004).

interaction with Cooper, it is respectfully submitted that the video, standing alone, provided a basis for Hale to have reasonably concluded that Solon had committed battery of Cooper." (D. SMF ¶ 41.) Aware that he needs an endzone to endzone throw, Hale enlists a star "quarterback" – John Melvin, former Acting District Attorney for Cobb County.[12]  But even Melvin testified that the video was not clear enough to determine what happened. Melvin Dep. 57:12–20. Melvin tries hard to bail out "the team in blue," but his throw should not make the line of scrimmage.

The law is crystal clear – unless the Mazzy's video "blatantly contradicts" Solon's version of events "so that no jury could reasonably believe it," the Court is bound to apply the traditional summary judgment standard.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Perez v. Suszcynski*, 809 F.3d 1213, 1221 (11th Cir. 2016).[13]

---

[12] Solon has objected and moved to strike all of Melvin's testimony, as well as the Amended Dismissal, as it is immaterial (Hale did not consult with Melvin prior to making the arrest), constitutes improper expert testimony from a witness who was not disclosed as an expert under Fed. R. Civ. Pro. 26.1, and is an improper attempt to bolster Hale's credibility on an ultimate issue – whether an objectively reasonable officer could rely on the video alone to find probable cause. *See* P. Resp. DSMF, ¶ 37 et seq.

[13] *See, e.g.*, *Patel v. City of Madison, Alabama*, 959 F.3d 1330, 1332-33 (11th Cir. 2020) (affirming denial of summary judgment  because the video recordings from two police dashboard cameras were unable to definitively resolve the parties' dispute about an officer's use of force); *Purmophani-Esfahani v. Gee*, 625 F.3d 1313 (11th Cir. 2010) (crediting plaintiff's version of events where closed-circuit video cameras did not provide an unobstructed view of events),  *Shaw v. City of Selma*, 884 F.3d 1093, 1097, n. 3 (11th Cir. 2018) (where video did not clearly depict that suspect was raising his arm, the Court "assumed he did not raise it" for summary judgment purposes); *Logan v. Smith*, 439 Fed. Appx. 798, 801 (11th Cir. 2011)

And crediting Solon's versions of events means construing any ambiguities in the Mazzy's video (there are plenty) in Solon's favor. For example, the video depicts Solon picking a dark object off the ground after the initial altercation but, as Hale conceded, it is impossible to tell whether the object was the gun. The Court must construe this ambiguity so that it aligns with Solon's version of events - he picked up the ammunition clip, not the gun.  When Solon walks back over to Cooper, the Court must resolve the ambiguity not as the Defendants wish but so that it aligns with Solon's version of events – he put his foot on Cooper's chest to keep him on the ground and told him to stay down until the police came.

### B. <u>Hale Is Not Entitled To Qualified Immunity</u>

In the false arrest context, the qualified immunity analysis is straightforward. Arguable probable cause exists when "reasonable officers in the acting under the same circumstances and possession the same knowledge as the arresting officer could have believed that probable cause existed to arrest." *Skop v. City of Atlanta*, 485 F.3d 1130, 1144 (11th Cir. 2007). Binding precedent in the

---

(reversing summary judgment where video did not "obviously contradict," plaintiff's version of events because videos were "low resolution" and ultimately "insufficient" to conclusively establish what happened); *Collar v. Austin*, 86 F. Supp. 3d 1294, 1303 (S.D. Ala. 2015) (holding that thirty-second video which showed unarmed student moving his feet and arms in manner that could possibly mimic motions of boxer in ring, and kneeling as police officer retreated, did not so utterly discredit version of events set forth such that no reasonable jury could believe it).

Eleventh Circuit "clearly established, at the time of [Solon's] arrest, that an arrest made without arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures. *Id.*; *see also Cozzi v. City of Birmingham*, 892 F.3d 1288, 1297–98 (11th Cir. 2018) (same). Thus, contrary to Defendants' argument, the Eleventh Circuit does not require near identical facts in a prior case to survive qualified immunity in a false arrest case.

Construing the facts in Solon's favor, no objectively reasonable officer would have believed that the Mazzy's video, without more, established probable cause to arrest Solon. Moreover, no objectively reasonable officer would have believed that fabricating evidence – Solon's alleged admission – to establish probable cause passed constitutional muster. *See Kingsland v. City of Miami*, 382 F. 3d 1220, 1232 (11th Cir. 2004) ("falsifying facts to establish probable cause is patently unconstitutional and has been so long before Kingsland's arrest in 1995"). Finally, every objectively reasonable officer charged with knowledge of readily available exculpatory information – eyewitnesses present on the scene – would have known to investigate further and, upon doing so, concluded that there was no probable cause to arrest Solon. *Id.* at 1229 (finding in part that offices had a duty to determine whether there were witnesses available to attest to who was at fault in the underlying accident); *Ortega v. Christian*, 85 F.3d 1521, 1524 (11th Cir. 1996) (finding on probable cause where arresting officer relied on unsubstantiated

informant's tip, failed to take independent steps to investigate the tip and did not have any evidence which would have corroborated the tip); *Cozzi*, *supra* at 1297 (finding no arguable cause where officer was confronted with readily verifiable exculpatory information and failed to verify that information).

## II.   O'BRIEN'S SEIZURE WAS UNLAWFUL BECAUSE IT WAS A FULL-BLOWN CUSTODIAL ARREST WITHOUT PROBABLE CAUSE, OTHERWISE EXCEEDED THE SCOPE OF A *TERRY* STOP, AND WAS RETALIATION FOR PROTECTED SPEECH

Defendant O'Brien moved for summary judgment asserting that his seizure of Plaintiff was only a limited *Terry* seizure, that he had reasonable suspicion, and that, in any event, he is entitled to qualified immunity. O'Brien is incorrect for at least three reasons.[14]

First, the seizure was a full-blown arrest because a reasonable person in the Plaintiff's position would have understood the seizure to constitute a restraint on freedom of the degree which the law associates with formal arrest.

Second, a permissible *Terry* seizure must be carefully circumscribed, meaning that "the scope of the stop 'must be carefully tailored to its underlying justification.'" *United States v. Campbell*, No. 16-10128, 2020 WL 4726652, at *6 (11th Cir. Aug. 14, 2020) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). To the extent O'Brien initiated a *Terry* seizure, it was not constitutionally justified.

---

[14] Plaintiff pursues this claim only as to Defendant O'Brien.

Third, Plaintiff's facts allow a reasonable jury to conclude that he was arrested in retaliation for his speech. Under the First Amendment analysis, there are disputed issue of fact with regard to the existence of arguable justification as well as the differential treatment of other would-be suspects under e.g., *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019).

### A.    *O'Brien subjected Plaintiff to a custodial arrest*

Defendants' briefing on O'Brien's initial seizure is devoted to the argument that Plaintiff's detention was lawful at its inception.[15] But Defendants do not address the line of demarcation between an otherwise permissible *Terry* stop and a custodial arrest, for which probable cause is required. This is critical because "a seizure that is reasonable at its inception may quickly become *unreasonable* if it extends beyond its unique justification." *Croom v. Balkwill*, 645 F.3d 1240, 1250 (11th Cir. 2011); *Campbell*, 2020 WL 4726652, at *6. Applying this proper test to the facts on summary judgment, established law compels the conclusion that O'Brien subjected Plaintiff to a full custodial arrest.

"A seizure is an arrest rather than a *Terry* detention if 'a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with

---

[15] In the next subsection, Plaintiff shows this is incorrect.

formal arrest.'" Wayne R. LaFave, 3 *Search and Seizure: A Treatise on the Fourth Amendment* § 5.1(a) (5th ed. 2019) (quoting *United States v. Corral-Franco*, 848 F.2d 536 (5th Cir. 1988)). "This can occur even when the officer has told the defendant he is not under arrest." *Id.*

In determining whether a reasonable person in Plaintiff's shoes would have believed themselves subject to a restriction of liberty commensurate with formal arrest, the cases point to two factors which push strongly towards a custodial arrest. First, putting a detainee in the back of a police car is only consistent with a permissible *Terry* seizure in "unique circumstances." 4 *Search and Seizure* § 9.2(d). Generally, "it cannot be said that such action would ordinarily be a permissible part of a stopping for investigation." *Id.* Second, the cases make clear that "handcuffing of the suspect is not ordinarily proper" in a *Terry* seizure. Handcuffing may be permitted where the suspect[] attempt[s] to 'frustrate further inquiry.' [But] [e]ven then, such restraint 'must be temporary,' and thus, 'absent other threatening circumstances, once the pat-down reveals the absence of weapons the handcuffs should be removed.'" *Id.*

On Plaintiff's facts, he was handcuffed and placed into the back of O'Brien's vehicle for an extended period of time and was not released from being detained until he was able to post bond the next day. The Eleventh Circuit has described this as "a severe form of intrusion" justified only by unusual circumstances, which

are not present here. *United States v. Gil*, 204 F.3d 1347, 1350–51 (11th Cir. 2000) (denying motion to suppress and finding handcuffing was justified because officers had reason to believe suspect was armed but they were not able to frisk her). When O'Brien handcuffed Plaintiff, he *knew* that Plaintiff was unarmed because he had just frisked him. O'Brien DC: 02:08:28. O'Brien also knew, on Plaintiff's facts, that Plaintiff had done nothing to frustrate any investigation and there was no cause to believe that he might: it was Plaintiff who called police and when they responded, he followed every direction (of dispatch and law enforcement) and answered every question. O'Brien DC: 02:05:29 – 02:08:50; O'Brien BC-1. On these facts, a reasonable jury could find that a reasonable person would believe Plaintiff was subjected to a formal arrest.

### B. O'Brien's seizure was not justified by any permissible **Terry** exception to the Fourth Amendment's probable cause requirement

As a "general principle . . . Fourth Amendment seizures must be supported by the 'long prevailing standards' of probable cause[.]"[16] *Terry* presents a limited exception to this general rule; however, unless this exception applies, the Fourth Amendment's prohibition on seizures without probable cause governs.

---

[16] *Dunaway v. New York*, 442 U.S. 200, 212–13 (1979) ("The requirement of probable cause has roots that are deep in our history.") (citation and internal quotation marks omitted); *see also Michigan v. Summers*, 452 U.S. 692, 700 (1981) ("[E]very arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause.").

Although Plaintiff maintains that O'Brien cannot avail himself of the *Terry* exception because he made a custodial arrest, Plaintiff also shows that O'Brien's claimed *Terry* stop did not comply with well-established requirements such that it was constitutionally unreasonable. The "non-exclusive factors" for "evaluating the reasonableness of a *Terry* stop are: [1] the law enforcement purposes served by the detention, [2] the diligence with which the police pursue the investigation, [3] the scope and intrusiveness of the detention, and [4] the duration of the detention." *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007) (quotation marks and citation omitted).

Each of these factors weighs strongly in Plaintiff's favor. First, there was no legitimate law enforcement justification for the kind of seizure O'Brien made. Clearly, not every *Terry* seizure justifies extended handcuffed detention in a police vehicle. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[T]he investigative methods employed should be *the least intrusive means* reasonably available to verify or dispel the officer's suspicion in a short period of time."). While law enforcement could have asked Plaintiff to stay put and frisked him to ensure he was unarmed, at the time of the seizure O'Brien *knew* that Plaintiff was cooperating with the investigation (which he himself had initiated by calling 911), had no intention to leave, and was unarmed. O'Brien DC – 02:05:29 - 02:08:50. "[T]he scope of the stop 'must be carefully tailored to its underlying justification.'" *Campbell*, 2020 WL

4726652, at *6 (quoting *Rodriguez*, 575 U.S. at 354). O'Brien argues the seizure was based on a need to investigate and ensure officer safety, but he has no facts to support any inference that cuffing and confining Plaintiff for an extended time was the least intrusive means of furthering the investigation or officer safety.

Second, there was no diligence on the scene. It is undisputed that no officer asked any witness whether Plaintiff committed a crime. Hale Dep. 81:23 – 82:2. O'Brien interviewed one witness for a few minutes on the scene. O'Brien Dep. 111:12–18. Horton interviewed no one. Horton Dep. 28:10–12. Meanwhile, Plaintiff was cuffed and locked up for an extended period of time.

Third, precedent confirms the obvious: handcuffing and putting someone in a police vehicle "is a severe form of intrusion," which is permissible in atypical circumstances not present here. *Gil*, 204 F.3d at 1350–51. It is hard to imagine a more intrusive seizure that could possibly fall under the ambit of *Terry*.

Fourth, the detention was extended. On Plaintiff's facts, at the time Plaintiff was seized, O'Brien had already made the decision that he would arrest and charge Plaintiff in retaliation for his speech. Indeed, Plaintiff was not released from this seizure until he bonded out of jail the next day.

C. **First Amendment retaliation because falsified reason, Solon rude, temporal connection, etc.**

"To state a claim for retaliation for exercising their First Amendment rights

a plaintiff must establish that: (1) the speech or act was constitutionally protected;
(2) the defendant's retaliatory conduct adversely affected the protected speech;
and (3) a causal connection existed between the retaliatory conduct and the
adverse effect on speech." *Bethel v. Town of Loxley*, 221 F. App'x 812, 813 (11th Cir.
2006). "[A]s a general matter the First Amendment prohibits government officials
from subjecting an individual to retaliatory actions, including criminal
prosecutions, for speaking out . . . ." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).[17]

Generally, law enforcement liability for seizures made in retaliation First
Amendment activity rises and falls with justification to seize. *See Redd v. City of
Enter.*, 140 F.3d 1378, 1383 (11th Cir. 1998). Because there was no justification for
O'Brien's seizure of Plaintiff, this claim should be allowed to proceed.

However, even if such justification exists, a civil rights plaintiff can bring a
retaliatory seizure claim where he was seized when "otherwise similarly situated
individuals not engaged in the same sort of protected speech had not been." *Nieves
v. Bartlett,* 139 S. Ct. 1715, 1727 (2019). Such facts are present here. At the time of
Plaintiff's seizure, O'Brien knew that Plaintiff was not trying to leave, was
answering all questions put to him after summoning police to the scene, and was

---

[17] Defendants complain there are no published Eleventh Circuit decisions
containing the phrase "retaliatory detention" on Westlaw. Doc. 51-1 at 13. That is
irrelevant where the applicable standard is well established.

unarmed. With regard to the comparators—all other persons on the scene—O'Brien had no such guarantees of officer safety and cooperation. At that time, the justifications for any *Terry* seizure were *not present* for Plaintiff but *were present* for every other person there. The critical difference between Plaintiff and the rest was that he was the only witness who had an "attitude." With these facts, a jury should determine the merits of Plaintiff's First Amendment claim.

### D.   *O'Brien is not entitled to qualified immunity*

The prohibition on unreasonable searches and seizures has long been clearly established. *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007). To the extent O'Brien formally arrested Plaintiff, the qualified immunity standard asks whether there was arguable probable cause for the arrest. *Id.* There was not any justification to believe Plaintiff committed a crime at the time O'Brien seized him. O'Brien does not argue otherwise.

To the extent Plaintiff's seizure was only a *Terry* stop, the question is whether such a seizure was arguably justified. *Young v. Brady*, 793 F. App'x 905, 910 (11th Cir. 2019) (denying qualified immunity where there was no arguable reasonable suspicion). Here, all four factors used to determine the validity of the seizure point strongly and unambiguously to a finding that the seizure was not reasonable, such that there is no arguable basis for it.

## IV. CRITICAL VIDEO EVIDENCE IS INEXPLICABLY ABSENT, WHICH IS FURTHER REASON TO DENY SUMMARY JUDGMENT

There is critical evidence missing from this litigation without a reasonable explanation. Apart from sporadic clips from O'Brien, no officers used their body camera, or other readily available means of recording, to document any interview with Plaintiff or any other witness, contrary to Kennesaw Police Department policy and common sense. The absence of this evidence, without any reasonable explanation, is an additional reason this Court should deny summary judgment.

There is no documentation of critical evidence such as Plaintiff's statements to law enforcement, the quality of the video at Mazzy's, and the witnesses' statements, and Defendants have offered no compelling excuse for their failure to document these critical pieces of evidence. Spoliation remedies are not a neat fit. *See* Mary D. Fan, *Missing Police Body Camera Videos: Remedies, Evidentiary Fairness, and Automatic Activation*, 52 Georgia L. Rev. 57, 100–03 (2017). Primarily, this is because there is uncontroverted evidence that this video was not destroyed because it was never created. However, there is also evidence that Defendants were under a series of mandatory duties to create this evidence but unreasonably failed to do so. The Kennesaw Police Department has clear policies for recording interactions with civilians. The basic rule is that all interactions must be recorded.[18]

---

[18] Exhibit 4, KPD Recording Policy at 1 ("Officers shall activate the audio/video

Policy also provided that officers must consider any alternative means to record interviews using dash camera and microphone or internal car microphone or cell phones.[19] There is no dispute that Hale had the means to audio and video record any interview with any witness on the scene. Hale Dep. 27:2–21. Policy further required that if there was any portion of an incident that was not recorded, the officer must author a report explaining what happened and why it was not recorded, but no such report was authored regarding any investigation involving Plaintiff.[20]

Under such circumstances where body camera and other means of recording were not activated but should have been, commentators have urged courts to craft appropriate remedies to ensure basic fairness.[21] Despite the inapplicability of Rule 37 sanctions regarding electronically stored information, these commentators have encouraged courts to craft jury instructions that carefully balance the relevant interests. *See id*. This Court would be authorized to

---

equipment to record all contacts with citizens in the performance of official duties."); O'Brien Dep. 40:18–21.

[19] Exhibit 4, KPD Recording Policy at 2 ("[I]t is necessary to consider every method available to document contacts with citizens . . . ."); Hale Dep. 21:25–22–22:11; 27:2–9.

[20] Exhibit 4, KPD Recording Policy at 2; Hale Dep. 25:17-22.

[21] *See generally* Fan, *supra*; ACLU of Mass. & Samuelson Law, Tech. & Pub. Policy Clinic, *No Tape, No Testimony* (2016), *available at* https://www.law.berkeley.edu/wp-content/uploads/2016/11/SLTPPC_ACLU_BodyCameras_Final.pdf.

provide such an instruction, and regardless of whether it does so or not, the substantial questions arising from the absence of evidence that should be in the record presents an additional reason to deny summary judgment.

Respectfully submitted this 24th day of August, 2019.

/s/ William J. Atkins
William J. Atkins
Georgia Bar No. 027060

EDMOND, LINDSAY & ATKINS, LLP
344 Woodward Avenue, SE
Atlanta, Georgia 30312
(404) 525-1090
batkins@edmondfirm.com

/s/ Zack Greenamyre
Zack Greenamyre
Georgia Bar No. 293002
Attorney for Plaintiff

MITCHELL & SHAPIRO LLP
3490 Piedmont Road, Suite 650
Atlanta, Georgia 30305
404-812-4747
zack@mitchellshapiro.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

MATTHEW SOLON,

      Plaintiff,

  v.

JOSHUA A.  HALE,
MICHAEL O'BRIEN, and
MICHAEL HORTON, individually,

      Defendants.

CIVIL ACTION FILE NO.:

1:19-cv-02467-JPB

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on I electronically filed the foregoing via CM/ECF and

served the underlying documents via email pursuant to the parties' stipulation,

as follows:

      Alex Joseph
      ajospeh@grsmb.com

      Harvey Scott Gray
      hgray@grsmb.com

This 24th day of August, 2020.

      */s/ Zack Greenamyre*
      Zack Greenamyre
      Georgia Bar No. 293002
      *Attorney for Plaintiff*

MITCHELL & SHAPIRO LLP
3490 Piedmont Road, Suite 650
Atlanta, Georgia 30305

404-812-4747
zack@mitchellshapiro.com